UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

_____

| | |
|---|---|
| JOHN DOE,[1] | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| TRUSTEES OF DARTMOUTH COLLEGE | ) |
| | ) |
| Defendant | ) |

Civil Action No._____

_____

## **VERIFIED COMPLAINT AND JURY DEMAND**

### **INTRODUCTION**

1.      This lawsuit arises out of defendant Dartmouth College's ("Dartmouth") unjust and unlawful expulsion of Plaintiff John Doe ("Doe") in January 2024 for alleged sexual misconduct following an unfair, biased, and partial investigation and adjudication that was a result-drive determination, all to Doe's detriment.

2.      While Dartmouth engaged in a myriad of procedural and substantive errors throughout the investigation and adjudication, the three most significant issues are: (1) Dartmouth's erroneous decision to confer jurisdiction over the complaint of sexual misconduct, despite the fact that it was beyond the scope of Dartmouth's authority; (2) the Hearing Panel's decision that ignores entirely the fact of the exculpatory rape kit in evidence; and (3) the Hearing Panel's crediting of and reliance on an unreliable and incomprehensible Snapchat video produced by the Complainant, date-stamped a month and a half after the alleged incident.

---

[1] Plaintiff seeks to file this complaint and all pleadings under pseudonym due to the serious and false nature of the allegations against him and the privacy implications to both himself and Sally Smith, and has concurrently filed with this complaint a motion requesting such designation. Plaintiff will also file an affidavit, under seal, providing his name, address, and attesting to the accuracy of the facts alleged in the Complaint if the Court so requests.

3.      On or about November 3, 2022, Doe and Sally Smith ("Smith") had a consensual intimate encounter at Doe's apartment in Fairlee, Vermont, which included consensual sexual intercourse.

4.      Shortly thereafter, Smith made a complaint to Dartmouth, alleging that Doe engaged in nonconsensual sexual intercourse with her during their night together. Dartmouth opened an investigation into her complaint under its Sexual and Gender-Based Misconduct Policy ("SMP").

5.      Dartmouth failed to follow its own policy on sexual assault investigations by exceeding the scope of its jurisdiction and conducting a biased investigation and rendering a biased decision through numerous procedural irregularities.

6.      Dartmouth failed to fulfill its contractual obligation to provide a fair, thorough, and impartial investigation as a result of many deficiencies, including: Dartmouth's brazen choice to exceed the scope of its jurisdiction in investigating Smith's complaint; the investigator's failure to consider available objective evidence in the form of a rape kit; the investigator's inconsistent and arbitrary consideration of a video produced by Smith; allowing Assistant Vice President for Equity and Compliance and Title IX Coordinator Kristi Clemens ("Ms. Clemens"), who had been involved in documented racist incidents against Doe dating back to 2015, to make the initial determination on jurisdiction; by failing to remove Ms. Clemens from the investigation until the process was well underway; and numerous procedural issues before, during, and after the Hearing.

7.      Dartmouth, acting by and through its retained investigators, also failed and/or refused to pursue obvious areas of investigation and failed to conduct basic competent

2

investigations of Smith despite objective evidence of inconsistencies in Smith's account of the events.

8.      Dartmouth's quasi-judicial process for hearing Smith's complaint used a biased investigator, then replaced the original investigator with another biased investigator, and lacked the basic elements of due process and/or fundamental fairness.

9.      Dartmouth assigned an all-white Hearing Panel made up of employees of Grand River Solutions, a California-based company hired by Dartmouth, to review the findings of the investigation and impose a sanction on Doe.

10.      In addition to breaching the contract that exists between Dartmouth and Doe, Dartmouth's improper, inadequate, and biased investigation and hearing process also violated its statutory duty under Title IX by discriminating against Doe on the basis of his gender and its statutory duties under 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964 by discriminating against Doe on the basis of his race.

## PARTIES

11.      Doe is a Black male originally from the Democratic Republic of the Congo who presently resides in Vermont.  At all times relevant to this complaint, he was a Student at Dartmouth College, progressing from undergraduate, to Tuck Bridge program, to Geisel School of Medicine ("Geisel").

12.      Defendant Trustees of Dartmouth College is the board of trustees for Dartmouth College, a partially federally funded private liberal arts college in Hanover, New Hampshire.

## JURISDICTION AND VENUE

13.      This action arises out of Dartmouth's breach of its contractual and other obligations to Doe, as well as its violations of Title IX of the Educational Amendments of 1972

(20 U.S.C. § 1681), Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), and 42 U.S.C. § 1981.

14.     This Court has federal question jurisdiction and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because the federal law claims arise under the constitution and statutes of the United States and because the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

15.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of separate states and the amount in controversy exceeds $75,000 exclusive of interests and costs.

16.     This court has personal jurisdiction over Defendant the Trustees of Dartmouth College because it resides and conducts business within the State of New Hampshire.

17.     Venue is proper in this district under 28 U.S.C. § 1391(b).

**FACTS**

18.     Doe is a Black male.

19.     Doe grew up in the Democratic Republic of the Congo.

20.     Doe left the Democratic Republic of the Congo in 2011 because of political instability and threats to his family.

21.     Doe and his sisters sought refuge in the United States in 2011 to join their mother, who had immigrated in 2003.

22.     Upon arriving in the United States, Doe's mother grappled with severe financial hardships exacerbated by a workplace accident which had left her disabled.  Doe took on the

responsibility of supporting his family, engaging in odd jobs and extended hours of manual labor to make ends meet and cover bills.

23.     After a year, Doe decided to resume his education, studying in English, his fifth language, and juggling the roles of student and provider.

24.     Doe earned an associate degree in chemistry.

25.     Doe went on to earned a bachelor's degree in psychology from Dartmouth.

26.     Doe secured acceptance into Geisel, Dartmouth College's Medical School, and relied on financial aid to provide housing, facilitating the relocation of his mother and sisters to join him.

27.     Doe has been a student at Geisel for the past seven years, with a focus on neurosurgery.

28.     Outside of his education at Geisel, Doe runs a nonprofit organization, Bonsomi, which is dedicated to providing free healthcare access to vulnerable populations, especially women and children in his home country.

29.     Doe's medical school years at Geisel have been marred by discrimination, racism, and retaliation, in addition to the hardships posed by language and cultural barriers.

30.     Despite these hardships, Doe secured fifteen residency interviews, placing him in a strong position to secure a residency match in March 2024 and graduate in May 2024.

31.     Doe is weeks away from being matched with a residency and beginning his career as a doctor.

### Plaintiff's Interactions with Smith

32.     Doe met Smith on Bumble, a dating app, in early November 2022.  Bumble allows people to "swipe" on each other in three different modes: "Date"; "BFF"; and "Bizz."

Bumble only allows users to "match" with users who are using the same mode. Doe had decided to re-enter the dating scene in October of 2022, and "matched" with Smith in date mode. On the Bumble app in heterosexual dating mode, only women are able to initiate conversations with matches, and matches expire within 24 hours if conversation is not initiated.

33. Smith is not and has never been a Dartmouth student.

34. Smith was in Vermont as part of her nursing curriculum at Bethel University to complete a labor and delivery clinical rotation at a midwifery – not associated with Dartmouth or the hospital.

35. Smith initiated conversation with Doe in date mode, and they exchanged messages for a few hours on the day that they matched. Doe and Smith agreed to exchange phone numbers to transition away from communicating through the Bumble app.

36. Doe suggested they meet, and Smith agreed. Doe suggested several public meeting places for the date, including the Collis Center at Dartmouth, a community socializing venue.

37. Doe and Smith met at the Collis Center around 6:00 p.m. on Tuesday, November 1, 2022, and talked for hours. They sat in chairs facing each other, and spoke about their backgrounds, work, goals, families, and friends. Doe expressed his interest in finding a serious, meaningful relationship.

38. During this conversation, Doe learned that Smith was using a fake name on her Bumble profile but learned her real name at that time.

39. Smith also expressed her interest in finding a serious relationship, but she expressed mistrust towards Black Africans. She explained that she believes that Black Africans tend to use "sweet talking" to persuade women into having sex with them, and then abruptly end

the relationship.  She shared an example of one of her friends who dated a Black African man who "ghosted" her after they were intimate.  Doe disagreed with her generalization but was encouraged to hear that she was also looking for a longer-term relationship.

40.     Doe and Smith bonded over their backgrounds, as Smith's parents are originally from Haiti, and shared their experiences in their cultures as well as with issues they'd faced in New England including racism and discrimination.  They also bonded over their shared values and passion for global health.  Doe explained how he hopes to provide healthcare to vulnerable people through Bonsomi, and Smith shared photographs of a clinic her father was constructing in Haiti.

41.     When Smith called Doe over to her to show him the photographs, he got up and sat on the arm of the chair where she was sitting and remained there.  As their discussion progressed, they began flirting, exchanging glances, and touching hands.

42.     While flirting, Doe and Smith leaned towards each other as if to kiss.  Smith told Doe: "not on the first date, maybe second or third date."  Doe and Smith continued talking and flirting.

43.     Doe and Smith left the Collis Center around 1:00 a.m., walking out to their cars with their arms around each other's waist.  Upon reaching their cars, they turned their engines on to warm them up and continued talking.

44.     Smith leaned against her car and Doe put his arms around her waist.  They remained in this embrace until Smith suggested they get out of the cold and sit in Doe's car.

45.     Doe and Smith parted ways just before 2:00 a.m. on November 2, 2022, after talking in Doe's car for some time and expressing interest in seeing each other again at Doe's apartment the following day.

46.     Doe and Smith exchanged messages throughout the day on November 2, 2022. On Thursday, November 3, 2022, Doe messaged Smith asking if she still wanted to meet.  Smith responded that she did and that she would be leaving work early.  Smith asked Doe to pick her up from her apartment.

47.     On Thursday, November 3, 2022, Doe picked Smith up in his car at her address in Norwich, Vermont, and drove her to his house in Fairlee, Vermont, arriving there around 7:00 or 8:00 p.m.

48.     Doe and Smith initially sat on opposite sofas to watch a movie.  Eventually, Doe asked if Smith wanted to cuddle.  Smith stood up and came to Doe's sofa, where she laid against Doe with her body pressed against his body and rested her head and back against his chest, with Doe's arm across her chest.

49.     Doe and Smith watched the movie in that position and Smith mentioned that she was hungry.  Doe said he had food that his mother had brought him, so they went together into the kitchen, heated it in the microwave, and shared it.  They ate together on the couch and watched the movie and then resumed cuddling.

50.     While they were on the couch, Doe told Smith that he was anxious about a board exam he was preparing for.  Smith offered Doe encouragement, massaging the back of his head, and telling him all was going to be fine.

51.     Smith told Doe that she had to see a patient near Hanover, New Hampshire around 7:00 a.m. the next morning, and asked that she leave around 5:00 or 6:00 a.m.  Up until that time, Doe had assumed he was going to drive Smith home that night.

52.     Doe and Smith began flirting, by physical contact and staring at each other.

53.     Smith turned her body toward Doe and then grabbed the back of Doe's head and kissed him passionately on the lips.

54.     Smith and Doe continued kissing, and Doe kissed Smith on the neck.  Smith removed her shirt and pants as they continued to kiss and touch each other, remaining with only a bra on.

55.     Doe suggested they move into his bedroom.  Smith assisted Doe in lifting her up, wrapping her legs around his waist, and they kissed as they made their way into the bedroom.

56.     Doe was not able to lift Smith off the couch without her hopping onto him and wrapping her legs around him due to both the simple physics of the lift, as well as Doe's documented back injuries that previously required multiple cortisone shots.  Smith provided support in this position, allowing Doe to carry her.

57.     Doe placed Smith on his bed and then removed his shirt.

58.     Doe suffers from sexual dysfunction, a medical condition which significantly impacts his sexual performance.  Because of this condition, Doe is unable to have sex for more than a few minutes without ejaculating. He received treatment for this condition in 2021 but discontinued medication because of adverse side-effects.  He had discontinued the medication before meeting Smith.

59.     Given his worries about sexual contact ending prematurely and his fear of embarrassment, Doe decided to perform oral sex on Smith.  Smith opened her legs, indicating her willingness to engage, and then grabbed his head, moaned, and said "it feels good," while he was performing oral sex.

60.     After engaging in oral sex, Smith asked Doe to lie down on the bed and relax. She took his shorts off and put his penis against her vagina without inserting it in her vagina while she was moving on top of him.

61.     After a while, Doe asked Smith to stand so he could retrieve a condom from the nightstand drawer next to his bed.

62.     Smith stood, and as Doe got out of bed to retrieve the condom, Smith bent at the waist and placed her hands on the bed next to Doe, allowing Doe to initiate penile-vaginal intercourse from behind her.

63.     Intercourse lasted less than two minutes before Doe ejaculated.

64.     After Doe flushed the condom down the toilet in his bathroom, Smith asked him if it had broken.  Doe responded that it had not and asked why.  Smith replied that she was ovulating.

65.     Doe was worried and in panic and asked why she had not told him ahead of time. He asked if she had access to birth control pills.  Smith told him not to worry and that she had handled worse situations in the past.

66.     Doe and Smith cuddled and went to sleep until between 5:00 and 6:00 a.m.  Smith woke Doe up when she returned from the bathroom.  When she returned, he got up to go to the bathroom, and when he returned, they began cuddling and kissing.

67.     As they kissed, Smith said his first name twice, to which Doe responded "yes," twice.  Smith then asked Doe to "stop."  Doe stopped kissing her and looked at Smith.

68.     Doe asked Smith if she wanted him to drop her off to see her patient in Hanover or if she wanted him to drop her off at her home in Norwich.  Smith said she wanted to be

dropped off in Norwich, so he asked her to get ready.  Smith went to the living room to retrieve

her pants and shirt, and they both got dressed before Doe drove her home.

69.     As he was driving, Smith asked Doe why he had gone from being apparently

happy to being silent. Doe responded that everything was fine, but was confused by Smith's

mood change.  Smith put her hand under his while he drove.

70.     Doe asked if they would be meeting again and Smith said yes, and that she would

text him on Wednesday of the following week.

71.     Doe texted Smith over the weekend, asking how she was doing and whether she

was able to get the birth control pill.  She did not reply, so he called her several times, but she did

not answer.

72.     Smith picked up one of Doe's calls, on Sunday evening, November 6, 2022.  She

said she was with family in Connecticut and was able to see the doctor and address everything.

She assured him that everything was under control and that she would be back on Tuesday,

November 8, 2022, or Wednesday, November 9, 2022.

73.     Doe texted Smith on November 9, 2022, expressing concern that Smith

considered him a "one-night stand":

> I hope all is well.  This is my last attempt to reach out to you.  I could be wrong,
> but I have a strong impression that there is no reciprocal attraction.  The first time
> we met, you said Africans are bizarre because an African guy slept with your friend
> and then ghosted her.  I tried to be different with you, but I realized that maybe guys
> need to be more like that African guy.  How would you blame him?  Anyways, I
> hope all is well and enjoy.

74.     Doe's message was prompted by emotional pain and concern that he was being

used for sex and not a relationship.

75.     Smith responded on November 10, 2022:

> [John], I thought we were only friends.  When you decided you wanted to have sex, I asked you to stop.  I begged you to stop and you didn't.  This has nothing to do with African people, just your selfishness.

76.    What Smith was describing in her text was not what had happened between them. Doe previously thought that he had found somebody interested in a meaningful relationship, and now was being confronted with something horrible and false.  Doe was shocked, confused, upset, and responded emotionally:

> [Sally], I'm deeply concerned and speechless by this insult.  I decided to have sex? And you begged me to stop, but I continued, so that means I raped you?  Isn't it?

> So, you know what?  I'm not going to say what's on my mind.  I said this to you before and I'm going to stick with it: "I have deep respect for all women I had a sexual relationship with."  You including, and I will leave it as that.  For the rest, keep on living in your imaginary world.

77.    Doe felt hurt and decided to block Smith and delete her number from his contacts.

### Criminal Investigation

78.    On December 9, 2022, Doe received a visit at his apartment from Detective Chris Pilner.  Detective Pilner explained that he came from Sharon, Vermont, and asked Doe if he knew a woman named Sally.

79.    Detective Pilner told Doe that Smith had reported to the police that Doe engaged in non-consensual sex with Smith in the morning and had blocked her from leaving his apartment by standing against her and the door.

80.    Doe denied the allegations.

81.    Detective Pilner asked Doe if he knew that Smith was married with a child, which Doe did not—Smith told Doe that she was single and childless.

82.    Doe invited Detective Pilner to search his apartment because he had nothing to hide and again denied the allegation of non-consensual sex.

83.     Detective Pilner told Doe that Smith had made the accusation a month ago and
had not responded to attempts by officers to follow-up.

84.     Detective Pilner told Doe that Smith's husband was angry and was thinking about
coming to hurt Doe.  This warning prompted Doe to tell Detective Pilner about recent messages
and calls he had received from a man purporting to be "James from Ghana."

85.     "James from Ghana" initially contacted Doe under the pretense that he was a new
intern at the hospital.  However, upon inquiring further about the identify the texter, Doe realized
that there was no new intern by that name.  James texted him a number of times, most of which
Doe ignored, but eventually responded that there was no person in James' purported department
by that name.  James became angry and began sending threatening messages.

86.     Doe stopped communicating with James after receiving threats and insults.  James
sent Doe a picture detailing Doe's area, saying, "I already know you."  James sent the following
threatening message:

> You are a smart one.  I will deal with you differently.  I have your plate number.  I
> know how to deal with a smart pussy like you.  I know everything about you.  You
> don't know shit about me.  I will get you cornered.  Everything you worked for will
> go down the shit. You will see my face when that day comes.  It will happen so fast
> too.  For the next few nights, you will get a visit to your place.  I'm a man.  Did I
> get close to you and your car last night while you were sleeping?  How do you think
> I got that picture?

87.     On another date, Doe answered a phone call, not realizing that it was James using
another number, and heard a male voice say, "I will f*cking kill you when I see you.  I told them
I'll be waiting for you."  James continued sending threats and requests for money from different
numbers.

88.     Doe reported Detective Pilner's visit to Dr. John Dick, Associate Dean of Clinical
Education, Dr. Alison Holmes, the Associate Dean for Student Affairs, and Ms. Alison Ricker,

the Director of Clinical Curriculum, because he believed he was in danger.  Dr. Holmes told Doe

that there was nothing the school could do to assist him.

89.     Doe was so frightened after the threat from James that he talked with several

people, including friends and Ms. Ricker, about wanting a gun for protection.

90.     Doe stopped sleeping in his own apartment out of fear.

91.     Doe would later learn, through Dartmouth's investigative process, that Smith's

husband was indeed in Vermont at the time of James' threats.

92.     Doe was never charged with any crime relating to Smith's allegations or

otherwise.

### Smith's Complaint to Dartmouth

93.     On December 19, 2022, Smith filed a report to Dartmouth's Title IX Office,

alleging that Doe had raped her three times on or about November 3, 2022.

94.     On December 20, Dartmouth issued a Notice of Allegations to Doe notifying him

that a white female attorney at a New England law firm ("Investigator 1") had been assigned as

investigator.

### Dartmouth's Relevant Policies and Procedures

95.     At the time of the events relevant to this case, Dartmouth investigated and

administered discipline for allegations of sexual assault by students in accordance with both its

"Sexual and Gender Based Misconduct Policy" ("SMP") and its "Process for Resolving Reports

Against Students" ("PRP").  The SMP and the PRP that were in effect at all times relevant to this

complaint are attached hereto as **Exhibit A** and **Exhibit B**.

96.     Included as "Prohibited Conduct" under the SMP is "sexual assault", which is

defined in the SMP as:

[H]aving or attempting to have sexual contact with another individual without consent . . . Sexual contact includes:

1.      Sexual intercourse (anal, oral, or vaginal), including penetration with a body part (e.g., penis, finger, hand, or tongue) or an object, or requiring another to penetrate themselves with a body part or an object, however slight; or

2.      Sexual touching of the private body parts, including, but not limited to, intentional contact with the breasts, buttocks, groin, genitals, or other intimate part of an individual's body for the purpose of sexual gratification.

3.      Attempts to commit sexual assault.

Exhibit A at VI.C.

97.      The SMP defines "consent" as "an affirmative and willing agreement to engage in specific forms of sexual contact with another person," and states that "[c]onsent cannot be obtained through: 1. The use of coercion or force; or 2. By taking advantage of the incapacitation of another individual."  Exhibit A at VII.A.

98.      The PRP applies to:

[A]cts of Prohibited Conduct committed by Students that occur within Dartmouth's Education Program or Activity.  The term Education Program or Activity includes all of Dartmouth's operations, including locations, events, or circumstances over which Dartmouth exercised substantial control over both the Respondent and the context in which the Prohibited Conduct occurred; and any building owned or controlled by a student organization that is officially recognized by Dartmouth.  The Title IX regulations, which direct Dartmouth's response to sexual harassment as defined by the Title IX regulations, do not draw a line between on campus, off campus, or online, provided the conduct occurred in an Education Program or Activity in the United States.  Examples include Dartmouth-sponsored, Dartmouth-funded or otherwise Dartmouth-supported study off campus, research, internship, mentorship, summer session, conferences, meetings, social events, or other affiliated programs or premises.

In keeping with Dartmouth's educational mission and commitment to foster a learning, living, and working environment free from discrimination and harassment, this process also pertains to acts of Prohibited Conduct that may fall outside of the jurisdiction set forth in the May 2020 Title IX regulations, including additional forms of sexual and gender-based harassment, as well as conduct that occurs outside the United States, but still within an Education Program or Activity. Conduct outside of the United States, may include, for example, Dartmouth-

sponsored, Dartmouth-funded or otherwise Dartmouth-supported study abroad. Under limited circumstances, this process may apply to instances in which the conduct occurred outside of the Education Program or Activity.

Exhibit B at I.

99.     Pursuant to the PRP,

The Title IX Coordinator or Deputy Title IX Coordinator will be responsible for determining whether the reported conduct falls within the scope of the Policy and this process, and more specifically, whether the reported conduct falls within Title IX jurisdiction as defined by the Title IX regulations. If so, Dartmouth may move forward with a Formal Complaint process as described below. If not, Dartmouth may be required to dismiss any Formal Complaint.

The Title IX Coordinator or Deputy Title IX Coordinator will evaluate reasonably available information to make the following determinations:

1.     Did the reported conduct occur within Dartmouth's Education Program or Activity; this question considers:

a.     Does Dartmouth have substantial control over the Respondent; and

b.     Does Dartmouth have substantial control over the context in which the conduct is reported to have occurred; or

c.     Did the conduct occur in a building owned or controlled by a student organization that is officially recognized by Dartmouth;

2.     Did the reported conduct occur in the United States; and,

3.     Would the facts set forth by the report, if substantiated, constitute a violation of sexual harassment as defined by the Title IX regulations.

Based on the answers to these questions, the Title IX Coordinator will make a determination about scope and process."

Exhibit B at III.

100.     At the conclusion of the above inquiry, described as "a threshold determination

regarding scope and jurisdiction," the appropriate next steps are determined as follows:

Where the answer to these three questions is yes, and a Formal Complaint is filed, Dartmouth will follow the formal resolution process required by the Title IX regulations (Title IX Hearing Process). The Title IX Hearing Process includes cross-examination by the party's advisor. The hearing will allow the participants to simultaneously see and hear each other but may be conducted remotely through videoconferencing technology.

Where the answer to any of these three questions is no, Dartmouth will dismiss the allegations in the Formal Complaint related to sexual harassment as defined in the Title IX regulations.

Exhibit B at III.

101.    "In all stages of the process, Dartmouth will apply the preponderance of the

evidence standard (i.e., more likely than not) when determining whether Dartmouth policy has

been violated." Exhibit B at IV.

102.    Once formal resolution is initiated, "[t]he Title IX Office will appoint one or more

trained investigators to conduct a <u>prompt</u>, <u>thorough</u>, <u>fair and impartial investigation</u>."  Exhibit B

at VI.A.2 (emphasis added).  "Any investigator used by Dartmouth will receive annual training

on the issues related to . . . sexual assault . . . and on how to conduct an investigation that is fair

and impartial, provides parties with notice and a meaningful opportunity to be heard, and

protects the safety of complainants while promoting accountability."  Exhibit B at VI.A.2.  "The

investigator will be impartial and free from conflict of interest or bias."  Exhibit B at VI.A.2.

103.    At the outset of the investigation, the Title IX Coordinator provides notice to the

Complainant and Respondent that is required to include, *inter alia*, the nature of the reported

conduct, the reported policy violations, and how to challenge participation by the investigator on

the basis of a conflict of interest or bias.  Exhibit B at VI.A.4.

104.    During the investigation, the investigator will seek to meet separately with the

Complainant, Respondent, and relevant witnesses for interviews. "<u>The investigator will also</u>

<u>gather other relevant information or evidence, including documents, photographs,</u>

<u>communications</u> between the parties, and <u>medical records</u> (subject to the consent of the

applicable person), and other electronic records as appropriate.  The investigator will not require,

allow, rely upon, or otherwise use questions or evidence that constitute, or seek disclosure of,

information protected under a legally recognized privilege, unless the person holding such

privilege has waived the privilege."  Exhibit B at VI.A.5.

105.    "Both the Complainant and the Respondent are permitted to provide other relevant evidence to the investigator.  Evidence may be inculpatory or exculpatory.  Evidence includes any facts or information presented in support of an assertion and may include text messages, email exchanges, timelines, receipts, photographs, etc. . . . During the course of the investigation, the parties should bring any new or evolving evidence, such as harassing or retaliatory conduct, to the attention of the investigator.  The investigator may consider such information in the investigation and will also share any information about retaliation . . . with the Title IX Coordinator for further action."  Exhibit B at VI.A.7.

106.    "Information that does not directly relate to the facts at issue, but instead reflects upon the reputation, personality, qualities, or habits of an individual is character evidence and is not relevant to the determination of whether there is a Policy violation."  Exhibit B at VI.A.8.

107.    Once the fact-gathering portion of the investigation is concluded, the investigator will produce a written investigation report, which is intended to be "a fair and thorough summary of all relevant information gathered that is inculpatory or exculpatory the accounts of the Complainant, the Respondent or other witnesses."  Exhibit B at VI.A.11.

108.    "The investigation report will include a determination by the investigator whether the conduct alleged in the Formal Complaint falls within the scope of the Policy and the definitions of Prohibited Conduct.  In particular, the investigator will determine whether the conduct alleged, if substantiated, would constitute Prohibited Conduct.  This is not a determination of responsibility, nor does it involve a determination about the credibility of the information gathered; those decisions are reserved for the Hearing Panel."  Exhibit B at VI.A.11.

109.    The Title IX Coordinator will review the investigator's determination as to whether the conduct alleged in the Formal Complaint falls within the scope of the Policy and the

definitions of Prohibited Conduct.  Based on the determination by the investigator in the investigative report, the Title IX Coordinator must dismiss some or all of the allegations in the Formal Complaint if . . . the conduct did not occur within Dartmouth's education program or activity."  Exhibit B at VI.A.12.

110.    The Title XI Coordinator or designee will provide the parties with a written notice of hearing, to include:

> [T]he specific policy violations that will be the subject of the hearing; the date time, and location of the hearing; the names of the Hearing Panel members; how to challenge participation by the Hearing Panelists on the basis of conflict of interest or bias; the right to have an advisor present at the hearing and conduct cross-examination on the party's behalf under the Title IX Hearing Process; that Dartmouth will provide an advisor, without fee or charge, to conduct cross-examination on behalf of the party at the Title IX Hearing Process if the party does not have an advisor present for the Title IX Hearing Process; how to request that witnesses be present at the hearing; and, information about the specific hearing format for sexual harassment as defined by the Title IX regulations and/or other Prohibited Conduct.

Exhibit B at VI.A.13.

111.    "The Hearing Panel will determine: whether there is sufficient evidence, by a preponderance of the evidence, to support a finding of responsibility as to each element of each Policy violation at issue. If the Hearing Panel determines that the evidence is sufficient to support one or more policy violations, the Hearing Panel will issue a determination as to the appropriate sanction."  Exhibit B at VI.B.

112.    "A Hearing Panel consists of fair and impartial decision-makers who will conduct an objective evaluation of all relevant evidence, including both inculpatory or exculpatory evidence.  The role of the Hearing Panel is to provide all parties with an equitable opportunity to be heard; to serve as a safeguard on the reliability and accuracy of the investigative process; to give appropriate consideration to victim impact and mitigating factors; and to reach a full and

fair determination of any sanction, should there be a finding of responsibility."  Exhibit B at VI.B.

113.    "The Complainant and Respondent will be informed of the composition of the Hearing Panel and may raise a challenge for actual bias or conflict of interest to the Title IX Coordinator" who "shall render a determination in writing on any such challenge, which determination shall be final."  Exhibit B at VI.B.

114.    For hearings involving allegations of conduct outside of Title IX jurisdiction, "the parties will have the opportunity to submit questions through the Hearing Coordinator and Chair of the Hearing Panel, and the Hearing Panel may consider any information provided in the final investigation report that the Hearing Panel finds reliable and credible."  Exhibit B at VI.B.2.a. "Only relevant questions may be asked of a party or witness.  Before a Complainant, Respondent, or witness responds to a question, the Chair, in consultation with the Hearing Coordinator, will first determine whether the question is relevant and explain any decision to exclude a question as not relevant.  The Chair and Hearing Coordinator will be guided by the same relevance considerations set forth in Section VI.A.8 of this process."  Exhibit B at VI.B.2.a.i.

115.    After the Hearing Panel reaches a determination, "[t]he Chair will issue the written notice of outcome to the Complainant, the Respondent, and the Title IX Coordinator within ten (10) business days following the conclusion of the deliberations."  Exhibit B at VI.B.5.

116.    Either party may appeal the final determination of responsibility and/or the resulting sanction based on: "1.  Procedural irregularity that affected the outcome of the matter and/or sanction; 2. New evidence, not reasonably available at the time of the hearing regarding

responsibility or dismissal of the Formal Complaint, that could affect the outcome of the matter; [or] 3. The Title IX Coordinator, investigator(s), or any member of the Hearing Panel had a conflict of interest or bias for or against Complainants or Respondents generally or the individual Complainant or Respondent that affected the outcome of the matter." Exhibit B at VI.C.

117.    An appeal "must be submitted to the Title IX Coordinator within three (3) business days following delivery of the notice of the outcome. Each party may respond in writing to any appeal submitted by the other party. Written responses must be submitted within three (3) business days following delivery of the notice of the written appeal." Exhibit B at VI.C.

118.    "Dartmouth will not draw any adverse inference solely from a Complainant's or Respondent's decision not to participate in the investigation or any form of resolution under this policy; however, the Complainant or Respondent should be aware that declining to participate in the investigation may impact the admissibility of certain information or the timing and outcome of the case." Exhibit B at VI.D.

119.    The PRP states:

Dartmouth will seek to complete its investigation and disciplinary process, if any, in a prompt, fair, and impartial manner following the issuance of the notice of the investigation. This process contemplates reasonably prompt timeframes for the major stages of the investigation and resolution process, but Dartmouth may extend any timeframe in this policy for good cause . . . While requests for delays by the parties may be considered, Dartmouth cannot unduly or unreasonably delay the prompt resolution of a report under this policy.

Reasonable requests for delays by the parties will serve to extend the anticipated time period for resolution of the report. The Title IX Coordinator, in consultation with the investigator, has the authority to determine whether an extension is required or warranted by the circumstances, and will notify the parties in writing of any extension of the timeframes for good cause and the reason for the extension.

Exhibit B at VII.

120.    "Dartmouth's overarching goal is that all Complaints be investigated in a prompt, fair, and impartial manner." Exhibit B at VII.

## Dartmouth's Procedurally Deficient Process

121.    On December 20, 2020, Ms. Clemens, emailed a notice to Doe that he was accused of sexual misconduct violating the Dartmouth Sexual Misconduct Policy, and notifying him that Investigator 1 had been assigned as the investigator to conduct the investigation of Smith's complaint ("Investigation").

122.    At all times relevant to the Investigation, Investigator 1 was an agent of Dartmouth.

123.    Upon receiving the notice, Doe reached out to Ms. Clemens to seek clarification on how his case fell under Dartmouth's jurisdiction.  Ms. Clemens acknowledged his concerns, responding: "I can see you've been doing your homework," and asserting that it was not Doe's role to define the boundaries of Dartmouth's jurisdiction.

124.    On January 3, 2023, Ms. Clemens sent Doe a passage from the SMP, highlighting sections she believed gave Dartmouth the authority to investigate the matter:

> In the "Scope of Policy" section, it states that the policy applies to all Dartmouth students.  Further in that section, it states:
>
>> In keeping with Dartmouth's educational mission and commitment to foster a learning, living, and working environment free from discrimination and harassment, this policy also pertains to acts of Prohibited Conduct that may fall outside of the jurisdiction set forth in the May 2020 Title IX regulations, including additional forms of sexual and gender-based harassment, as well as conduct that occurs outside the United States, but still in an Education Program or Activity.  Conduct outside of the United States, may include, for example, Dartmouth-sponsored, Dartmouth-funded or otherwise Dartmouth-supported study abroad.  Under limited circumstances, this policy may also pertain to instances in which the conduct occurred outside of the Education Program or Activity.

22

The highlighted sections are those that give me the authority to investigate this report under the SMP.

125.    Over the course of several communications in January and February 2023, Doe asked Dartmouth to address his concerns regarding its exercise of jurisdiction and Ms. Clemens's history of racial bias against him, explained in additional detail *infra*, ¶¶ 277-289.  Doe was hesitant to participate in the investigation because of these concerns.  Doe's concerns were minimized and ignored.

126.    During these communications, Doe repeatedly noted past incidents, dating back to 2015, where Ms. Clemens engaged in racially biased behavior towards him and repeatedly asked for Ms. Clemens to be removed.

127.    Ms. Clemens was not removed initially.

128.    Investigator 1 interviewed Smith on January 12, 2023.

129.    Investigator 1 interviewed witnesses, including "Witness 1", Smith's brother, who would later become her Advisor; "Witness 2", the girlfriend of Witness 1; "Witness 3", Smith's husband; "Witness 4", named by Smith as her friend; "and "Witness 5", named by Smith as her best friend, between January 23, 2023, and February 3, 2023.

130.    Doe was not interviewed.

131.    Investigator 1 gathered other evidence from Smith, the witnesses, and Dartmouth.

132.    Doe was initially denied access to the evidence, despite repeatedly asking, but was eventually provided secure access to the evidence from March 3, 2023, to March 17, 2023.

133.    During the evidence review period, Doe learned from Smith's husband's interview transcript that when Smith called Dartmouth, "somebody" told her that Doe's "name has been circulating around for a while" and there was a "behavioral pattern" that "somebody needs to look into."

23

134.     On March 8, 2023, Ms. Clemens was removed from the investigation.  She had

overseen the investigation until that date and had made the initial determination of jurisdiction.

135.     On March 8, 2023, Ann James ("Ms. James"), a "Senior Solutions Specialist" at

Grand River Solutions, was named Acting Coordinator.

136.     Because Doe feared that Ms. Clemens's bias had influenced her determination of

jurisdiction, Smith's decision to move forward with a formal allegation, Investigator 1, and the

investigation itself, he sought to have Investigator 1 removed for bias as well.

137.     On May 26, 2023, Ms. James notified Doe that she decided to pause the hearing

timeline to assign a new investigator.  Ms. James told Doe that the initial investigation was not

properly conducted as it had been "rushed."

138.     On June 2, 2023, a white female employee of Grand River Solutions was

identified as the new investigator ("Investigator 2").

139.     On June 19, 2023, Investigator 2 met with Smith and her advisor, Witness 1.

140.     On August 6, 2023, Investigator 2 interviewed Doe.

141.     The complete investigation was not done in full, as promised by Ms. James.

142.     Doe was provided secure access to the "second evidence review" from September

5, 2023, to September 18, 2023.

143.     On September 19, 2023, Investigator 2 submitted her Final Report ("Final

Report").  Investigator 2's Final Report summarizes her interviews and some relevant evidence.

It concludes with a recitation of undisputed and disputed facts.

144.     Doe continued to question the fairness of the process.  On November 17, 2023, he

wrote to Ms. James, Investigator 2, Jennifer Larimore, another Grand River Solutions employee

("Ms. Larimore"), and Alejandro Diaz, Dartmouth's Chief Compliance Officer ("Mr. Diaz") to point out instances of bias and misrepresentation within the Final Report.

145.     Doe's hearing was initially scheduled to take place on December 7, 2023.

146.     Doe informed Ms. James a number of times that he would not be able to attend the hearing that day due to an all-day residency interview.  Ms. James refused to change the date of the hearing.

147.     Doe retained an Advisor approximately five days before the hearing, who also requested Ms. James change the date of the hearing to allow for preparation and to avoid her own scheduling conflicts.

148.     Doe's Advisor was provided with the evidentiary record and the Final Report on December 6, 2023.

149.     On December 6, 2023, Ms. James notified Doe that the hearing had been rescheduled for December 8, 2023, due to a medical concern with one of the panelists.

150.     On December 7, 2023, Ms. James notified Doe that one of the panelists had been replaced, and if Doe wanted to challenge his participation, he needed to inform her by 4:00 p.m. that same day.

151.     At 4:52 p.m. on December 7, 2023, Ms. James notified Doe that the replacement panelist "also had an urgent conflict arise" and was replaced by a third panelist.  Ms. James informed Doe that if he wanted to challenge the third panelist's participation, he would have to inform her of his objection by 8:00 a.m. the next day.

152.     Ms. James provided Doe exactly eight minutes during business hours to object to the new panelist.  This did not provide enough notice to meaningfully respond.

153.     Doe's hearing was convened on December 8, 2023.

154.     The three panelists were white employees of Grand River Solutions: Hearing

Chair, Dr. Adam Wolkoff; Hearing Panelist, Megan Altman-Cosgrove; and Hearing Panelist

Ashley Hull.

155.     During the hearing, it became apparent that despite Doe's Advisor timely

submitting questions to be asked on cross-examination, they were not submitted to the Hearing

Panel in advance and had to be submitted in the middle of the hearing for review.  Because of

this deficiency, the panel was not able to cross-reference the questions with the report and

appendix before them in a meaningful and timely way, harming their ability to make connections

between the questions and the evidence for the purpose of relevance.

156.     Notwithstanding its contractual obligations, Dartmouth did not issue the written

notice of income within ten (10) business days following the conclusion of deliberations.

157.     At 4:47 p.m. on December 22, 2023, Doe's Advisor contacted Ms. James to

inquire about the written notice of outcome because ten (10) business days had passed since the

hearing date.

158.     On December 24, 2023, Ms. James reported that an extension had been requested

and granted through January 10, 2024.  No good cause was provided.  Notwithstanding its

contractual obligations, Dartmouth failed to notify Doe in writing of any extension for good

cause and the reason for the extension.

159.     On January 8, 2024, Ms. James emailed Doe to inform him that the hearing

determination would be communicated on January 17, 2024.  Again, no good cause was

provided.  Notwithstanding its contractual obligations, Dartmouth failed to notify Doe in writing

of any extension for good cause and the reason for the extension.

160.     On January 16, 2024, Doe submitted a "Mitigation Statement" to the panel.

161. On January 16, 2024, Doe was told to come to campus the following day to receive the determination in person.

162. The panel found Doe responsible for violating the SMP and imposed the sanction of expulsion.

163. On January 22, 2024, Doe filed a request for appeal through his Advisor, detailing the procedural irregularities which affected the outcome of his matter, producing new evidence, and describing the instances of bias which affected the outcome of his matter.

164. On January 25, 2024, Ms. James granted Smith's request for an extension to respond to Doe's appeal.  Based on this extension, the deadline for Smith to respond was January 29, 2024.

165. After being asked to provide good cause for this extension, Ms. James told Doe, "I have determined that the requested one-business day extension was reasonable given the length of the written record – including the length of [John's] appeal submission – and the minimal impact of the request on the overall timeline.

166. Smith did not submit a response to Doe's appeal.

167. On February 1, 2024, Ms. James wrote to Doe offering him an "opportunity to clarify his appeal submission."  Ms. James wrote:

> Exhibit 1 to that submission contains records not previously submitted to either the investigator or the Hearing Panel.  In addition, those records are not explicitly referenced within the text of your appeal submission.  Upon review, these records do not, on their face, appear to be "new evidence" as defined in the Dartmouth College Sexual and Gender-Misconduct Policy (SMP) procedures and it is unclear how they relate to any of the grounds for appeal you have asserted.  Refraining from any assessment of the substance of the records, I therefore would like to give you the opportunity to explain how the records fit within the bounds of the three grounds for appeal outlined in the SMP procedures and how, if considered, they could have affected the outcome of the matter.

Please submit any clarification to me by 5:00 pm on Monday, February 5, 2024. Please note that should you elect to provide a clarification, I will provide the supplement to Complainant, who will have 3 business days to respond. If you are not interested in providing a further submission, please let me know and consideration of your existing appeal of January 22 will then proceed.

168. The timing of this communication was deeply concerning. Ms. James' email indicated that she had not yet turned the appeal and record over to Geisel Medical School Dean Duane A. Compton, PhD ("Dean Compton"), who should have been in possession of the appeal documents on January 22, 2024. This delay is highly irregular and violative of the PRP, and further prejudiced Doe by needlessly extending the timeline of his appeal.

169. Additionally, Ms. James's apparently unilateral determination that Doe's medical records did not relate to the grounds of his appeal was clearly erroneous, as the records were explicitly referenced within the text of the appeal. They were referenced in the section addressing the two bases for appeal: procedural irregularity and bias. Both bases were substantially addressed throughout the appeal submission and are both independent and legitimate grounds for appeal pursuant to the PRP.

170. Ms. James' erroneous determination caused Doe to, in the imperative interest of receiving a determination on appeal before the date of his residency match, sever his medical records from his appeal, depriving Dean Compton of a crucial piece of objective evidence corroborating Doe's sexual dysfunction and directly contradicting Smith's claims that he raped her three times, with the final rape lasting for an hour.

171. On February 12, 2024, Doe's appeal was denied, determining that the exercise of jurisdiction under the policy was permissible, and that there were no procedural irregularities or evidence of bias.

**Motivated by Bias Against Doe, Dartmouth Exceeded the Scope of Its Jurisdiction in Investigating Smith's Complaint Against Him**

172.    Doe's alleged conduct occurred off-campus at his apartment in Fairlee, Vermont with a person who did not attend Dartmouth and was not in any way affiliated with any Dartmouth Program or Activity.  Doe's alleged conduct was not related to any Dartmouth Program or Activity and did not have any remote relationship to Dartmouth.

173.    When Doe raised these concerns with Ms. Clemens, she responded that the alleged conduct fell "within the scope since [Doe] [was] participating in Dartmouth's Education Program or Activity at the time of the incident- meaning, [Doe] [was] a current Dartmouth student."

174.    Ms. Clemens's application of her office's policies was plainly wrong.  Both the SMP and PRP state:

> The term Education Program or Activity includes all of Dartmouth's operations, including locations, events, or circumstances over which Dartmouth exercised substantial control over <u>both the Respondent and the context in which the Prohibited Conduct occurred</u>; and any building owned or controlled by a student organization that is officially recognized by Dartmouth.

Exhibit A at II; Exhibit B at I.

175.    The SMP does not apply universally in any instance to any Dartmouth student simply because they are enrolled at Dartmouth.

176.    The alleged conduct did not take place on Dartmouth's campus, in a building owned or controlled by a Dartmouth organization, or in any place Dartmouth had substantial control over Doe or the conduct.  Doe and Smith were not interacting as a result of any Dartmouth sponsored or affiliated activity or event.  The only connection to Dartmouth is Doe's enrollment in the medical school.

29

177.    Ms. Clemens went on to cite that the policy pertains to additional forms of sexual harassment not included under the Title IX policy, or conduct occurring in an Education Program or Activity occurring outside the United States.  This portion is inapplicable to the instant matter.

178.    Finally, she cited a policy reading: "[u]nder limited circumstances, this policy may also pertain to instances in which the conduct occurred outside of the Education Program or Activity."

179.    Doe asked Ms. Clemens repeatedly how his alleged conduct fell under the "limited circumstances" portion.  Upon Ms. Clemens's removal, Doe asked Ms. James to clarify how his alleged conduct fell within the "limited circumstances" portion.  In later conversations with Mr. Diaz, Doe asked for clarification as to how his alleged conduct fell within the "limited circumstances" portion.

180.    The only response Doe has received from anyone is that the "exercise of jurisdiction over the claims against [Doe] under the Sexual Misconduct Policy is appropriate and consistent with both the provisions of the Sexual Misconduct Policy and previous exercises of jurisdiction by Dartmouth in similar circumstances."

181.    In December of 2023, Doe's Advisor asked Ms. James to provide the specific criteria for "limited circumstances" granting extended jurisdiction under Dartmouth's external or internal policy, attaching with this request a PowerPoint presentation slide prepared specifically for Dartmouth's Title IX training, which permits the exercise of jurisdiction under the SMP for conduct occurring off campus or otherwise unassociated with Dartmouth "**as long as the conduct has a nexus to Dartmouth**" (emphasis added).

182.    Doe's Advisor requested that if Ms. James or any other member of Dartmouth possessed any policy defining "limited circumstances" beyond requiring that the conduct has a nexus to Dartmouth to please provide it.

183.    Doe's Advisor requested that Ms. James, as acting Title IX coordinator, independently reassess the decision to confer jurisdiction over the conduct, given the fact that Ms. Clemens, the original determiner of jurisdiction, was removed from the matter following allegations of bias.

184.    Doe's Advisor requested that Ms. James provide the similar criteria shared in the "similar circumstances" in which jurisdiction was exercised.

185.    Ms. James never responded to this correspondence.

186.    The SMP clearly provides that the policy only applies in "limited circumstances" if the conduct occurs off-campus/outside of an education program or activity.  It does not assert jurisdiction over conduct occurring off-campus/outside of an education program or activity as long as the Respondent is a student/employee/staff member of Dartmouth.  The caveat regarding the limitation on the applicability of the policy to *certain circumstances* necessarily narrows the scope of the reaches of the policy itself.

187.    Moreover, the determination should have been reassessed by the acting Title IX coordinator in light of Ms. Clemens's removal from the proceeding.  If her bias made her inappropriate to act as the Title IX coordinator in this matter, surely it would also render her jurisdictional decisions tainted by bias as well.

188.    The decision to confer jurisdiction was improper, lacked substantiation, and was made as a result of bias.  This matter should have never reached the formal investigation procedural posture.

**Dartmouth's Delayed Removal of Ms. Clemens Prejudiced the Investigation**

189.     Doe has previous experience with Ms. Clemens dating back to 2015, where she engaged in racially biased behavior toward him.  Doe repeatedly raised this issue and asked for Ms. Clemens to be removed from this matter.  She was not removed initially.

190.     Ms. Clemens was not removed until March 8, 2023, after Doe learned that when Smith called Dartmouth, "somebody" told her that Doe's "name has been circulating around for a while" and there was a "behavioral pattern" that "somebody needs to look into."

191.     Considering that Smith's point of contact at Dartmouth would have been Ms. Clemens as a result of her Complaint, upon information and belief, Ms. Clemens was the person who made this statement.

192.     The statements regarding Doe's name being circulated were not investigated despite Doe's requests, and likely had already impacted Smith's decision to move forward with a formal allegation.  Furthermore, a person who had demonstrated bias was the sole arbitrator for determining jurisdiction, as outlined above.  Finally, it likely impacted the investigator and the investigation itself, as Clemens oversaw the initial investigation and Investigator 1.

193.     Much of the record had already been created by the time Ms. Clemens was removed and Ms. James was appointed.

194.     Most of that work was not revisited by Investigator 2.

195.     To be clear, Doe had never previously been accused of or investigated for sexual misconduct.

**Dartmouth Failed to Apply the Preponderance of the Evidence Standard Properly, Fairly, and Impartially in Finding Doe Responsible for Violating the SMP**

196.     The Hearing Panel's Final Decision provides an outrageous "analysis" of the two parties' statements, apparently evaluating "the reliability of each party's statements, considering

the sufficiency of detail and specificity in each account; whether other reliable evidence corroborated each account; the internal consistency and inherent plausibility of each account; and whether either party omitted material information or had a motive to falsify."

197.     The Panel "generally found each party's statements to be detailed, specific, plausible, and internally consistent regarding the critical facts at issue," and found that neither party had motives to falsify.  This finding is illogical given the evidence before the panel.

A.  *The Hearing Panel Failed to Evaluate the Rape Kit, a Crucial Piece of Objective Evidence Directly Contradicting Smith's Claims.*

198.     The most profound omission from the Hearing Panel's Final Decision is the absence of the rape kit provided by Smith to Investigator 1.

199.     This rape kit was taken less than one hour following the third and final alleged rape, and provides objective, scientific data regarding the plausibility of Smith's allegations.

200.     Smith alleged that Doe engaged in nonconsensual oral sex with digital penetration and three occasions of nonconsensual vaginal intercourse, including the final iteration, which is alleged to have occurred for an hour, during which Doe allegedly pried Smith's legs open, as well as allegedly "vigorously" and "viciously" fingered her.  Smith also reported to Investigator 1 that she felt swollen everywhere and her whole body hurt.

201.     Smith produced six pages of a 39 plus-page rape kit, which was attached to the Final Investigation Report submitted by Investigator 2.

202.     Those pages state that there was "no obvious trauma noted" on any of Smith's genitalia or surrounding structures.

203.     There were no signs of redness, swelling, tearing, or bruising of Smith's genitals or surrounding areas.  There were two bruises, one black and one light blue (indicating different ages and stages of healing), that she did not attribute to her legs being pried apart.

204.     This evidence, though incomplete and seemingly unquestioned regarding the missing pages of the report, is highly relevant and probative to the plausibility and consistency of Smith's statements.

205.     Not only does the Hearing Panel's decision fail to consider the implausibility of Smith's claims when contrasted with this objective, reliable evidence—**it does not mention the results of the rape kit at all**.

206.     Excluding a relevant, reliable piece of non-testamentary evidence from the entire analysis demonstrates that the Hearing Panel did not correctly apply the preponderance of the evidence standard when assessing these claims.

B.   *The Hearing Panel Gave Undue Weight to Smith's Snapchat Video.*

207.     The Hearing Panel also erred in determining that a Snapchat video provided by Smith to Investigator 1 was reliable, credible evidence of rape.

208.     The video in question is an eight-second video file submitted by Smith.

209.     Smith's video is date-stamped December 19, 2022.

210.     Smith alleged that the assaults occurred on November 3, 2022, and November 4, 2022.

211.     The Hearing Panel made no mention of this date discrepancy in its final report.

212.     The video is black, neither party is visible in the video, and there are no other voices or discernable noises.

213.     In the video, Smith states in a dispassionate, steady voice: "[John], I'm telling you to stop.  What are you doing?  Get off."

214.     The video is totally dark, except for a small triangular section in the upper right, that is only visible at the last second.

215.     The Hearing Panel "found plausible that the recording was dark, with only a single source of light showing, because the only strong light source came from the hallway through a slightly open door, and that Complainant was the only audible voice because Respondent had become quiet by that part of the encounter."

216.     This conclusion suggests that the proper evidentiary standard was not applied.

217.     If a light source was coming through a cracked door, it would appear in a straight line, not a triangular one.

218.     In her interview with Investigator 1, Smith stated there were lights on in the kitchen, the other bedroom, and in the hallway, and that the door was open.

219.     Further, the idea that it was pitch black in the room is inconsistent and implausible with her previous statements regarding looking around the room for her clothes, ultimately finding them under Doe, where Doe was looking "very pitiful, looking all sad," suggesting Doe's facial expression and emotions were clearly visible.

220.     Additionally, she stated that the bed would "sway ridiculously" with "literally any little movement."

221.     Smith alleges she captured the Snapchat video in the midst of the last alleged rape.  However, there is no significant visible movement that would suggest either the motion of intercourse or the ridiculous swaying as she suggests.

222.     Investigator 2 reported: "[Sally] stated that she was crying throughout the incident…"  In the video, her voice is clear, with no indication she was crying.

223.     No other sounds can be heard in the video.  There is no other voice, breathing, moaning, rustling of sheets, swaying of the mattress, or movement of bodies.

224.     This piece of evidence is neither relevant nor probative, especially considering that the date stamp on the produced video itself is over a month and a half after the alleged rape.

225.     The Hearing Panel viewing this video as a credible piece of objective evidence demonstrates that they did not correctly apply a preponderance of the evidence standard.

C.  *Smith's Inconsistent Statements*

226.     The Hearing Panel noted that the Complainant's statements to authorities, the Sexual Assault Nurse Examiner ("SANE nurse"), the narrative given to Investigator 1, the police report, and the Hearing Panelists "included much of the same description of the incident."

227.     However, Smith reported notably different accounts to Investigator 1, the SANE nurse, the police, Witness 1, Witness 2, and the Hearing Panel.

228.     In her statement to the Investigator 1, Smith alleged that Doe pulled her into him so that she was laying against his chest, and he then "picked [her] up so that [the two] were facing each other and [Doe] was just supporting [Smith] with [his] arms."  Smith alleged that Doe brought her to his room, held her down with his bodyweight while also engaging in oral sex, stopped eventually, went back to the couch, went to bed, groped and raped her, vigorously fingered her and then raped her, pushed her down to the bed and then raped her for an hour.

229.     In her SANE report, Smith stated that Doe sucked her breasts, bit her nipples, and sexually assaulted her 3 times.

230.     In her statement to the police, Smith alleged that Doe carried her to his room, got her undressed, but stopped after she told him to get off, went back to the couch, went back to bed, dry humped her, raped her, viciously fingered her but stopped after she told him to, later tried to rub her genitals, pushed her hand away, grabbed her when she tried to get up, spread her legs, and raped her—losing his erection, fingering her again, and then penetrating her again.

231.    Smith told Witness 1 that Doe forced her to give him oral sex.

232.    Smith told Witness 2 that Doe threw her to the ground and raped her.

233.    Smith told the Hearing Panel that she and Doe never cuddled—that she never had her back to his chest in that position—and also that Doe would pull out to masturbate during the final rape.

234.    Each of these statements omits and/or adds significantly varied details—especially regarding the police report, which does not allege that Doe engaged in any oral sex, and specifically states that he did not penetrate her after the alleged "vicious" fingering.

235.    The Hearing Panel's decision to equate these as the "same description of the incident" is shocking—these inconsistencies are significant and should have been evaluated with respect to the credibility of Smith's narrative in the first place.  To weigh these inconsistent statements as evidence of credibility is demonstrative of the failure to implement the preponderance standard.

D.  *Smith's Motive to Falsify*

236.    The Hearing Panel also took no notice of the inconsistencies regarding how Smith claimed she met Doe.

237.    Although Smith disclosed to the investigator that she met Doe on Bumble, she led the investigator and the Hearing Panel to believe that she was on Bumble for "friendship."

238.    Smith did not tell any of her witnesses, including her husband, her brother, her brother's girlfriend, or her two friends, that she met Doe on Bumble.

239.    Smith told Witness 1, her brother, that Doe was within her program.

240.    Smith told Witness 2, her brother's girlfriend, that she had seen Doe on campus walking around and the two became friends after that.

241.    Smith told Witness 3, her husband, that she and Doe would hang out to talk about a collaboration for their organizations.

242.    Smith told Witness 4, her friend, that she met Doe because the two were "both medical."

243.    Finally, Smith told Witness 5, her friend, that she met Doe on an "online friend app or something" at Dartmouth.

244.    Smith did not tell anyone that she met Doe on Bumble because she is married, and Bumble is known as a dating app.

245.    Doe explained the function of Bumble Date versus Bumble BFF in his interview and in several statements thereafter, although it is not apparent whether Investigator 2 confirmed his representation that one cannot match with another gender in Bumble BFF mode.  This could have been easily confirmed by the investigator or Hearing Panel.[2]

246.    Smith and Doe matched in date mode, and her failure to disclose that to any of her witnesses, including her husband, suggests knowledge of her indiscretion.  There is no mention of these significant inconsistencies in the Hearing Panel's Decision.

247.    Additionally, Doe's Advisor had requested that the panel chair ask Smith a question about the importance of virginity to her husband.

248.    The chair refused, citing lack of relevance and an absence of anything related to the question in the record.

---

[2] *See Will I be able to make friends with other genders in the new Bumble for Friends app?*, bumble, https://bumble.com/en-us/help/will-i-be-able-to-make-friends-with-other-genders-in-the-new-bumble-for-friends-app ("For now, you'll only be able to make friends with people of the same gender as you.").

249.     Smith's husband articulated in his brief interview that he "found his wife a virgin at 23 years old and [he] married her as fast as [he] could."  This was also reflected in the Final Investigation Report.

250.     The panel chair nevertheless refused to ask the question.

251.     Smith's husband's bewildering statement in his interview, when coupled with Smith's false, contradictory, and evasive statements regarding how she met Doe, is directly related to her motive to falsify.  Smith has motive to falsify insofar as she was having consensual sex with a man outside of her marriage.  Her husband's statement about her virginity further emphasizes a concern about her sexual purity and a motive to falsify consensual sex with Doe.

252.     Throughout her statement to police and to the Investigators, Smith never mentioned telling Doe she was married or partnered.  Smith only claimed that she told Doe that she was married to her witnesses.

253.     For the first time, at the hearing, Smith stated she told Doe she was partnered and that her phone wallpaper had a picture of her husband and son.

254.     Again, the Hearing Panel did not assess these inconsistencies for credibility or for motive to falsify.  Rather, it did the opposite, stating that it did not "draw a negative determination about the reliability of Complainant's statements, as the Respondent urged, based on her decision not to discuss her marriage at the hearing or directly tell Respondent she had a husband and child prior to the incident."

255.     This is an abuse of the evidentiary standard, underweighting her probative, inconsistent statements that give clarity on Smith's motive to falsify these allegations.

E.  *Procedural Irregularities at the Hearing*

256.   It is apparent from the Hearing Panel's decision that much of their decision rested on the fact that Doe failed to produce his sensitive medical records and deleted his text messages with Smith.  Notably, Doe was not represented by an advisor during the evidentiary stage.

257.   Despite Doe's consistent responses, the Hearing Panel found his answers inconsistent, finding that he should have known he was accused of something based on the text exchange with Smith.

258.   Doe maintained and made clear that he did not realize Smith was actually accusing him of sexual assault given how discordant it was from the consensual experience the two had just shared—Doe was shocked and appalled, but not legitimately concerned because Doe knew he had engaged in consensual sex with Smith.  It was not until the police arrived at Doe's door that he understood he was actually being accused of sexual assault.

259.   Further, the Hearing Panel's implication that Doe "intentionally destroyed material documents in anticipation of an investigation" fails to account for the numerous requests Doe made to Dartmouth to subpoena the phone records or request that Smith produce the entire text exchange.  Both investigators failed to ever request any additional texts from the Complainant.

260.   The Hearing Panel decision also suggests that the deleted texts are potentially exculpatory, yet the Panel failed to consider the already existing exculpatory evidence in the text messages that were produced.  The text exchange seen in the Final Investigation Report, which contains a text from Doe about the first time he and Smith met and their discussion about the "African guy" who slept with Smith's friend.  This substantiates and gives credibility to Doe's

statements regarding their conversation from the first night he and Smith met and their

discussion about what they were looking for in a relationship.

261.    The Hearing Panel ignores this exculpatory evidence entirely, yet pretends, in

their Decision, that if Doe had provided the text messages, it could have changed their decision.

262.    The Panel stated: "The Panel's confidence in the reliability of Respondent's

account, then, was diminished by his inconsistent explanation for why he could not provide

potentially exculpatory documents and raised significant questions about whether he had

intentionally destroyed material documents in anticipation of an investigation."

263.    The Hearing Panel also questioned Doe's honesty by suggesting that he

mentioned that he deleted all the messages but was still able to provide Smith's correct address.

If the panel asked Doe this question, rather than drawing speculative conclusions, he would have

told them that the day he went to pick her up, she texted him her address, which was one of the

text messages she did not share with the investigator.  Doe used his GPS to go pick her up.  That

is where Doe was able to retrieve her address.

264.    Doe attempted to recover the text messages, but Verizon refused because he was

on a prepaid plan.  The only way to get the messages is with a subpoena.  This explains why he

requested that Dartmouth either ask Smith to provide all texts or subpoena the sought messages

directly from Verizon or Apple.

265.    While it is not clear from the record whether either Investigator 1 or Investigator 2

requested the complete record of text and Bumble messages between Doe and Smith from Smith,

who had produced a partial record of their text exchange, the Hearing Panel only made a

negative inference about Doe's failure to provide the text messages, while not making any

inference about Smith's failure to provide all of the messages.

266.     The Hearing Panel also lamented that Doe did not provide his sensitive healthcare documents, stating, "without this information, the Panel could afford his statements about his medical history only limited weight, and ultimately did not find them persuasive in light of Complainant's statements about his use of physical force and the duration and nature of sexual intercourse."

267.     Again, it is not clear whether either Investigator requested the entirety of the 39+ page rape kit from Smith, who had produced six (6) of the pages, but the Hearing Panel only made a negative inference about Doe's failure to provide his medical records, while not making any inference about Smith's failure to provide a complete copy of her relevant medical records.

268.     Doe explained in his statement to the Investigator 2 that he was concerned about the production of his healthcare documents, given the fact that he did not trust Smith, who had already made false allegations against him and would have had access to the documents through the investigation report, to not distribute his highly personal and embarrassing healthcare records.

269.     Despite significant risk to his privacy, Doe specifically discussed his medical history and relevant treatment for his knee and back injuries and sexual dysfunction with Investigator 2 and the Hearing Panel.

270.     In his appeal, Doe produced his medical records detailing treatment for knee and back injuries, as well as his sexual dysfunction.

271.     The records show that on August 6, 2021, Doe was prescribed 25 mg Sildenafil by his primary care provider to combat "early ejaculation", and on November 3, 2021, Doe reported during a follow-up visit that even with the Sildenafil, he could still only last "about 5 min[utes]" before ejaculating, and his dosage was increased.

272.    Concerningly, the Hearing Panel Decision contains the following statement: "Respondent did not provide supporting medical information, and he was not obliged to produce those records, as the burden of proof rests with Dartmouth and medical information is privileged from disclosure." (emphasis added).

273.    This is incidentally revealing, as it makes apparent that Dartmouth views its role not as a neutral decision-maker, but as the prosecution.  If Dartmouth bears the burden of proof, Dartmouth makes clear that its goal is to prove that Doe engaged in this behavior, rather than determine whether he did.  This is clear bias and procedural misconduct.

**Dartmouth Showed Clear Evidence of Motive and Bias Throughout the Proceeding**

274.    Without restating the above, there was clear evidence of motive and bias throughout the proceeding.

275.    The Hearing Panel showed obvious bias in favor of Smith, as her inconsistent statements are weighted as more credible than Doe's consistent statements, her inconsistent statements are weighted as more credible than external, reliable evidence, and her inconsistent statements are weighted as more credible despite clear evidence of her motive to falsify.

276.    The failure to implement the proper evidentiary standard makes the bias against Doe obvious and prejudicial.

277.    Moreover, Doe had a number of experiences of racism at Dartmouth.

278.    Dartmouth chose to selectively enforce the SMP policy under the "limited circumstances" caveat without providing policy or factually specific substantiation to render the exercise of the jurisdiction appropriate.

279.    Further, Doe had racist experiences with Ms. Clemens personally, yet she was the person charged with determining jurisdiction and pursuing this matter.

280.     It is obvious that there is a conflict of interest insofar as Dartmouth viewing itself

as the prosecutor—not the judge.

### Doe Has Experienced Racism and Bias at the Hands of Dartmouth Employees and Community Members Dating Back to 2015

281.     Doe has been a student at Dartmouth for ten years.

282.     In 2015, an undergraduate professor falsely accused Doe of threatening her in

class in front of numerous classmates.  Ms. Clemens, then the Assistant Dean of the College and

Director of Case Management, emailed Doe requesting a meeting.  Despite having no proof

beyond a verbal accusation, Ms. Clemens summoned Dean Higgins and the Director of Safety

and Security, Harry Kinne, to the meeting, indicating her implicit belief in Doe's capacity to

carry out the alleged threat.

283.     When Doe asked about Mr. Kinne's presence, Ms. Clemens responded, "I heard

you were threatening, so I did not know what to expect; that's why I called Mr. Kinne."  Doe was

told that he posed a threat because he was "tall, big, and Black."  Dr. Higgins chuckled, affirming

this statement.

284.     This marked the commencement of Ms. Clemens's years-long demonstration of

racial and personal bias against Doe.

285.     The false allegation against Doe was investigated and found unsubstantiated.  The

same professor then falsely reported to Ms. Clemens that Doe had plagiarized a paper.  This

allegation was also investigated and found unsubstantiated.

286.     Subsequently, Doe encountered a series of discriminatory and racist incidents

from faculty and colleagues.

287.     In 2015, Doe was awoken by a group of white male students banging on his door,

who had written the words "f*ck n*gga" on the door itself.

288.     In 2016, Doe reported concerns relating to a professor and related threats he had received to Ms. Clemens.  Despite reporting each instance, Ms. Clemens and others failed to act to protect Doe.

289.     In 2018, Dartmouth refused to publish Doe's Fellowships at Auschwitz for the Study of Professional Ethics ("FASPE") award, after publishing the FASPE award earned by another student, who was not Black, in 2017.

290.     In 2020, Doe was referred to as a "Black male in a dark-colored hoodie" by a Dartmouth Safety and Security officer following Doe's request for assistance after noticing his car keys had been taken.  When Doe asked Dr. Julie Kim and the Committee on Student Performance and Conduct to investigate, he was ignored.

291.     In 2022, during his four-week sub-internship in Dartmouth's neurosurgery department, Dr. Jennifer Hong subjected Doe to detrimental assessments without a clear delineation of academic or clinical obligations, failed to provide grading criteria or transparency in the grading process, and graded Doe with different standards compared to his peers, including inaccurate and retaliatory final evaluations.

292.     Dr. Hong told Doe that he needed to "speak, act, and behave like a white man" in order to have the opportunity to match in neurosurgery.

293.     Doe reported his complaints against Dr. Hong to Dr. John Dick, the Associate Dean of Assessment, Quality & Accreditation.  His complaints were then referred to Dr. Lysa McBride, the Dean of Diversity.  Dr. Weissburg and Dr. McBride concluded that Doe's appeal of his grade had merit, and his grade was changed from High Pass to Honors.  No disciplinary action or apology was issued.

294.     As referred to in this Complaint, Doe experienced discrimination and harassment at the hands of Ms. Clemens or another individual in the Title IX office when Smith was told that Doe's "name has been circulating around" and that there was a "behavior pattern" that "somebody needs to look into."  This false and damaging statement also speaks to Clemens's racial bias and selective enforcement of the SMP.

295.     Dartmouth also has a detailed history of bias and selective enforcement in applying its sexual misconduct policy against male respondents.[3]

**Consequences of Dartmouth's Decision**

296.     If Dartmouth's expulsion of Doe is allowed to remain, Doe will be irreparably harmed.

297.     The expulsion from Geisel prevents Doe from finishing medical school.  Doe was nearly finished earning his degree and was set to match for a residency in March 2024, and graduate from Geisel in May of 2024.  The expulsion leaves Doe with substantial student loan debt without the earning capacity to be able to pay it off in a timely manner.  It also prevents him from achieving his lifelong goal, which he has nearly achieved, of becoming a doctor and contributing to his Congolese community in the Democratic Republic of the Congo in the future.

298.     Further, the expulsion will significantly harm Doe's work through his non-profit organization Bonsomi, which he established in 2012.  Bonsomi is dedicated to combatting sexual assault against women and facilitating easy access to healthcare for women and children.

299.     Without appropriate redress, the unfair outcome of Dartmouth's flawed and biased disciplinary process will cause irreparable harm to Doe by not permitting him to complete his

---

[3] *See* Complaint at 41-54, 1:21-cv-00085-JD Doe v. Trustees of Dartmouth College.

education at Geisel, impairing his ability to continue his education elsewhere, and impacting his ability to work in his chosen field should he eventually be able to complete his medical degree.

**CAUSES OF ACTION**

**COUNT I**
**20 U.S.C. § 1681 et seq.**
**TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**(Erroneous Outcome and Selective Enforcement)**

300. Doe repeats and realleges the allegations above as if fully set forth herein.

301. Pursuant to Title IX of the Education Amendments of 1972, Dartmouth is prohibited from subjecting Doe to a disciplinary proceeding where sex is a motivating factor in the decision to impose sanctions.

302. Pursuant to Title IX of the Education Amendments of 1972, Dartmouth is further prohibited from providing a disciplinary proceeding that is not prompt or equitable.

303. Dartmouth's employees and agents made incorrect determinations of fact, ignoring substantial evidence presented that supported Doe's innocence and undermined Smith's claims against him, resulting in an erroneous outcome in his case.

304. On information and belief, current Dartmouth employees and agents involved in the Title IX process in Doe's case believed Smith's report from the time her report was made, leading them to be inherently biased against Doe's denial of her report and evidence supporting his position, resulting in an erroneous finding that Doe was responsible for the conduct as alleged by Smith.

305. On information and belief, Doe, was presumed guilty by Dartmouth's Title IX administrators, the Investigators, the Hearing Panel, and Dean Compton because he is a Black male student, whereas the same actors took Smith's allegations at face value and inherently believed them because she was a female complainant.

306.    The erroneous outcome of ordering Doe's suspension from Dartmouth was caused in substantial part by gender bias against males in cases involving allegations of sexual misconduct.  This bias is reflected in the patterns of decision making and procedural missteps demonstrated by Dartmouth throughout the entire investigative, decision-making, and review process in this case.

307.    Additionally, Dartmouth exhibited patterns and practices of decision-making that show that the decision to pursue a Title IX investigation and proceeding against Doe while failing to address his numerous concerns with procedural errors and bias were motivated by Dartmouth's pattern and practice of intentional animus against Doe's gender.

308.    Dartmouth's violations of its obligations under Title IX proximately caused Doe to sustain tremendous damages, including, without limitation: economic injuries, reputational damages, and the loss of educational and post-graduate opportunities and other direct and consequential damages.

309.    Doe is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action for the harm he suffered as a result of Dartmouth's violation of its Title IX obligations.

**COUNT II.**
**42 U.S.C. § 2000d et seq.**
**TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**
**(Racial Discrimination)**

310.    Doe repeats and realleges the allegations above as if fully set forth herein.

311.    Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

312.     Doe is African American and is a member of a protected class.

313.     Doe had an excellent academic record throughout his decade at Dartmouth and qualified to continue his education career at Dartmouth and would be currently doing so but for the expulsion erroneously imposed as a result of the flawed and biased Title IX process as set forth herein.

314.     Doe suffered an adverse action in pursuit of his education by Dartmouth in that he was expelled from Dartmouth as a result of an investigation, hearing, and sanctioning process and application of that process that was applied differently against Doe because he is Black, and that Dartmouth was deliberately indifferent to his repeated claims of racial stereotyping, implicit racial bias, and systemic racism that resulted in his wrongful expulsion.

315.     Implicit and explicit systemic, structural racism pervades Dartmouth's culture such that over 300 mostly Black professors, administrators, alumni, and students, drafted and signed a letter to Trustees of Dartmouth College and others describing Dartmouth as a "racially hostile" environment.[4]

316.     In this case, Dartmouth's Title IX office, the Investigators, the Hearing Panel, and Dean Compton exhibited implicit (and in the case of Ms. Clemens, explicit) racial bias in their application of stereotypes against Doe to characterize him as a hypersexual, physically imposing, aggressive Black male and used these racially discriminatory stereotypes to erroneously make adverse credibility determinations and the ultimate finding of responsibility against Doe.

317.     When Doe raised Ms. Clemens's and Investigator 1's racial biases repeatedly, Dartmouth nonetheless selected a second white female investigator and an all-white Hearing Panel, showing deliberate indifference to Doe's claims of racial bias and animus.

---

[4] *See* https://docs.google.com/forms/d/e/1FAIpQLSdnG4s4g4HoIc-zvNw75Qs3q7_BcvlHoH4tItFAsqID0FAwFw/viewform.

318.    Once Doe was found responsible by the Hearing Panel without any Black representation, the same panel expelled Doe.  Like at least eight other Black students who had been suspended or expelled as a result of an adverse Title IX finding within the last fifteen years, Doe's expulsion was imposed immediately, whereas at least one white student during that same time period was allowed to finish his athletic season before being removed from the school.

319.    Dartmouth was deliberately indifferent to Doe's repeated reports of implicit and explicit racial bias in Ms. Clemens, the Investigators, and the Hearing Panel.  When Dartmouth did finally act to remove Ms. Clemens and Investigator 1, the erroneous decision to pursue the investigation had already been made and a significant record had already been gathered.

320.    As such, an intentional and motivating factor in Dartmouth's adverse Title IX finding against Doe, his suspension, and its immediate imposition was Doe's race.

321.    Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

322.    Thus, Plaintiff is entitled to all legal and equitable remedies available including all applicable damages, prejudgment interest, attorneys' fees, costs, and other compensation in an amount to be determined upon the trial of this action.

## COUNT III
### Breach of Contract

323.    Doe repeats and realleges the allegations above as if fully set forth herein.

324.    Doe paid Dartmouth sums of money for his education, and in return, the College contracted to provide Doe with access to its medical degree program.

325.    The relationship between the parties is contractual in nature, and each party owes the other certain duties, some of which can be found in Dartmouth's written policies.

326.    By the facts alleged herein, Dartmouth breached its contract with Doe by instituting and prosecuting an investigation and adjudication in violation of its policies and procedures, specifically, the SMP's and PRP's promise of a "fair, thorough, and impartial" investigation and adjudication process.

327.    Additionally, by the facts alleged herein, Dartmouth breached its contract with Doe by instituting and implementing an investigation and adjudication that did not comport with basic elements of fundamental fairness, including procedural and substantive fairness.

328.    As a direct and proximate result of that breach, Doe suffered the harms described above and is entitled to all available legal and equitable remedies.

**COUNT IV**
**Breach of Covenant of Good Faith and Fair Dealing**

329.    Doe repeats and realleges the allegations above as if fully set forth herein.

330.    Every contract contains within it an implied covenant of good faith and fair dealing.

331.    By the facts alleged herein, Dartmouth breached that covenant by exceeding the limits of reasonableness by pursuing that investigation and adjudication in an unfair and biased manner, thereby exercising its contractually vested discretion in a manner that thwarted Doe's reasonable expectation as to the essence of the contract.

332.    As a direct and proximate result of that breach Doe suffered the harms described above.

**COUNT V**
**42 U.S.C. § 1981**
**(Equal Rights Under the Law – Racial Discrimination)**

333.    Doe repeats and realleges the allegations above as if fully set forth herein.

334.    42 U.S.C. § 1981 in relevant part requires that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

335.    42 U.S.C. § 1981 protects the African American student's "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" pursuant to Dartmouth's SMP and PRP.

336.    Dartmouth's SMP and PRP represent a contractual commitment to Doe.

337.    As an African American student, Doe is a member of a protected class.

338.    Doe was qualified to attend Dartmouth, was accepted at Dartmouth, and attended Dartmouth as an undergraduate, in the Tuck Bridge Program, and as a medical student.

339.    Doe suffered adverse actions in that he was deprived of his contractual rights pursuant to Dartmouth's SMP and PRP as an African American student in all the ways set out herein.

340.    As a result, Doe was erroneously found responsible for violating Dartmouth's SMP and expelled immediately upon imposition of his sanction.

341.    Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and

reputation have been severely harmed, and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

342.    Thus, Plaintiff is entitled to all legal and equitable remedies available including all applicable damages, prejudgment interest, attorneys' fees, costs, and other compensation in an amount to be determined upon the trial of this action.

## COUNT VI
## Negligence

343.    Doe repeats and realleges the allegations above as if fully set forth herein.

344.    Dartmouth and its agents had a duty of care, imposed on it by its policies and federal law and voluntarily undertaken, to handle allegations of sexual misconduct and/or violence fairly and consistently, without bias or prejudice, especially on the bases of sex and race.

345.    By the facts alleged herein, Dartmouth and its agents breached that duty by pursuing the investigation and adjudication of Smith's complaint against Doe in a manner that deviated from its policies and federal law and was unfair, biased, and prejudiced on the bases of sex and race.

346.    As a direct and proximate result of that breach, Doe suffered the harms described above.

347.    Doe is entitled to enhanced compensatory damages as a consequence of Dartmouth's wanton, malicious, oppressive and aggravating conduct alleged herein.


**WHEREFORE**, John Doe respectfully requests that this court enter judgment against defendant on all counts of this complaint.  Doe further requests that this court:

A.      Issue an injunction enjoining Dartmouth from enforcing Doe's suspension and ordering it to allow him to enroll in classes, attend classes, and participate in all campus activities pending the outcome of this action;

B.      Order defendant to reverse its finding that Doe violated its policies, and expunge his record;

C.      Order defendant to reinstate Doe as a student in good standing;

D.      Award Doe damages and enhanced compensatory damages in an amount to be determined at trial;

E.      Award Doe the reasonable costs of this action, including attorneys' fees;

F.      Grant such other and further relief as this Court deems equitable and just.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Date: February 16, 2024                    Respectfully submitted,


                                           /s/ *Leah Cole Durst*
                                           Leah Cole Durst (NH Bar #273679)
                                           Olivia Bensinger (NH Bar #274145)
                                           SHAHEEN & GORDON, P.A.
                                           107 Storrs Street/P.O. Box 2703
                                           Concord, NH 03302
                                           (603) 225-7262
                                           ldurst@shaheengordon.com
                                           obensinger@shaheengordon.com


                                           *Attorneys for plaintiff John Doe*

## **VERIFICATION**

I, John Doe, declare as follows:

1.      I am the plaintiff in this action.

2.      I have personal knowledge of the facts set out in the foregoing Verified Complaint and Jury Demand, and if called upon to testify I would competently testify as to the matters stated herein.

3.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Complaint and Jury Demand and true and correct.


Date: February 16, 2024                    /s/ *John Doe*                              
                                                      John Doe