UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| |
|---|
| JOHN DOE, |
| Plaintiff, |
| v. |
| TRUSTEES OF DARTMOUTH COLLEGE, |
| Defendant. |

Civil Action No.

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR A
PRELIMINARY INJNCTON AND EXPEDITED RELIEF**

Plaintiff John Doe ("Doe") respectfully offers this Memorandum of Law in Support of
His Motion for Preliminary Injunction and Expedited Relief.

**STATEMENT OF FACTS**

**Background**

At all times relevant to this case, Doe was a student at the Geisel School of Medicine at
Dartmouth ("Geisel").  Verified Complaint ("Compl.") ¶ 27.  In the evening of November 3 to
the early morning hours of November 4, 2022, Doe and his date, Sally Smith ("Smith"), engaged
in an intimate encounter, to which Smith later claimed to be nonconsensual. Compl. ¶¶ 54-63,
75, 82.  On December 19, 2022, Smith submitted a formal complaint to Dartmouth College's
("Dartmouth") Title IX Office, alleging that Doe had raped her three times. Compl. ¶ 93.  Smith
was not a Dartmouth student, nor was she associated with a Dartmouth Program or Activity in
any way. Compl. ¶ 33.  On January 17, 2024, Dartmouth decided that Doe had engaged in sexual
assault of Smith.  Compl. ¶ 162.  As a result, Dartmouth expelled Doe from the medical school.
Compl. ¶ 162.  On February 12, 2024, Dean Duane A. Compton of Geisel upheld the findings by

the Investigator and Hearing Panel from the Title IX office and confirmed Doe's expulsion without any notable analysis of the issues raised.  Compl. ¶ 171.

### Dartmouth's Procedurally Deficient Investigation

Dartmouth's investigation into Smith's allegations and the proceedings that resulted in the sanction against Doe were procedurally deficient.  Dartmouth's original Title IX coordinator, Kristi Clemens, committed a procedural error by making a determination conferring jurisdiction over the allegations in question despite the alleged conduct having no identifiable nexus to Dartmouth.  Compl. ¶¶ 172-80.  Specifically, Ms. Clemens, and then later, the acting Title IX coordinator, Ann James, refused to or were unable to articulate the "limited circumstances" in which conduct outside of a Dartmouth Program or Activity is actionable under the policy.  *Id.* at ¶¶ 172-86.  Doe was found responsible for an act that was not covered by Dartmouth's jurisdictional authority.  There is perhaps no greater egregious procedural error than being found responsible and expelled for an act for which the institution has no authority over under Dartmouth policy, prior precedent, and fundamental concepts of basics fairness.  This finding and expulsion must be enjoined.

The Hearing Panel also failed to appropriately apply the preponderance standard of evidence in making its final findings by failing to consider evidence provided by Smith that her rape kit yielded no signs of trauma when she alleged that Doe raped her three times, with the final rape lasting for one hour, and "viscously" and "vigorously" fingered her.  Compl. ¶¶ 200-05.  The Hearing Panel also failed to apply the preponderance of evidence standard when it determined the Snapchat video provided by Smith, date stamped December 19, 2022, was credible evidence of the allegations.  Compl. ¶¶ 207-23.  The Hearing Panel applied the

preponderance of the evidence standard inconsistently between the parties' statements, overweighting the statements from Smith and underweighting Doe's. Compl. ¶ 275.

**Dartmouth's Errors Have Resulted and Will Result in Harm to Doe**

As a result of Dartmouth's erroneous proceeding and decision, Doe is suffering and will continue to suffer irreparable harm.  The expulsion from Geisel will significantly affect Doe's ability to have a medical career.  Compl. ¶¶ 297.  When Doe was expelled, he had one course to complete before earning his M.D. from Geisel. Compl. ¶¶ 30, 297.  The decision to expel Doe took away his ability to return to Geisel and created a longer gap in his education that will need to be explained to future employers, which will require disclosure of his expulsion.  Notably, his expulsion on January 17, 2024, and his appeal determination on February 12, 2024, put him in extreme jeopardy of being unable to submit to the National Matching Program for his residency, which goes through Dartmouth's system.[1]  Upon information and belief, Geisel submits its eligible students to "Match" with their residency programs[2] on February 26, 2024.  Without being submitted into the Match pool, Doe will not be offered a residency program and his pursued career as a neurologist will immediately halt.

The fact that Doe has been expelled—and the reason therefore—also place doubt in his ability to transfer to another medical school.  Without redress from this Court, Doe's transfer application to any medical school will have to disclose the expulsion from Geisel, which will weigh against his admission.  If Doe is unable to finish medical school, he will be unable to obtain his residency to become a neurologist—a career of which he has always dreamed and of which our society is in desperate need.  Doe's expulsion also leaves Doe with substantial student loan debt without the promised earning capacity necessary to pay it off in a timely manner.

---

[1] https://www.nationalmatchingprogram.org/about-nmp/.
[2] https://www.umhs-sk.org/blog/what-is-medical-residency.

Without a preliminary injunction issued by this Court, Doe will continue to suffer these and other irreparable harms.  Doe seeks redress from the Court to undo the harms Dartmouth has caused and to avoid further irreparable harm.  To that end, Doe is entitled to a preliminary injunction enjoining his expulsion and any other discipline pending the outcome of this case.

## ARGUMENT

"A district court, faced with a motion for preliminary injunction, must assess the request in four particular ways, evaluating (1) the movant's probability of victory on the merits; (2) the potential for irreparable harm if the injunction is refused; (3) the balance of interests as between the parties, *i.e.*, whether the harm to the movant if the injunction is withheld outweighs the harm to the nonmovant if the injunction is granted; and (4) the public interest."  *Cohen v. Brown Univ.*, 991 F.2d 888, 902 (1st Cir. 1993) (upholding the grant of a preliminary injunction under Title IX against a private university seeking to discontinue its varsity women's volleyball and gymnastic teams).  The Court in *Cohen* further elucidated, "It is old hat, but still very much in fashion, that a movant's likelihood of success at trial is particularly influential in the preliminary injunction calculus."  *Id.* at 903.  "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail."  *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012) (upholding the grant of a preliminary injunction in the First Amendment context) (internal citation omitted).  Importantly, the *Cohen* Court cautioned:

> It is similarly fundamental that a preliminary injunction, by its very nature, is sometimes ephemeral.  Hence, the risk that some observers might read into a temporary restrainer more than it eventually proves to mean is endemic to the equitable device and cannot tip the scales against its use in any particular circumstance.  It defies elemental logic to say that parties who the court has determined will probably succeed at trial should be denied the interim relief to which they are entitled because their ultimate victory is less than absolutely certain.

*Cohen*, 991 F.2d at 905.  All of these factors weigh in favor of a preliminary injunction here.

I.     **Doe has shown a likelihood of success on the merits of his breach of contract, Title VI, and Title IX claims.**

A.     **Breach of Contract Claims**

Doe has alleged sufficient facts to demonstrate a likelihood of success on the merits of his breach of contract claims against Dartmouth.  The relationship between a university and its students is contractual in nature.  *Marlowe v. Keene State Coll.*, 189 F. Supp. 3d 326, 332 (D. Mass. 2016) (applying New Hampshire law).  *See Doe v. Brown Univ.*, 327 F. Supp. 3d 397, 415 (D.R.I. 2018) ("[A] student's relationship to his university is based in contract.") (internal citation omitted); *Doe v. W. New England Univ.*, 228 F. Supp. 3d 154, 169 (D. Mass. 2017) ("[T]he relationship between a student and a university is based on contract."); *see also Doe v. Trs. of Dartmouth Coll.*, 2021 WL 2857518 at *9 (D.N.H. July 8, 2021) (denying the school's motion to dismiss the student's based on breach of contract); *Doe v. Trs. of Dartmouth Coll.*, No. 19-cv-13-JL (D.N.H. Apr. 7, 2019) (denying the school's motion to dismiss the student's based on breach of contract orally from the bench).  "The terms of this contract [are] the terms contained in the Student Handbook and other college materials."  *Bleiler v. Coll. of Holy Cross*, No. 11-11541-DJC, 2013 WL 4714340, at *14 (D. Mass. Aug. 26, 2013).

When reviewing the contractual relationship and the relevant documents, courts "employ a reasonable expectations standard," which requires that they "ask what meaning the party making the manifestation, the university, should reasonably expect the other party[, the student,] to give it."  *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 80 (1st Cir. 2018) (internal citations and quotation marks omitted).  "In the context of disciplinary hearings, [courts] 'review the procedures followed to ensure that they fall within the range of reasonable expectations of one

reading the relevant rules.'" *Id.* (quoting *Cloud v. Trs. of Boston Univ.*, 720 F.2d 721, 724-25 (1st Cir. 1983)).  "[I]f the facts show that the university has failed to meet [the student's] reasonable expectations the university has committed a breach."  *Id.* (quoting *Walker v. President & Fellows of Harvard Coll.*, 840 F.3d 57, 61-62 (1st Cir. 2016)) (internal quotation marks omitted).

Based on these standards, for the reasons set forth below, John Doe is likely to succeed on his breach of contract claims.

### i.  Claim Based on Dartmouth Policies

### a.  Relevant Contractual Provisions

The terms of the contractual relationship between Doe and Dartmouth include the provisions in Dartmouth's "Sexual and Gender-Based Misconduct Policy" ("SMP") and its "Process for Resolving Complaints Against Students" ("PRP").  Once a formal complaint has been filed and the formal resolution process initiated, "[t]he Title IX Office will appoint one or more trained investigators to conduct a **prompt**, **thorough**, **fair** and **impartial** investigation." Compl. ¶ 102.  At the outset of the investigation, the Title IX Coordinator provides notice to the Complainant and the Respondent that is required to include, *inter alia*, **the nature of the reported conduct and the reported policy violations**.  Compl. ¶ 103.  "If the investigation reveals the existence of additional or different potential policy violations, . . . the Title IX Office will issue a supplemental notice of investigation." *Id.*

After gathering all of the facts, the Investigator must produce an initial written investigation report, which is intended to be "a fair and thorough summary of all relevant information gathered that supports (or detracts from) the accounts of the Complainant, the Respondent, or other witnesses."  Compl. ¶ 107.  The initial report is provided to the

Complainant and the Respondent and they have an opportunity to submit feedback to the investigator, after which the investigator produces a final investigative report, which "include[s] a finding as to whether there is sufficient information, by a preponderance of the evidence, to support responsibility for a violation of the [SMP] or any other Dartmouth policies that were implicated in [the] investigation." *Id.*  "In all stages of the process, Dartmouth will apply the preponderance of the evidence standard (i.e., more likely than not) when determining whether Dartmouth policy has been violated."  Compl. ¶ 101.

> **b.**  **Dartmouth's Procedurally Deficient Investigation Failed to Conform to Doe's "Reasonable Expectations" and Elements of Procedural Fairness**

The SMP guarantees that Dartmouth will "conduct a **prompt**, **thorough**, **fair** and **impartial** investigation."  Compl. ¶ 102.  Dartmouth also has an "obligation to provide basic fairness in its proceedings [that] is separate from and in addition to its contractual obligations to follow the rules set forth in the [SMP]."  *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 601 (D. Mass. 2016) (citing *Cloud*, 720 F.2d at 725).  "Basic fairness" in university disciplinary proceedings includes both "procedural fairness"—"whether the process used to adjudicate the matter was sufficient to provide the accused student a fair and reasonable opportunity to defend himself"—and "substantive fairness"—"whether the decision was unduly arbitrary or irrational, or tainted by bias or other unfairness."  *Id.* at 602.

"It is well-established . . . that a private university is not required to adhere to the standards of due process guaranteed to criminal defendants or to abide by rules of evidence adopted by courts. . . .  However, courts may refer to those rules in evaluating the fairness of a particular disciplinary hearing."  *Id.* (internal citations and quotation marks omitted).

Dartmouth breached its contract with Doe by failing to conduct the investigation in a "fair, thorough, and impartial manner," and without comporting to standards of "basic fairness," in three ways.  First, by committing one major procedural error:  it found Doe responsible for an act outside of the scope of its jurisdiction.  Second, by failing to appropriately apply the preponderance of the evidence standard in making its final findings by failing to fairly, thoroughly, and impartially consider evidence provided by Smith, including the rape kit and Snapchat video, which supports Doe's narrative of the events and impairs Smith's credibility.  And, third, by failing to impartially and fairly assess the consistency of the two parties' statements, as well as Smith's motives to falsify.

> **1.**   **Dartmouth Erroneously Exercised Jurisdiction under the SMP over Doe's Alleged Conduct Despite Having No Nexus to Dartmouth.**

As a threshold issue, Dartmouth's Title IX Coordinator, Ms. Clemens, improperly determined that Dartmouth had jurisdiction under the SMP.  Compl. ¶ 123.  When Doe initially raised this, Clemens provided several irrelevant portions of the SMP, ultimately citing to what Dartmouth has repeatedly cited to in the policy during this investigation: "*Under limited circumstances*, this policy may also pertain to instances in which the conduct occurred outside of the Education Program or Activity." Compl. ¶¶ 124, 178, 179.  In December 2023, Doe's advisor asked the acting Title IX Coordinator to please provide the specific policy defining "limited circumstances," attaching thereto the PowerPoint presentation slide specifically prepared for Dartmouth's Title IX training, permitting the exercise of jurisdiction under the SMP for conduct occurring off campus or otherwise unassociated with Dartmouth "as long as the conduct has a nexus to Dartmouth." Compl. ¶ 181-82.  There was no response to this request. Compl. ¶ 185.

Doe's alleged conduct occurred off-campus at his apartment in Fairlee, Vermont with a person who did not attend Dartmouth and was not in any way affiliated with any Dartmouth Program or Activity.  Doe's alleged conduct was not related to any Dartmouth Program or Activity and did not have any remote relationship to Dartmouth. Compl. ¶ 172.  The conduct in question has no nexus to Dartmouth.  Dartmouth's policy specifically narrows its applicability to "under certain circumstances."  It does not, despite Ms. Clemens' representation, apply in all instances in which the Respondent is a student.  The caveat restricting the applicability of the SMP necessarily limits its scope.  The procedural error to investigate, find responsible, and ultimately expel a student when the alleged conduct in question is not covered within the scope of Dartmouth's jurisdiction is a significant breach of contract.

It is difficult to identify analogous case law in this instance, as it is likely that most schools do not erroneously confer jurisdiction in such a profoundly unfair way.  Most cases occur on campus or at least are affiliated with a program or activity, or the institution has some form of control over the locale in which the alleged conduct occurs.  While Plaintiff concedes that each institution has its own sexual misconduct policy, the closest analog discovered thus far is in the matter of *Vaughn v. Vermont Law School, Inc.*, 2011 WL 3421521 (D.V.T. Aug. 4, 2011), which found that the institution had the authority to pursue "disciplinary charges against a student for allegations of off campus sexual harassment, where those allegations include 'unwelcome sexual advances' that 'could have a significant impact on the educational ... environment' and 'could pose a threat to the safety or other interests of [the school] or members of the [school] community.'" *Id*. at *15 (citing the school's policy).  This case is importantly distinguishable from the instant matter, though, as the complainants in question were all classmates, who were repeatedly confronted and harassed by the respondent, and were made to

feel uncomfortable while *being members of the student body and school's community*. *Id.* at \*2, \*14.  The holding here is centered around the fact that the off-campus conduct tends to interfere with the affected individual's educational performance or environment. *Id.* at \*14.  This is not the case in the instant matter.  Dartmouth has no authority or ability to provide recourse for Smith's education, employment, general safety, or interests because she has no relationship with Dartmouth, nor is there any evidence that Doe posed any safety risk to any member of the Dartmouth community.

For that reason, and the above facts supporting it, Doe has a likelihood of success on the merits of his breach of contract claim based on the erroneous conferring of jurisdiction over alleged conduct that was beyond the scope of Dartmouth's authority.

> **2.      Dartmouth Failed to Apply the Preponderance of the Evidence Standard by Failing to Fairly, Thoroughly, and Impartially Consider the Evidence.**

*Rape Kit*

Second, Smith alleged that Doe raped her three times, including one instance that lasted for an hour, and that he vigorously and viscously "fingered" her. Compl. ¶ 200.  Doe, in the alternate, claimed that he and Smith had brief, consensual oral sex followed by intercourse. Compl. ¶¶ 59 – 63.  Smith went to the hospital immediately after leaving Doe's house and received a rape kit.  Compl. ¶ 199.  Smith produced six (6) pages of a 39 plus-page rape kit, including the documentation of the physical exam. Compl. ¶ 201.  The rape kit makes clear that there was "no obvious trauma noted" on any of Smith's genitalia or surrounding structures, including no signs of redness, swelling, tearing, or bruising of Smith's genitals or surrounding structures. Compl. ¶¶ 202-03.

The Hearing Panel failed to assess the implausibility of Smith's allegations when contrasted with a crucial piece of objective medical evidence. Compl. ¶ 205.  Shockingly, the Hearing Panel makes <u>no mention</u> of the objective findings contained in the rape kit in its written decision. *Id*.  The Investigator and Hearing Panel alike failed to ask about the 33 missing pages of the rape kit, and further failed to inquire how multiple, allegedly violent sexual acts lasting up to an hour could result in no signs of trauma to the genitals. Compl. ¶ 204.

*Snapchat Video*

However, the Hearing Panel credited Smith's Snapchat video as credible evidence of a documented rape, supporting the finding of responsibility. Compl. ¶ 207.  The video in question is an eight-second video submitted by Smith, date-stamped December 19, 2022, a month and a half after the alleged incident occurred. Compl. ¶¶ 208-10.  The video is completely dark but for a small, dim triangle of light in the upper right section of the video.  Compl. ¶ 214.  The only sound audible in the video is Smith, flatly and quietly saying: "[John], I'm telling you to stop. What are you doing? Get off."  Compl. ¶¶ 213-14.  Neither party is visible, no clear movement is visible, and there are no other voices or discernable noises.  Compl. ¶ 212.

The Hearing Panel "found plausible that the recording was dark, with only a single source of light showing, because the only strong light source came from the hallway through a slightly open door, and that Complainant was the only audible voice because Respondent had become quiet by that part of the encounter." Compl. ¶ 215.  The Hearing Panel failed to consider or apply the inconsistencies and implausibility the video.  First, if a light source was coming through a cracked door, it would appear in a straight line, not a triangular one.  Compl. ¶ 217.  In her interview with Investigator 1, Smith stated there were lights on in the kitchen, the other bedroom, and in the hallway, and that the door was open. Compl. ¶ 218.  Further, the idea that it

was pitch black in the room is inconsistent and implausible with her previous statements regarding looking around the room for her clothes, ultimately finding them under Doe, where Doe was looking "very pitiful, looking all sad," suggesting Doe's facial expression and emotions were clearly visible.  Compl. ¶ 219.

Additionally, Smith stated that the bed would "sway ridiculously" with "literally any little movement."  Compl. ¶ 220.  Smith alleged she captured the Snapchat video in the midst of the last alleged rape.  However, there is no significant visible movement that would suggest either the motion of intercourse or the ridiculous swaying as she suggests.  Compl. ¶ 221. Investigator 2 reported: "[Sally] stated that she was crying throughout the incident…" In the video, her voice is clear, with no indication she was crying.  Compl. ¶ 222.  <u>No other sounds can be heard in the video</u>. There is no other voice, breathing, moaning, rustling of sheets, swaying of the mattress, or movement of bodies. Compl. ¶ 223.

*Inconsistent Statements*

Finally, the Hearing Panel failed to impartially and thoroughly assess the credibility and consistency of the two parties' statements.  The Hearing Panel found that Smith provided "much of the same description of the incident" when contrasted with the statements to authorities, the Investigator, and the Hearing Panelists.  Compl. ¶ 226.  However, Smith's story materially changed every single time she told it.  Smith added and/or omitted significant acts during every iteration to different audience, adding or subtracting penetrative sex, oral sex, digital penetration, masturbation, and cuddling.  Compl. ¶¶ 228-34.  These changes are significantly and materially inconsistent, and the Hearing Panel's finding to the contrary cannot be true under a proper application of the preponderance of the evidence standard.

Moreover, the Investigator and the Hearing Panel alike failed to take notice of or inquire into the inconsistencies and motive to falsify with respect to Smith's statements about how she and Doe met.  Compl. ¶ 236.  Smith told the investigator that she met Doe on Bumble "for friendship."  Compl. ¶ 237.  Doe explained the function of Bumble Date versus Bumble BFF in his interview and in several statements thereafter, although it is not apparent whether Investigator 2 confirmed his representation that one cannot match with another gender in Bumble BFF mode. Compl. ¶ 245.  This could have been easily confirmed by the investigator or Hearing Panel. However, Smith told each of her five (5) witnesses a different version of how she met Doe, but none of those versions included Bumble.  Compl. ¶¶ 238-43.  During the hearing, Doe's advisor submitted a question to the Chair regarding the importance of virginity to Smith's husband based on a statement made by Smith's husband during his interview that he "found his wife a virgin at 23 years old and [he] married her as fast as [he] could."  Compl. ¶¶ 247, 249.  However, the Chair refused to ask the question and deemed it irrelevant. Compl. ¶ 248.

The Hearing Panel's determination ultimately rested on Doe's failure to produce medical documents and text messages that he described consistently and in detail.  Compl. ¶ 256. Despite the fact that Doe remained extremely consistent throughout each statement given, even at points providing diagrams and extensive written responses to the Investigator, the Hearing Panel ultimately deemed that Smith's narrative was more consistent and plausible – ignoring, of course, the objective medical evidence.  Compl. ¶¶ 197, 257, 275.  Notably, the Hearing Panel Decision contains the following statement: "Respondent did not provide supporting medical information, and he was not obliged to produce those records, as the burden of proof rests with Dartmouth and medical information is privileged from disclosure." Compl. ¶ 272 (emphasis added).  Dartmouth viewed its role not as a neutral decision-maker, but as the prosecution.  Its

goal was to prove that Doe engaged in the behavior, rather than to determine whether or not he did.

The Hearing Panel credited Smith's inconsistent statements as consistent and found Doe's consistent statements to be inconsistent. Compl. ¶ 275. Additionally, the Hearing Panel made a negative inference regarding Doe's failure to produce his sensitive medical documents and unavailable text messages but did not make the same negative inference regarding Smith's failure to turn over the entirety of the text message exchange between herself and Doe or the entirety of the 39+ pages of the rape kit that was partially produced. Compl. ¶¶ 265, 267. Further, the Hearing Panel explicitly refused to make a negative inference regarding Smith's refusal to discuss her marriage at the hearing or her failure to disclose to Doe that she had a husband and child. Compl. ¶ 254. Unlike medical records, information about a Complainant's relationship is not privileged from disclosure, yet the failure to disclose the privileged documents formed the basis for a negative inference. Compl. ¶ 272.

The Investigator's inconsistent findings regarding the consistency and credibility of Smith fail to meet the preponderance standard of evidence properly, fairly, and impartially applied, as it must be under Dartmouth's policies.

*Analysis*

In *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195 (D. Mass. 2017), the court denied the school's motion to dismiss and allowed the claim that the school breached its contractual obligations to the student in that the school's "decision was not supported by a preponderance of the evidence" to proceed. *Id.* at 216. In *Doe v. Princeton Univ.*, 30 F.4th 335 (3d Cir. 2022), the court, denying the school's motion to dismiss where plaintiff sufficiently alleged that the university breached its contract by failing to provide plaintiff the promised fair and impartial

proceeding under a preponderance of the evidence standard because it "'applied inconsistent standards to assess [Complainant]'s and [Respondent]'s credibility…overlooked or minimized glaring substantial factors that would tend to undermine [Complainant]'s veracity…including…her motivations to lie,'…and 'disregarded compelling exculpatory evidence which contradicted [Complainant]'s allegations.'" *Id.* at 347-48; *see also Doe v. Rollins Coll.*, 352 F. Supp. 3d 1205, 1212 (M.D. Fla. 2019) (denying motion to dismiss because plaintiff sufficiently alleged, in part, a biased investigator assessed the female as more credible than the male).

In *Doe v. Syracuse University*, 440 F. Supp. 3d 158 (N.D.N.Y. 2020), the court denied the motion to dismiss where plaintiff "plausibly alleged that the disciplinary decision was a **result-driven determination** in which [the school] failed to apply the applicable standard" which resulted in a breach of contract. *Id*. at 179 (emphasis added). Specifically, the *Syracuse* court noted that plaintiff's claims were supported by his allegations that the credibility determinations against him and in favor of the Complainant were not rationally based on the evidence because it assessed the Complainant as credible "without addressing or considering [Complainant]'s 'multiple versions of events'; that [the Investigator] 'disregarded and gave no account of inconsistencies in [Complainant]'s statements'; and that the Board followed these findings, finding [Complainant] credible…without any explanation of this discrepancy." *Id*.

In *Doe v. Siena College*, 2023 WL 197461, (N.D.N.Y. Jan. 17, 2023), the university utilized the same consulting firm, Grand River Solutions, to serve as the hearing officer for adjudication of a similar complaint. *Id*. at *9. In *Siena College*, the court granted the plaintiff's Motion for Preliminary Injunction, finding that the plaintiff had plausibly alleged breach of contract for failure to apply preponderance of evidence standard based on the Grand River

Solutions' officer's hearing decision, which "failed to assess the entirety of the record, ignored exculpatory evidence and evidence which contradicted [Complainant]'s and her friends' accounts, and relied heavily on photographic evidence whose reliability had been questioned, without explanation." *Id*. at *18.

Similarly, in this case, the Hearing Panel credited Smith's inconsistent statements as consistent, ignored the exculpatory evidence in the form of the rape kit, and relied on a Snapchat video that does not substantiate the allegations whatsoever in finding Doe responsible for sexual misconduct under Dartmouth's policy.  Compl. ¶¶ 205, 207, 226.

Dartmouth's finding that Doe was responsible notwithstanding the relevant exculpatory evidence and evidence calling into question Smith's credibility is not supported by a preponderance of the evidence.  For that reason, and the case law supporting it, Doe has a likelihood of success on the merits of his breach of contract claim based on Dartmouth's failure to apply the preponderance of the evidence standard fairly, thoroughly, and impartially to the investigation and adjudicatory process in his case.

### B.    Title IX Claim

"Title IX prohibits gender-based discrimination in a wide array of programs and activities undertaken by educational institutions." *Amherst Coll.*, 238 F. Supp. 3d at 221 (citing *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002)).  "One of the purposes of Title IX is 'to provide individual citizens with effective protection against [discriminatory] practices.'"  *Id.* (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979)).  Specifically, "Title IX provides that '[n]o person in the United States shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance.'"  *Trs. of Boston Coll.*, 892 F.3d at 89-90 (quoting 20 U.S.C. § 1681(a)).  The U.S. Department of

Education interprets "program" to include "all of the operations of . . . [a] college, university, or other postsecondary institution." 34 C.F.R. § 106.2(h)(2)(i). Title IX "is enforceable through an implied private right of action." *Trs. of Boston Coll.*, 892 F.3d at 90 (internal quotation marks and citations omitted).

In this age of heightened sensitivity to allegations of sexual misconduct, a court in this circuit has pointed out that "[c]ourts increasingly see claims brought pursuant to Title IX by male students who have been found responsible and disciplined for violating the sexual misconduct policies colleges use to deter and respond to sexual misconduct." *Amherst Coll.*, 238 F. Supp. 3d at 222 (collecting cases). And, while "[n]either the Supreme Court nor [the First] Circuit have adopted a framework for analyzing claims by students challenging a university's disciplinary procedures as discriminatory under Title IX," the courts in both the *Amherst College* and the *Boston College* cases apply the framework set out by the Second Circuit in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994). *Trs. of Boston Coll.*, 892 F.3d at 90; *see also Amherst Coll.*, 238 F. Supp. 3d at 222. In the absence of authority to the contrary, Doe argues his claims pursuant to that framework and establishes that his claims are likely to succeed when viewed in light of a full evidentiary record.

"In *Yusuf*, the Second Circuit described two categories of claims arising in these types of cases, both of which fall under the differential treatment line of Title IX cases. In one category are claims alleging bias in the disciplinary process led to an erroneous outcome. The other category includes claims asserting selective enforcement." *Amherst Coll.*, 238 F. Supp. 3d at 222 (citing *Yusuf*, 35 F.3d at 715). In this case, Doe has a reasonable likelihood of success on both types of Title IX claims.

### i.  Erroneous Outcome

"To succeed on an erroneous outcome claim, a plaintiff must demonstrate there was (1) a flawed proceeding that (2) led to an erroneous outcome that was adverse to the plaintiff and (3) specific circumstances casually connecting gender bias to the erroneous outcome." *Amherst Coll.*, 238 F. Supp. 3d at 222 (internal citations omitted).

In stating an erroneous outcome claim under Title IX, Doe "may rely on circumstantial evidence alone to prove that there was a discriminatory pattern of decision-making" to show that gender bias was a "motivating factor" behind the report finding him responsible. *Trs. of Boston Coll.*, 892 F.3d at 92.  In cases where "the plaintiff claims he is innocent but was wrongly found to have committed a disciplinary offense, the plaintiff must allege 'particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding.'" *Siena College*, 2023 WL 197461 at *14 (quoting *Yusuf*, 35 F.3d at 715).

In this case, there is abundant evidence sufficient to cast some articulable doubt on the accuracy of the outcome, which was both procedurally and substantively flawed.  Beginning from the conferring of jurisdiction for a matter outside of the scope of Dartmouth's authority, to ignoring exculpatory evidence, to failing to properly and fairly assess the consistency and plausibility of the statements both and the investigatory and adjudicatory stage, discussed substantially above.  The *Siena College* analysis is particularly useful here, denying the motion to dismiss finding that plaintiff had sufficiently articulated facts casting doubt on the accuracy of the outcome. *Id.* at *15.  In that matter, plaintiff identified:

> "particular evidentiary weaknesses" behind [the school]'s finding of responsibility, including particular "exculpatory evidence" that [the Grand River Solutions Hearing Officer] '"ignore[ed]" in her decision. . .Specifically, [the Hearing Officer]'s hearing decision does not meaningfully consider, or fails to mention entirely: … [the Complainant]'s medical records from February 13 and 14 documenting no objective indication of a lip or neck injury. . . [the Hearing Officer]'s decision offers no explanation

for her failure to mention or her discounting of this evidence. Importantly, these evidentiary weaknesses and gaps in [the Hearing Officer]'s analysis bear directly on the credibility of the witnesses. Because the outcome of the proceeding in large part hinged on the parties' credibility, Plaintiff has raised an articulable doubt as to the accuracy of the outcome.

*Id*. (citing *Doe v. Trs. of Dartmouth Coll.*, No. 22-cv-18, 2022 WL 2704275, at *7 (D.N.H. July 12, 2022) (finding that the plaintiff had plausibly alleged articulable doubt where the university discounted the plaintiff's credibility and "the evidence was largely [the complainant's] word against [the plaintiff's]")).

With respect to the second prong, establishing gender bias as a motivating factor behind the erroneous outcome, Doe has sufficiently done so.  In *Siena College*, the Plaintiff asserted that the Grand River Solutions Hearing Officer's decision "failed to acknowledge or note exculpatory evidence in favor of Plaintiff" despite crediting Complainant's "continually evolv[ing]" story and relied on "highly questionable, suspect, and entirely unreliable pieces of evidence." *Siena College*, 2023 WL 197461 at *16.  "When the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias." *Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d. Cir 2016).  Just as it occurred here, the "hearing decision's failure to address or even mention certain exculpatory evidence, as set forth more fully above, is sufficient to support an inference of bias on the part of the evaluator." *Siena College*, 2023 WL 197461 at *16.

Furthermore, since at least 2016, there has been external and internal pressure on Dartmouth to adopt a position respecting investigations of sexual assault that is biased against male responding students and in favor of female reporting students.[3]   Dartmouth has faced pressure from the U.S. Department of Education, in the form of the now-discredited and

---

[3] For a concise synopsis, please s*ee* Complaint at 41-54, 1:21-cv-00085-JD *Doe v. Trustees of Dartmouth College*.

rescinded 2011 "Dear Colleague" letter and the Department's multiple investigations into Dartmouth's handling of cases of sexual misconduct. *Id.* Dartmouth also faced intense pressure from students to increase its focus on punishing male responding students and to blindly accept allegations made by female reporting students. *Id.* Dartmouth also faced financial pressure as a result of a movement amongst alumni to withhold donations until such changes were made. *Id.*

The *Columbia University* court found that, as is true with Dartmouth:

> the Complaint allege[d] that during the period preceding the disciplinary hearing, there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students. It alleges further that the University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue. Against this factual background, it is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault.

*Columbia Univ.*, 831 F.3d at 57; *see also Vengalattore v. Cornell Univ.*, 36 F.4th 87, 106–07 (2d Cir. 2022) ("Given that 'procedural irregularity alone' may suggest some form of bias, when there are 'clear procedural irregularities in a university's response to allegations of sexual misconduct' we have concluded that 'even minimal evidence of sex-based pressure on the university is sufficient' to permit a plausible inference that the 'bias [was] on account of sex.'" (citation omitted)).

In an atmosphere of political and public pressure to enforce Title IX in a manner that has a discriminatory result against male responding students, Dartmouth has fashioned itself detective, prosecutor, and judge, with a clear goal of conviction. The Investigator and Hearing Panel failed to draw any inferences in Doe's favor, or against Smith's credibility, and failed to credit Doe's account over Smith's in any dispute between them, despite receiving exculpatory evidence, and failing to pursue evidence that Smith intentionally omitted. Compl. ¶¶ 226, 254,

265, 266, 267.  The Hearing Panel wrongfully weighed the lack of text message evidence against Doe, when in fact the unavailability of the complete exchanges can be attributed to Smith, as she was still in possession of the exchanges, and therefore their unavailability should have weighed against her. Compl. ¶ 265.

In *Doe v. Brown University*, the court declined to dismiss plaintiff's claim where plaintiff cited a handful of comparable cases. Specifically, the plaintiff alleged that "[u]pon information and belief" the university's handling of his case "fit[ ] within a pattern of showing gender bias toward female students in cases of sexual misconduct," and named two prior cases as well as other instances documented in student newspapers from specific dates. 166 F. Supp. 3d 177, 189 (D.R.I. 2016).

In a recent Title IX case against Dartmouth, the court held that "viewing the pattern of discrimination that Doe alleges in the light most favorable to Doe, it is sufficient to allege that discrimination was the but-for cause of the school's finding that Doe lacked credibility and therefore the finding that he was responsible for sexual misconduct," concluding that the plaintiff had sufficiently stated a claim of Title IX discrimination under the erroneous outcome theory. *Doe v. Trs. Of Dartmouth Coll.*, 615 F. Supp. 3d, 47, 59-60 (D.N.H. 2022).  In two other recent Title IX lawsuits against Dartmouth, plaintiffs alleged that gender bias infected the investigatory and adjudicatory process, in which the female complainant was credited every step of the way, and male respondent was discredited every step of the way. *Doe v. Trs. of Dartmouth Coll.*, No. 19-cv-13-JL (D.N.H. Apr. 7, 2019) (docket no. 49); *Doe v. Trs. of Dartmouth Coll.*, 2021 WL 2857518 at *5 (D.N.H. July 8, 2021).  While the latter two cases were not successful in establishing gender bias when taken independently, both survived motions to dismiss on the basis that Dartmouth breached its respective contracts to the plaintiffs in upholding the impartial

and fundamentally fair investigations and proceedings that the policy requires. *Id*. The obvious pattern of conduct in which Dartmouth fails to fairly and impartially conduct Title IX or SMP processes with respect to male respondents permits an inference that Dartmouth demonstrates gender bias against men in cases of sexual misconduct. Accordingly, Doe is likely to prevail on the erroneous outcome claim.

### ii.    Selective Enforcement

"In order to prevail on a Title IX selective enforcement claim, Doe must establish his gender was a motivating factor behind either the College's decision to pursue disciplinary action against him or its decision as to the severity of the punishment to impose upon him." *Amherst Coll.*, 238 F. Supp. 3d at 223. "Unlike an erroneous outcome claim, a plaintiff can prevail on a selective enforcement claim without disturbing the factual findings made in a disciplinary proceeding." *Id.* at 222 (citing *Yusuf*, 35 F.3d at 715).

As stated above, Dartmouth aggressively pursued an SMP claim against Doe, despite the fact that the conduct alleged occurred off-campus with a person with no remote connection to Dartmouth or any Dartmouth Program or Activity. Smith was not a member of the student body, nor was she at all associated with the community, including within the hospital system. Dartmouth nevertheless pursued this investigation, erroneously conferring jurisdiction, despite the fact that it did not attempt to provide redress or protection for a student. Dartmouth *chose* to pursue this claim without any contractual obligation to do so, on behalf of an otherwise unknown female Complainant, *even after her criminal complaint closed without resulting in charges.* Dartmouth credited the unsupported, implausible claim of a woman unknown to the community over Doe's narrative. In doing so, Dartmouth has treated a random female accuser, whose allegations have no cognizable nexus to Dartmouth, differently than they have treated Doe and

other male students – and affirmatively elected to pursue the complaint and sanctions against him without any duty to do so.  That is the definition of selective enforcement.

Doe can cite to at least one relevant example without the benefit of discovery in which Dartmouth, and specifically Ms. Clemens, refused to exercise jurisdiction of a complaint submitted by a man, on the basis that it was not part of a Dartmouth-sponsored or -controlled activity, and the allegations were beyond the scope of the SMP. *Doe v. Trs. of Dartmouth Coll.*, 2021 WL 2857518 at *4 (D.N.H. July 8, 2021).  Doe can cite to another instance in which Dartmouth responded to two cross reports, each alleging claims of sexual misconduct by the other, with significant bias toward the male. *See Doe v. Trs. of Dartmouth Coll.*, 2018 WL 2048385 at *1-*2 (D.N.H. May 2, 2018).  Additionally, based on this example and with the benefit of discovery, Doe will be able to make "specific factual allegations that the College responded differently to similar reports when the genders of the potential victims and aggressors were different" and those specific allegations can provide "a foundation from which a court can infer [that] gender-based discrimination may have played a role in the College's responses." *Amherst Coll.*, 238 F. Supp. 3d at 218.

Like the plaintiffs in the cases cited above, Doe has alleged sufficient facts to establish a likelihood of success on the merits of his Title IX select enforcement claim based on the manner in which Dartmouth has aggressively pursued the complaint filed by a non-student female complainant to whom it had no duty, and credited her statements as true while discrediting Doe's statements as false.

### C.  Title VI Claim

To succeed on a Title VI claim, a plaintiff must allege facts from which plausible inferences can be made that (1) defendant discriminated against the plaintiff on the basis of race;

(2) the discrimination was intentional; and (3) the discrimination was a substantial motivating factor for the defendant's actions. *Goodman v. Bowdoin Coll.*, 380 F.3d 33, 34 (1st Cir. 2004). "Intentional racial discrimination can be inferred from disparate or differential treatment of races… Regardless of the type of circumstantial evidence used to support the claim, the pleading must support a connection 'between the university's actions and racially discriminatory motivations.'" *Doe v. Trs. of Dartmouth Coll.*, 2021 WL 2857518 at *8 (D.N.H. July 8, 2021) (quoting *Doe v. Harvard Univ.*, 462 F. Supp. 3d 51, 62 (D. Mass. 2020)).

In *Doe v. Brown University*, the court found that the plaintiff had plausibly alleged intentional racial discrimination and that the reason behind his differential treatment was his race. 327 F. Supp. 3d at 413. Specifically, the court noted that the description of the plaintiff as a "predator" and the use of the racial epithet "boy" could be found by a jury to be "imbued with racial hostility." *Id.* *See Mayale-Eke v. Merrill Lynch*, 754 F.Supp.2d 372, 381 (D.R.I. 2010) (noting that plaintiffs in discrimination suits must rely on the cumulative weight of circumstantial evidence because it is "unrealistic to think that in the 21st century any sophisticated" person would make a blatant statement tainted with impermissible discriminatory animus).

In the instant matter, Doe has faced open, intentional acts of racism throughout his time at Dartmouth. In 2015, Doe was falsely accused of threatening behavior in the middle of class by a faculty member. Compl. ¶ 282. Ms. Clemens, the first Title IX coordinator, requested a meeting with Doe, arming herself with the Director of Safety and Security, and called Doe "threatening." Compl. ¶¶ 282-83. The report was unsubstantiated, but Doe faced retaliation, as the accusing professor later falsely reported Doe for plagiarism. Compl. ¶ 285. This report was likewise unsubstantiated. *Id.* Doe was called "tall, big, and Black," as well as "threatening" at

the meeting with Ms. Clemens in 2015. Compl. ¶ 283. In 2016, Doe reported concerns with professors to Ms. Clemens. Compl. ¶ 288. No action was taken on his behalf. *Id.* In 2020, Doe was called a "Black man in a dark-colored hoodie" by a Dartmouth Safety and Security officer following Doe's request for assistance after noticing his car keys had been taken. Compl. ¶ 290. Again, his report went unaddressed. *Id.* In 2022, during an internship in Dartmouth's neurosurgery department, a professor told him that he needed to "speak, act, and behave like a white man" in order to have the opportunity to match in neurosurgery. Compl. ¶ 292. Upon information and belief, Dartmouth has never had a Black student "Match" in neurosurgery. Doe reported this incident of racism, as well as the following retaliatory final evaluations. Compl. ¶ 293, 291. His report was determined to be substantiated, and his grade was changed, but there was no additional action taken on his behalf. Compl. ¶ 293.

When the formal complaint for sexual misconduct was filed against Doe, he repeatedly requested that Ms. Clemens be removed for bias. Compl. ¶ 126. However, she was not removed for several months until Doe learned through the evidentiary review that "somebody" at Dartmouth told Smith that Doe's "name ha[d] been circulating around for a while" and there was a "behavioral pattern" that "somebody needed to look into." Compl. ¶ 133. Doe had never previously been accused of or investigated for sexual misconduct. Compl. ¶ 195. Upon information and belief, Ms. Clemens is the person who falsely and improperly disclosed this to Smith. When Doe raised this issue, Ms. Clemens was removed from the proceeding. Compl. ¶ 134. However, the damage had been done: Ms. Clemens had already issued the jurisdictional decision, and Investigator 1 had already completed a majority of the interviews that would become the Final Record. Compl. ¶ 136.

There are clear acts of intentional racism in the form of racial epithets, racially motivated comments, and racially based retaliation that provide the framework and the foundation for the intentional, racially motivated approach toward Doe with respect to disciplinary action. Ms. Clemens' statement that Doe's name has been circulating with a behavioral pattern is just the same as "predator" with more words. *See Doe v. Brown Univ.*, 327 F. Supp. 3d at 413. The choice to pursue this formal complaint, despite the fact that it was beyond the scope of Dartmouth's authority, and the total failure to conduct the investigation in a fair and impartial manner was an intentional act of discrimination motivated by race, evidenced by Doe's cumulative history with open and unpunished racism at Dartmouth.

## II. Doe will suffer irreparable harm in the absence of preliminary relief.

Courts have held that allegations that a suspension or expulsion from college would damage a student's academic and professional reputation are sufficient to establish irreparable harm at the preliminary injunction stage. *See Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 712 (S.D. Ohio 2016). More specifically, courts have recognized that,

> While Plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate for the loss of his senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career . . . . Further, Plaintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap.

*Doe v. Middlebury Coll.*, No. 1:15-cv-192-jgm, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015). Similarly, a court granted a preliminary injunction against DePauw University in part because the plaintiff would suffer irreparable harm if "not permitted to complete this upcoming semester" because the gap created in his record would make it "inevitable that he would be asked to explain [the] situation by future employers or graduate school admission committees, which would require him to reveal that he was found guilty of sexual misconduct by DePauw." *King v.*

*DePauw Univ.*, No. 2:14-cv-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014). *See also Ritter v. Oklahoma*, No. CIV-16-0438-HE, 2016 WL 2659620, at *3 (W.D. Okla. May 6, 2016) (plaintiff seeking a TRO demonstrated that the "loss of educational and career opportunities he will encounter if he is not reinstated and allowed to graduate is not readily compensable in money damages."). The plaintiffs in the *DePauw* and *Middlebury* cases both sought and were granted injunctions to return to their respective universities and complete the school year, thus avoiding any appearance of a gap in their education while their cases proceeded.

This case is particularly urgent. Doe is in his final semester of medical school. He is set to apply for "Match" for his residency in February 2024. His "Match" application **must** be submitted through Dartmouth's system. Upon information and belief, despite the "Match" submission being due on February 28, 2024, Dartmouth intends to submit its eligible students' applications on **February 26, 2024**. The "Match" results are available on March 15, 2024. Doe secured fifteen (15) interviews with residency programs, which is considered a "guaranteed Match." If his application is not submitted in Dartmouth's batch on February 26, 2024, he will not be eligible to "Match" with a residency program, and his career will be over before it ever began.

Doe has one (1) course remaining until he completes his M.D. degree, and that course can be completed remotely. Upon information and belief, Geisel has a policy of limiting the total number of years one can spend in the program to seven (7) – a student may not earn an M.D. after that point. Doe is in his seventh year and would not likely be allowed to return if he is not reinstated immediately. If Doe is not reinstated, and the expulsion is enforced, Doe will be forced to explain the expulsion, including the reason for the expulsion itself, to all future

employers and to any medical school at which he may seek to finish out the last semester of his degree.  Delays in Doe obtaining his degree and starting his residency only serve to deprive him of the career in helping people of which he has always dreamed and the world of one of the many skilled neurologists it needs.  Additionally, if Doe is forced to pursue his education at a medical school outside of the United States or at an osteopathic medical school in the United States, he will likely have difficulties getting into a residency program in the United States or require additional education or training in the United States that he would not have if he were to graduate from Geisel.  Thus, Doe has experienced and will continue to experience irreparable harm in the absence of a preliminary injunction.

Additionally, Doe would suffer irreparable harm in the denial of his constitutional right to equal treatment under the Fourteenth Amendment.  *See Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016).  In the *Portz* case, the court recognized that even though the school was a private institution, the plaintiffs suffered irreparable harm due to their "expectation that they may be treated unequally in violation of Title IX's terms," because "when the constitutional right at issue is protected by the Fourteenth Amendment, the denial of that right is an irreparable harm regardless of whether the plaintiff seeks redress under the Fourteenth Amendment itself or under a statute enacted via Congress's power to enforce the Fourteenth Amendment," such as Title IX.  *Id.*  As such, Doe has suffered irreparable harm that will only continue and increase in the absence of an injunction in this case.

III.     **The balance of equities weighs in favor of a preliminary injunction.**

In this case, the balance of the equities weighs in favor of a preliminary injunction because, while Doe will suffer immediate and lasting irreparable harm without one, Dartmouth will suffer only limited harm if it ultimately prevails, and the injunction is lifted.  There will be

no harm to Smith because she has no association with Dartmouth or any of its Programs or Activities.

In *Doe v. Middlebury College*, the court found that, while the plaintiff was "likely to suffer irreparable harm if he is expelled, it is unlikely [the university] will suffer great damage or loss as a result of the issuance of a preliminary injunction preventing the expulsion of [the plaintiff] for the fall semester." 2015 WL 5488109, at *4. In so holding, the court recognized that the university would suffer interference with its process for dealing with allegations of sexual misconduct if an injunction were granted, but that if the university ultimately prevails, it can refuse to confer a degree on the plaintiff and maintain his disciplinary record in their files. *See id.* On the other hand, the court found that plaintiff "will suffer if he is not permitted to return to campus but ultimately prevails in the case." *Id.* Therefore, the balance of the equities favored granting the injunction in favor of the plaintiff. *See id.*; *see also King*, 2014 WL 4197507, at *14 (recognizing the harm that the university would suffer in terms of being denied the right to enforce its policies and being second guessed by the court but finding that harm was outweighed by the harm to the plaintiff in loss of education, job opportunities, and having to explain a gap year for the rest of his life).

Similarly, Dartmouth will not suffer harm while its process in this case is subject to judicial scrutiny sufficient to outweigh the tangible harm Doe will certainly suffer as he will be unable to finish his medical degree and apply for residency in the absence of an injunction.

**IV.    A preliminary injunction is in the public interest.**

Courts have recognized that when a plaintiff has a likelihood of success on a Title IX claim, "the public interest weighs in Plaintiffs [*sic*] favor because the public's interest in eradicating sex discrimination is compelling." *Portz*, 196 F. Supp. 3d at 978 (citing *Bob Jones*

*Univ. v. United States*, 461 U.S. 574, 604 (1983)). Also, courts have recognized "that there is a broad public interest in enforcing fundamental constitutional principles" and that contractual fairness claims against universities in the Title IX context are sufficient to justify issuing a preliminary injunction against allegedly unfair disciplinary proceedings. *See, e.g.*, *Univ. of Cincinnati*, 223 F. Supp. 3d at 712. It is critical in this day and age, both in terms of practical application and in terms of perception, that fairness and impartiality to all parties be the rule in Title IX cases. Consequently, in this case, granting a preliminary injunction is in the public interest.

## CONCLUSION

For the foregoing reasons, Doe has made a showing entitling him to preliminary injunctive relief. Accordingly, Doe respectfully requests that the Court grant his motion for preliminary injunction and enjoin Dartmouth's expulsion of Doe pending the outcome of this case. Doe requests oral argument and an expedited hearing.

Respectfully submitted,

Dated: February 16, 2024

/s/ *Leah Cole Durst*
Leah Cole Durst (NH Bar #273679)
Olivia F. Bensinger (NH Bar #274145)
SHAHEEN & GORDON, P.A.
107 Storrs Street, P.O. Box 2703
Concord, NH 03302
(603) 225-7262
ldurst@shaheengordon.com
obensinger@shaheengordon.com

*Attorney for Plaintiff John Doe*

**CERTIFICATE OF SERVICE**

I, Leah Cole Durst, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be served conventionally on all parties or their counsel.

/s/ *Leah Cole Durst*
Leah Cole Durst