UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

JOHN DOE,

          Plaintiff

    v.

TRUSTEES OF DARTMOUTH COLLEGE,

        Defendant

Civil Action No:  1:24-cv-46-JL

**DEFENDANT'S MEMORANDUM OF OBJECTION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION AND EXPEDITED RELIEF**

Plaintiff's motion for a preliminary injunction should be denied.  Plaintiff cannot demonstrate a likelihood of success on the merits or that he will suffer irreparable harm absent the extraordinary remedy of a mandatory preliminary injunction.  The balance of equities and public interest also disfavor the award of such relief.

Along with this memorandum of objection, Defendant Trustees of Dartmouth College ("Dartmouth") submits the Declarations of Kristi L. Clemens (Exhibit A), Alejandro Diaz (Exhibit B), Adam Wolkoff (Exhibit C), and Dr. Sonia Chimienti (Exhibit D).  The numbered Exhibits referenced herein are filed as Joint Exhibits for the Hearing on Plaintiff's Motion for Preliminary Injunction.

**RELEVANT FACTS**

The plaintiff John Doe was a student at Dartmouth's Geisel School of Medicine.  Compl. ¶ 11.  On December 19, 2022, a woman not affiliated with Dartmouth (referred to in the Complaint as "Sally Smith") filed a formal complaint with Dartmouth's Title IX office, alleging that Doe raped her in his off-campus apartment on the night of November 3-4, 2022.  *Id*. ¶ 93. The next day, Dartmouth initiated a formal complaint resolution process pursuant to its Sexual and Gender-Based Misconduct Policy ("Sexual Misconduct Policy" or "SMP").  *Id*. ¶¶ 94-95.

The SMP applies primarily, but not exclusively, to complaints of sexual misconduct that occur in Dartmouth's "Education Program or Activity," in which case Dartmouth follows the procedures required under Title IX of the Education Amendments of 1972. Title IX prohibits discrimination on the basis of sex in any education program or activity that receives Federal financial assistance. 20 U.S.C. § 1681. Each recipient must appoint a Title IX Coordinator, 34 C.F.R. § 106.8, and must adopt certain grievance procedures for addressing formal complaints of sexual harassment, including sexual assault, occurring in the recipient's education program or activity. 34 C.F.R. § 106.45.

Where alleged sexual misconduct occurs outside a recipient's education program or activity, the recipient is free to address the matter under its code of conduct without following the procedures required under Title IX. 34 C.F.R. 106.45(b)(3)(ii). Thus, the SMP provides that it also can apply in "limited circumstances" when the alleged sexual misconduct occurs outside of Dartmouth's Education Program or Activity. Compl. ¶ 98. In that case, Dartmouth has chosen to follow most but not all the procedures that apply to a case within the scope of Title IX. The one difference concerns the hearing stage of the proceedings. In a Title IX case, witnesses are questioned by advisors to the complainant and respondent, whereas in a non-Title IX case, witnesses are questioned by the Hearing Panel. Compl. ¶ 114; Compl. Ex. A at 4; Compl. Ex. B at 20-21.

Dartmouth's Title IX Coordinator, Kristi L. Clemens, determined that Smith's allegation of rape was among the "limited circumstances" in which the SMP will apply to conduct occurring outside Dartmouth's Education Program or Activity. Clemens Decl. ¶ 14. Ms. Clemens made this determination based upon the serious nature of the allegations and the fact that they involved a current Dartmouth student. *Id.* The allegations, if substantiated, would

mean that a Dartmouth student had committed a violent sexual assault and thus could pose a threat to the Dartmouth Community. *Id.* During Ms. Clemens's time as Dartmouth's Title IX Coordinator, since 2018, Dartmouth consistently has applied the SMP in cases of alleged sexual assault by a member of the Dartmouth community occurring outside its Education Program and Activity. *Id.* ¶ 15. There have been two such cases, which are described in Ms. Clemens's Declaration. *Id.* ¶¶ 16-17. In one of them, the alleged assailant was a white man; in the other case, the alleged assailant was a Latinx man. *Id.*

Consistent with Dartmouth's Process for Resolving Complaints Against Students Pursuant to the Sexual Misconduct Policy ("Process for Resolving Complaints" or "PRC"), Ms. Clemens appointed an attorney from outside Dartmouth (referred to in the Complaint as "Investigator 1") to conduct an investigation. Compl. ¶¶ 93, 121. Pursuant to the PRC, the investigator conducts an investigation; the evidence then is shared with the parties for their review and comment; and the investigator issues a final report. Compl. Ex. B at 13-16. The case then is heard by a three-person Hearing Panel, which determines whether a preponderance of the evidence supports a finding that the respondent has violated the Sexual Misconduct Policy, in which case the Panel also determines the appropriate sanction. *Id.* at 18-19. Throughout the process, a respondent may be assisted by an advisor of their choice. *Id.* at 10-11. Initially Doe's advisor was an attorney named Christine Brown; he later replaced Brown with the attorneys who represent him in this litigation. Clemens Decl. ¶ 21.

Investigator 1 interviewed Sally Smith and five witnesses. Compl. ¶ 129. Doe refused to participate in the investigation during this time. Clemens Decl. ¶ 22. Smith and Doe were afforded an opportunity to review and respond to the evidence gathered during the investigation, but neither party responded. *Id.* ¶ 23.

On April 26, 2023, Doe wrote to Ms. Clemens and others, stating why he "declined to participate in this so-called investigation," including his belief that Dartmouth could not exercise jurisdiction under the Sexual Misconduct Policy, alleged bias on the part of Ms. Clemens and her office, and a history of alleged discrimination, harassment, and unfair treatment he allegedly had experienced at Dartmouth. *See* Exhibit 3. Doe's allegations were referred to Dartmouth's Chief Compliance Officer, Alejandro J. Diaz, who met with Doe and reviewed his concerns.  Diaz Decl. ¶¶ 3-4

In consultation with others at Dartmouth and a third-party consultant with expertise in such matters, Mr. Diaz determined that Ms. Clemens's decision to exercise discretionary jurisdiction under the Sexual Misconduct Policy in Doe's case was both sound and consistent with Dartmouth's decisions in prior, analogous cases. *Id*. ¶ 5.

Also in consultation with others, Mr. Dias decided to address Doe's concerns of alleged bias on the part of Ms. Clemens and her office by outsourcing the entire investigation and adjudication process to a third party. *Id*. ¶ 7. Dartmouth engaged the firm Grand River Solutions ("GRS"), which specializes in this work. *Id*. A GRS employee was appointed to serve as the Title IX Coordinator for Doe's case; another GRS employee was appointed to serve as the investigator (referred to in the Complaint as "Investigator 2"); and three other GRS employees were appointed as the Hearing Panel in Doe's case. *Id*.; Compl. ¶ 138. Dartmouth also referred Doe's other allegations – not relating to the SMP case – for review by GRS; that process that is ongoing. Diaz Decl. ¶¶ 8-11.

Doe agreed to meet with Investigator 2, who conducted an interview of Doe. Compl. ¶¶ 138-40. Once again, Smith and Doe were afforded an opportunity to review all the evidence gathered in the investigation, and this time Doe submitted a response. *Id*. ¶ 142; Exhibit 4.

Investigator 2 issued a Final Investigation Report on September 19, 2023.  *See* Exhibit 5, Final

Report.

On November 17, 2023, Doe submitted a request to dismiss the case, in which he

advanced essentially the same arguments he now asserts in this litigation, including his claims

that the SMP should not apply and that the evidence did not support a finding against him.  *See*

Exhibit 7.

The Hearing Panel reviewed all the investigation materials and then convened a hearing

on December 8, 2023.  Compl. ¶ 153; Wolkoff Decl. ¶ 2.  Smith and Doe both attended,

accompanied by their advisors.  Wolkoff Decl. ¶ 3.  The Hearing Panel questioned both parties,

taking into account the questions that both Smith and Doe suggested the Panel should ask,

including questions that Doe submitted during the hearing.  *Id*. ¶ 4.

The Panel issued its decision on January 17, 2024.  Exhibit 8. The Panel found Doe

responsible for violating the Sexual Misconduct Policy by sexually assaulting Smith three times

on the night of November 3-4, 2022.  *Id*. at 5, 10-12.

The Panel found Smith's account of the events at issue more reliable than Doe's.  *Id*. at 5.

The Panel found that Smith provided a "detailed and consistent" account of what transpired,

which was corroborated by the accounts Smith provided to several witnesses immediately after

the events at issue, the account she gave to a SANE nurse within hours of the events, and the

accounts she later provided to Dartmouth's investigators and law enforcement officials.  *Id*. at 5-

6.  The Panel considered but was not persuaded by Doe's arguments about inconsistencies

between Smith's account and those of certain witnesses.  *Id*. at 7; Wolkoff Decl. ¶ 12.  The Panel

noted that some details about the encounter were not included in the police report's version of

Smith's account.  However, the panel also observed the police report's account of Doe's

statement also appeared to lack some relevant details.  *Id.* ¶ 11.  One of the panelists who served for nearly ten years as a campus police officer noted that the police report did not seem thorough and complete.  *Id.*

The Panel carefully assessed the plausibility of Smith's account in light of the SANE exam notes, which stated there were no "obvious" signs of trauma in the physical exam.  *Id.* ¶ 6.[1] The Panel determined the evidence was largely consistent with Smith's own statement (in her interview at page 24) that her body "reacted to what [Doe] was doing" during the assault and this caused her embarrassment because she had not consented to the penetration.  *Id.*  The Panel felt it unnecessary to include further graphic details from the SANE examination in the Final Report. *Id.*  In addition, Smith clarified at the hearing that although the last assault spanned an hour, and Doe was on top of her for that long, he was not penetrating her that entire time.  *Id.* The Panel also considered but was not persuaded by Doe's arguments about the reliability of the Snapchat video Smith provided. Exhibit 8 at 7-8; Wolkoff Decl. ¶¶ 8-9.[2]

The Panel found Doe's account was less reliable than Smith's for a number of reasons, including the fact that Doe was unable to produce text messages he said would demonstrate a "warm relationship" between him and Smith before the incident; and Doe's statements made it apparent he deleted the texts after Smith had accused him of assaulting her, although he claimed otherwise.  Exhibit 8 at 9; Wolkoff Decl. ¶¶ 14.  The Panel also noted Doe's failure to produce medical documentation corroborating his claimed physical limitations, which were relevant to

---

[1] Doe never raised any issue about the SANE examination records being incomplete.  Wolkoff. Decl. ¶ 7.

[2] Doe argues that the Panel failed to consider that the date on the Snapchat video was December 19, 2022, suggesting it was falsified. Pl. Mem. at 11. However, during the hearing the Hearing Panel questioned Smith about this, and she credibly explained that that was likely the date she produced the video to Dartmouth. Exhibit 9 at 25; Wolkoff Decl. ¶ 8.

his argument that the sexual encounter could not have transpired as Smith alleged.  Exhibit 8.

Having found that Doe violated the Sexual Misconduct Policy by sexually assaulting Smith, the Panel determined that Doe should be expelled.  *Id.* at 12-13.  Dartmouth mandates expulsion in cases of sexual assault involving penetration and use of physical force.  Exhibit 2 at 23.

On January 22, 2024, Doe appealed the Panel's findings to the Dean of the Geisel School. Compl. ¶ 163.  Doe made essentially the same arguments he is advancing in this case.  *See* Exhibit 10.  The Dean issued his decision in a letter dated February 12, 2024.  Compl. ¶ 171. The Dean carefully addressed each of Doe's arguments and explained why he was unpersuaded.  *See* Exhibit 11.

Doe was in the final year of his degree program at Geisel.  Compl. ¶ 30.  Before being expelled, Doe submitted applications for post-graduate residencies through "the Match" – a program in which graduating medical students seek a residency in their area of desired medical specialty.  *Id.* ¶ 30.  The Match is administered by the National Resident Matching Program (NRMP).  Chimienti Decl. ¶ 2.  In order for Geisel graduates to participate in the Match, the School has entered into a Match Participation Agreement for Medical Schools with the NRMP. *Id.* ¶ 5-6.  Pursuant to that Agreement, the School is obligated to submit complete, timely, and accurate information to the NRMP about the School and its applicants for residency.  *Id.* ¶¶ 6-8. The School's deadline for submitting this information is February 28, 2024 at 9:00 PM.  *Id.* ¶ 15. A school violates the Match Participation Agreement if it intentionally omits any information relevant to the student's eligibility to participate in graduate medical education, including any information that may adversely affect the student's graduation from medical school.  *Id.* ¶ 5. Because Doe has been expelled, the School cannot certify him to participate in the Match.  *Id.* ¶

8.  Violating the Match Participation Agreement for Medical Schools would adversely affect the School's standing with the NRMP and would adversely affect the Match for all future Dartmouth students.  *Id.* ¶ 9.

ARGUMENT

## I.   DOE SEEKS MANDATORY INJUNCTIVE RELIEF, WHICH IS STRONGLY DISFAVORED.

Preliminary injunctive relief typically is allowed only to preserve the status quo – to enjoin the non-moving party from taking some action.  *See Braintree Lab's, Inc. v. Citigroup Global Markets Inc*., 622 F.3d 36, 41 (1st Cir. 2010); *Bercovitch v. Baldwin School, Inc.,* 133 F.3d 141, 151 (1st Cir. 1998); *Merrimack Congregation of Jehovah's Witnesses v. Town of Merrimack*, No. 10-CV-581-JD, 2011 WL 1236133, at *2 (D.N.H. Mar. 31, 2011).

Mandatory injunctions, which alter the status quo, are disfavored.  *L.L. Bean, Inc. v. Bank of Am.*, 630 F. Supp. 2d 83, 89 (D. Me. 2009) (collecting cases); *Isaacs v. Trs. of Dartmouth Coll.*, No. 17-cv-40-LM, 2017 WL 4119611, at *3 (D.N.H. Sept. 14, 2017); *Potts NH RE, LLC v. Northgate Classics, LLC*, No. 12-cv-82-SM, 2012 WL 1964554, at *3 (D.N.H. May 10, 2012), *report and rec. adopted*, No. 12-cv-82-SM, 2012 WL 1969051 (D.N.H. May 30, 2012).

A party seeking mandatory injunctive relief must meet an "elevated" burden, demonstrating that "the exigencies of the situation demand such relief."  *Braintree Labs.*, 662 F.3d at 41; *see also NBA Properties, Inc. v. Gold*, 895 F.2d 30, 33 (1st Cir. 1990); *Mass. Coalition of Citizens with Disabilities v. Civil Defense Agency,* 649 F.2d 71, 76 n.7 (1st Cir. 1981).  A "mandatory injunction should not issue unless the facts and the law clearly favor the moving party."  *Robinson v. Wall*, C.A. 09-277, 2013 WL 4039027, at *2 (D.R.I. Aug. 7, 2013); *see also L.L. Bean*, 630 F. Supp. 2d at 89.

The status quo is that Doe was expelled effective February 12, 2024.  Doe does not seek

8

to enjoin Dartmouth from finding him responsible or from expelling him, which already have occurred.  He seeks a preliminary injunction which would enjoin Dartmouth from "enforcing" his expulsion and require Dartmouth to allow him to register for and attend classes, participate fully in campus activities, and submit an application for the Match.  Compl. at p. 54.  Doe thus seeks mandatory injunctive relief, which would alter the status quo.  The requested injunction would require Dartmouth to vacate Doe's expulsion, return him to good academic standing, and make affirmative representations to the NRMP about his eligibility to match that would violate Dartmouth's obligations under its Match Participation Agreement.  Allowing Doe to complete his medical degree and enter the Match pending the outcome of this action is tantamount to awarding him the ultimate relief he seeks at trial, which for obvious reasons is disfavored. *Isaacs v. Trs. of Dartmouth Coll.*, No. 17-cv-040-LM, 2017 WL 4119611, at *3 (D.N.H. Sept. 14, 2017) (the "relief that plaintiff seeks here – affirmative action by a defendant in advance of trial that consists of the very relief sought at trial – is especially disfavored") (citations omitted).

The "exigencies of the situation" also do not favor the granting of such extraordinary relief because Doe has waited too long to seek it.  Doe knew that Dartmouth was exercising jurisdiction over Smith's complaint in December 2022 – more than a year before he filed this lawsuit on February 16, 2024 – and he could have sought injunctive relief on that issue at the time.  Doe was found responsible for sexual assault and told he was being expelled on January 22, 2024 – nearly a month before he filed his complaint and motion for preliminary injunction. While Doe had the right to appeal the finding of responsibility, he and his experienced counsel had every reason to expect the appeal would not succeed in light of the weakness of his arguments and the thorough, well-reasoned findings of the Hearing Panel.  If Doe wanted to enjoin Dartmouth from expelling him, he should have sought injunctive relief before the

expulsion became effective.  Yet he waited for nearly a full month, until after the expulsion

became effective and Geisel was fast approaching its deadline to report his expulsion to the

NRMP.  *Cf., Doe v. Trs. of Dartmouth Coll*., No. 22-cv-018-LM (D.N.H. April 4, 2022)

(denying an expelled Geisel student's request for injunctive relief based in part upon the

student's "lack of urgency" in pursuing the requested injunction).

        Mandatory injunctive relief also is inappropriate because, as Dartmouth demonstrates

below, the law does not "clearly favor the moving party," a prerequisite for such relief.

## II.      DOE HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.      The Contract Claims

        The college-student relationship is contractual in nature.  *Gamble v. Univ. Sys. of New

Hampshire*, 136 N.H. 9, 13 (1992).  The interpretation of that contract is a question of law for the

Court, to which traditional contract principles apply while taking into account the distinctive

nature of the college-student relationship.  *Id.*  The contract may include student handbooks and

policies and should be given the meaning a reasonable student would ascribe to it.  *Id.*

#### 1.      Doe's jurisdictional claim has no merit.

        Doe argues that Dartmouth breached its contract with him by applying the Sexual

Misconduct Policy to conduct occurring outside Dartmouth's Education Program and Activity.

Pl. Mem. at 8-10.  Doe concedes that the SMP may apply to such conduct in "limited

circumstances."  *Id*. at 8.  He argues that Dartmouth has defined such circumstances to include

only those in which "the conduct has a nexus to Dartmouth."  *Id*.  Plainly the allegation that a

Dartmouth medical student has raped someone "has a nexus to Dartmouth."  No reasonable

medical student could believe that if they are accused of raping someone off-campus, and the

victim is not a member of the Dartmouth community, Dartmouth must simply ignore it.

Dartmouth would put its community at risk of harm, and itself at risk of legal liability, if it ignored an allegation of sexual assault simply because it happened off campus.  For these reasons, Dartmouth consistently has exercised jurisdiction over such allegations in the past. Moreover, as noted above, the Title IX regulations specifically provide that if alleged sexual misconduct occurs outside a school's education program or activity, the school can address the matter under its code of conduct regardless of the fact that Title IX would not apply.

The lone case *Doe* cites in support of his argument, *Vaughan v. Vermont Law School*, 2011 WL 3421521 (D. Vt. Aug. 4, 2011), has no application to this one.  That school had a policy which allowed it to address allegations of off-campus sexual misconduct where the conduct "could have a significant impact on the educational environment" or "pose a threat to the safety or other interests of [the school] or members of [its] community."  *Id.* at *15. Although Dartmouth's Sexual Misconduct Policy contains no such language, it would permit the exercise of jurisdiction in this case in any event; as discussed above, the "interests of the school or members of its community" plainly are implicated when it is alleged that a current student has committed a serious sexual assault.

### 2.   Doe's claims about the preponderance of evidence lack merit.

Doe claims that Dartmouth "failed to apply the preponderance of evidence standard" in his case by "failing to fairly, thoroughly, and impartially consider the evidence."  Pl. Mem. at 10. Specifically, Doe claims the Hearing Panel failed properly to assess the evidence relating to Smith's "rape kit," a Snapchat video that Smith provided, purported inconsistencies in Smith's accounts of the events at issue, Smith's motive to falsify her statements about how she and Doe

met, and Doe's failure to produce medical records and text messages supporting his case, which

Doe instead "described." *Id*. at 10-14.[3]

Doe's argument fails for the simple reason that the Hearing Panel carefully considered

each of these issues:

- The Panel fully considered the rape kit and its consistency with Smith's account. Wolkoff Decl. ¶¶ 6-7.

- The Panel fully considered the reliability of the SnapChat video. Wolkoff Decl. ¶¶ 8-9; Exhibit 8 at 7-8.

- The Panel fully considered the differences in Smith's accounts of the events given at difference times to different people. Wolkoff Decl. ¶¶ 10-12; Exhibit 8 at 5-6, 7, 9-10.

- The Panel fully considered Smith's motives to falsify how the parties met, but found the evidence irreconcilable and lacking. Wolkoff Decl. ¶¶ 13-14; Exhibit 8 at 5, 10.

- The Panel fairly decided that Doe's alleged missing texts and records deserved little weight. Wolkoff Decl. ¶ 14; Exhibit 8 at 9.

The fact that Doe disagrees with the Panel's assessment of the evidence, including as to

the credibility and weight of that evidence, fails to support his claim that Dartmouth breached its

contractual obligations – a ruling this Court previously made in a directly analogous case. *Doe v.*

*Trs. of Dartmouth Coll.*, 1:19-cv-13-JL, Dkt. No. 30 at 325-26, 328 (D.N.H. Jan. 24, 2019) (a

fact-finder's failure to give more weight to certain evidence or to assess credibility differently in

light of alleged inconsistencies is insufficient to show that the hearing was not thorough, fair and

impartial); *see also Doe v. Williams Coll.*, 530 F. Supp. 3d 92, 99 (D. Mass. 2021) (whether a

---

[3] As Doe notes, the Panel recognized that Doe "was not obliged" to produce his confidential medical records. Pl. Mem. at 13. But it was Doe who raised his purported medical conditions as defenses to Smith's claim, and it was fair for the Hearing Panel to draw reasonable inferences against Doe when he failed to provide corroborating evidence that only he could obtain and provide. Doe's assertion that the medical records are "privileged" also rings hollow for the simple reason that he disclosed the purported substance of them – his claimed physical limitation – in the investigation and at the hearing.

different fact-finder might reach a different outcome "is not a relevant line of inquiry"); *Doe v. W. New Engl. Univ.*, 228 F. Supp. 3d at 180 (because there "was an evidentiary basis for the [board's] decision," plaintiff's "disagreement with that decision does not constitute a claim upon which relief can be granted"); *Doe v. Phillips Exeter Acad.*, No. 16-cv-396-JL, 2016 WL 6651310, at *2 (D.N.H. Nov. 10, 2016) (it "is not the court's role in contract-based cases such as this" to conduct an "appellate review of the investigator's factual findings and conclusions"); *Doe v. Brown Univ.*, 210 F. Supp. 3d at 313 (the court "is not a super-appeals court for sexual misconduct cases"); *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 14 (D. Me. 2005) (it is not the court's task to make an independent determination about the underlying events or who was credible); *see also Schaer v. Brandeis Univ.*, 432 Mass. 474, 479 n.9 (2000) (where there was evidence that could support the board's decision, the existence of conflicting evidence failed to support a breach of contract claim).

Doe's memorandum discusses a series of cases in which courts have denied motions to dismiss because a plaintiff plausibly alleged that a fact-finder "overlooked" or "minimized" relevant evidence or the like. Pl. Mem. at 13-16. The procedural posture of those cases is all-important. With one exception, discussed below, they address the question whether a complaint, taking all the well-pleaded factual allegations as true, plausibly alleges an erroneous outcome. *See Doe v. Princeton Univ.*, 30 F.4th 335, 347 (3d Cir. 2022); *Doe v. Syracuse University*, 440 F. Supp. 3d 158, 179 (N.D.N.Y. 2020); *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 216 (D. Mass. 2017). That threshold of course is entirely different from, and substantially lower than, the standard for obtaining preliminary injunctive relief, as one of Doe's own authorities affirms. *Doe v. Siena Coll.*, No. 122-CV-1115, 2023 WL 197461, at *31 n.20 (N.D.N.Y. Jan. 17, 2023)

("Plaintiff inaptly relies on cases ruling on motions to dismiss," whereas injunctive relief requires plaintiff to show a substantial likelihood of ultimate success on the merits).

The Court in *Siena College* entered a preliminary injunction, but that decision is easily distinguished.  The fact-finder in *Siena College* failed to address multiple forms of exculpatory evidence, ignored substantial evidence which undermined the reliability of photographs on which the fact-finder relied, and issued a decision with significant gaps in her analysis.  *Id.* at *31-33. This is no such case.  The Hearing Panel did not simply ignore or fail to address significant, exculpatory evidence, or fail to provide a proper rationale for its decision; to the contrary, the Panel considered the relevant evidence and cogently explained why it found Smith's account more credible.[4]

**B.     The Title IX Claim.**

Doe alleges that Dartmouth discriminated against him on the basis of his sex in violation of Title IX, asserting the theories of "erroneous outcome" and "selective enforcement."  Pl. Mem. at 16-23.  Doe has no likelihood of success on the merits of either claim.

**1.     Erroneous outcome**

To succeed on an erroneous outcome claim, Doe first must offer evidence that would "cast some articulable doubt on the accuracy of the outcome" of the investigation.  *Doe v. Trs.* of *Boston Coll.*, 892 F.3d 67, 91 (1st Cir. 2018) (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).  Such doubt may be shown, for example, by "particular evidentiary weaknesses" in the

---

[4] To the extent Plaintiff argues that the Hearing Panel failed to ask Smith questions about her marriage, PI Mem at 14, under the PRC, the Hearing Panel Chair decides what questions are appropriate and relevant to the proceedings. Compl. Ex. B at 19.  Given the express language of the PRP, the Hearing Panel chair's decision was not a violation of Doe's reasonable expectations.  *See Anderson v. Trs. of Dartmouth Coll.*, No. 19-cv-109-SM, 2020 WL 7129968, at *13 (D.N.H. Dec. 4, 2020) (where hearing board has power to make rulings on relevance and admissibility, its exclusion of evidence provides no basis for breach of contract claim).

case or "particular procedural flaws affecting the proof." *Doe v. Harvard Univ.*, 462 F. Supp. 3d
51, 60 (D. Mass. 2020) (quoting *Yusuf*, 35 F.3d at 715). If Doe provides sufficient evidence of a
flawed outcome, he then must demonstrate that gender bias was the cause of that outcome.
*Boston Coll.*, 892 F. 3d at 91. He "cannot merely rest on superficial assertions of discrimination,
but must establish that 'particular circumstances suggest[] that gender bias'" caused the outcome,
*id.* (quoting *Yusuf*, 35 F.3d at 715), such as statements by decision-makers or other "pertinent
university officials, or patterns of decision-making that … tend to show the influence of gender."
*Yusuf*, 35 F.3d at 715. Moreover, Doe must demonstrate that gender bias is the "but for" cause
of the outcome, not merely a "motivating factor." *Sheppard v. Visitors of Va. St. Univ.*, 993 F.3d
230, 236-37 & n.7 (4th Cir. 2021).[5]

Doe has not demonstrated "articulable doubt" in the outcome of his case. The fact that
Doe disagrees with the Hearing Panel's findings does not suffice. *See Yu v. Vassar Coll.*, 97 F.
Supp. 3d 448, 462 (S.D.N.Y. 2015); *see also Doe v. Colgate Univ.*, 760 F. App'x 22, 33 (2d Cir.
2019). As discussed above, there was ample evidence to support a finding, by a preponderance
of the evidence, that Doe sexually assaulted Smith.

Moreover, even assuming Doe had demonstrated "articulable doubt" about that finding,
he has failed to meet his burden to show that gender bias was the "but for" cause. Doe has the

---

[5] While the First Circuit has used the term "motivating factor" in student Title IX cases, it did so
because the parties cited that language in *Yusuf*, without addressing whether "motivating factor"
or "but for" is the correct standard. *See Boston Coll.*, 892 F.3d at 90 & n.12; *Haidak v. Univ. of
Mass.-Amherst*, 933 F.3d 56, 74 & n.11 (1st Cir. 2019). *Yusuf* borrowed the "motivating factor"
language from the Civil Rights Act of 1991, which applies to Title VII, not Title IX. *See
Sheppard*, 993 F.3d at 236-37 & n.7 (citing *Yusuf*, 35 F.3d at 715). Title IX requires "but for"
causation. *Id.* (citing *Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1739 (2020); *Univ. of Tex.
Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351-52 (2013); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S.
167, 176, (2009); *Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 184 (2005)). Moreover, if a
"motivating factor" analysis were applied, Doe cannot meet even that lower standard, for the
reasons discussed below.

burden to come forward with specific evidence of bias in the record of his case, not just "speculation" or "tenuous inferences." *Boston Coll.*, 892 F.3d at 84 (citations omitted); *Doe v. Trs. of Dartmouth Coll.*, No. 21-cv-085-JD, 2021 WL 2857518, at *5 (D.N.H. July 8, 2021) (dismissing a Title IX erroneous outcome claim on this basis).  Such "specific evidence" is required to overcome courts' presumption that, as a legal matter, university officials – including those involved in student conduct matters such as this one – act without bias.  *Id*.

Moreover, to be actionable under Title IX, allegations of bias must pertain to the specific individuals involved in the disciplinary proceeding at issue.  *See Haidak*, 933 F.3d at 75; *see also Doe v. Univ. of Denver*, 952 F.3d 1182, 1200 (10th Cir. 2020); *Doe v. St. Joseph's Univ.*, 832 F. App'x 770, 774 (3d Cir. 2020); *Anderson v. Trs. of Dartmouth Coll.,* No. 19-cv-109-SM, 2020 WL 7129968, at *15 (D.N.H. Dec. 4, 2020)*; Dismukes v. Brandeis Univ*., No. CV 19-11049-LTS, 2021 WL 1518828, at *3 (D. Mass. Apr. 16, 2021); *Doe v. W. New England Univ.*, 228 F. Supp. 3d at 188-89 (citing *Mallory v. Ohio Univ.*, 76 F. App'x 634, 640 (6th Cir. 2003)).

Doe cites no evidence of gender bias at work in his case.  He cites not a single statement by any decision-maker in his case or other "pertinent university officials" that tends to show gender bias; nor does he cite any "patterns of decision-making" that "tend to show the influence of gender."  *Yusuf*, 35 F.3d at 715.  In fact, the "patterns of decision-making" at Dartmouth demonstrate the absence of gender bias.  Since 2018, Dartmouth has reached a final determination on 26 complaints of sexual assault by male students, and in 12 of those cases – nearly half the time – the male respondent was found ***not*** responsible.  Clemens Decl. ¶ 27. These outcomes preclude any inference of gender bias.  *Doe v. Rollins Coll*., No. 21-11081, 2023 WL 5199469, at *15 (11th Cir. Aug. 14, 2023) (evidence failed to support claim of anti-male bias where 5 of 12 male students accused of sexual misconduct were found not responsible); *Bos.*

*Coll.*, 892 F.3d at 90 (same, where 10 of 32 male students accused of sexual assault were not found responsible); *Bleiler v. Coll. of the Holy Cross*, No. 11-11541, 2013 WL 4714340, at *8 (D. Mass. Aug. 26, 2012) (same, where one-third of male students accused of sexual assault were found not responsible).

Doe claims that Dartmouth "has faced pressure from the U.S. Department of Education" and from campus constituencies in relation to its handling of sexual misconduct cases.  Pl. Mem. at 19-20.  Lawyers such as Doe's have been making this argument in Title IX cases for years and courts consistently have rejected it absent specific evidence that such "pressure" in fact was targeted toward punishing males, not just persons accused of sexual assault; such pressure was known to decision-makers in the case; and that pressure may have influenced the outcome.  *See John Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 337 (1st Cir. 2022)*; Doe v. St. Joseph's Univ.*, 832 F. App'x 770, 774 (3d Cir. 2020); *Doe v. Colgate Univ.*, 760 F. App'x 22, 30 (2d Cir. 2019); *Doe v. Harvard Univ.*, 462 F. Supp. at 62.

 Doe offers no such evidence.  Instead, Doe merely cites to the ***allegations*** of such pressure at Dartmouth that his lawyers made in another case, Pl. Mem. at 19-20 (citing the complaint in *Doe v. Trs. of Dartmouth Coll.*, 1:21-cv-85-JD) – allegations which the Court rejected and dismissed.  2021 WL 2857518, at *5 (D.N.H. July 8, 2021) (dismissing Title IX claim based on allegations of "pressure" to find those accused of sexual assault responsible).

Moreover, the decision-makers in Doe's case were not Dartmouth officials who plausibly would be subject to such alleged "pressure" in any event.  As noted above, Dartmouth outsourced the decision-making role in this case to a third party, Grand River Solutions, in response to Doe's claims of bias.  Doe offers no evidence that GRS even was aware of, much less influenced by, any supposed "pressure" at Dartmouth in relation to its handling of sexual

misconduct cases.  Moreover, there is no "cat's paw" liability under Title IX; a school can be liable under Title IX only for its own discriminatory actions and not those of its agents, absent a showing that appropriate school officials had "actual knowledge" of the agent's discriminatory acts and were "deliberately indifferent."  *See Bose v. Bea*, 947 F.3d 983, 989-91 (6th Cir. 2020). Doe offers no such evidence for the simple reason that none exists.

Ultimately, Doe's argument that gender bias was the "but for" cause of the outcome in his case rests on the assertion that such bias can be inferred from the Hearing Panel's supposed failure properly to weigh the evidence.  Pl. Mem. at 20-21.  The argument is without merit on its face, as it seeks to collapse the two-prong analysis of erroneous outcome claims into just one. Doe's argument, if accepted, would mean that a plaintiff can prevail on an erroneous outcome claim merely by satisfying the threshold requirement to cast "articulable doubt" on the outcome, thus rendering the second element – showing that gender bias caused the outcome – a nullity.

### 2.      Selective Enforcement

As Doe acknowledges, a student claiming selective enforcement of disciplinary policies in violation of Title IX must show that sex was a motivating factor in the decision to initiate a disciplinary proceeding against him and/or the severity of the penalty imposed.  Pl. Mem. at 22 (citing *Doe v. Amherst Coll.*, 238 F. Supp. 3d at 223).  To meet that burden, Doe must show that a female student in circumstances "sufficiently similar" to his – i.e., one accused of, or found responsible for, similar conduct – was treated more favorably and that gender bias caused that discrepancy.  *Haidak,* 933 F.3d at 74; *Yusuf,* 35 F.3d at 715; *see also Doe v. St. Joseph's Univ.,* 832 F. App'x at 774; *Mallory,* 76 F. App'x at 641; *Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019); *Doe v. Trs. of Dartmouth Coll.*, 615 F. Supp. 3d 47, 60 (D.N.H. 2022).

Doe cites no such evidence.  He claims to know of "one relevant example" in which Ms.

18

Clemens "refused to exercise jurisdiction [over] a complaint submitted by a man, on the basis

that [the alleged conduct] was not part of a Dartmouth-sponsored or -controlled activity, and the

allegations were beyond the scope of the SMP."  Pl. Mem. at 23 (citing *Doe v. Trs. of Dartmouth

Coll.*, 21-cv-085-JD, 2021 WL 2857518 at *4 (D.N.H. July 8, 2021).  That case does not involve

facts "sufficiently similar" to Doe's, as his attorneys well know; it was their office that litigated

the other case.  Clemens Decl. ¶ 18.  The male student in that case was accused of, and

ultimately found responsible for, sexually assaulting a female student in a Dartmouth residence

hall.  *Id.* ¶ 19.  During Dartmouth's investigation of the female student's complaint, the male

student complained that a friend and roommate of the complainant had "retaliated" against him

by removing him from an online chat group of Black students and alumni.  *Id.*  Ms. Clemens

determined that the Title IX office had no jurisdiction over the matter because Dartmouth did not

sponsor and exercised no control over the online chat group and its activities were outside the

scope of the SMP.  *Id.* ¶ 20.  Moreover, unlike an allegation of sexual assault or dating violence,

the allegation of exclusion from an online chat group did not present a risk of harm to the

Dartmouth community.  *Id.*  Far from being a "relevant example," this other case is not remotely

comparable to Doe's, which involved an alleged rape.[6]  *See Theidon v. Harvard Univ.*, 948 F.3d

477, 501 (1st Cir. 2020) (plaintiff must establish situational similarity of comparators and not

ignore relevant differences).  There are obvious, objective differences in asserting jurisdiction

over a serious allegation of rape as compared with removal from a chat group. *See Ray v. Ropes

& Gray LLP*, 799 F.3d 99, 114 (1st Cir. 2015) ("We ask whether 'a prudent person, looking

objectively at the incidents, would think them roughly equivalent and the protagonists similarly

---

[6] Nor does the case otherwise support any inference of gender bias against Dartmouth:  Judge
DiClerico dismissed the Title IX claim at the outset of the case.  *Doe v. Trs. of Dartmouth Coll.*,
No. 21-CV-085-JD, 2021 WL 2857518, at *7 (D.N.H. July 8, 2021).

situated.'" (citation omitted)).

Doe claims that he "can cite to another instance in which Dartmouth responded to two cross reports, each alleging claims of sexual misconduct by the other, with significant bias toward the male."  Pl. Mem. at 23 (citing *Doe v. Trs. of Dartmouth Coll.*, No. 18-cv-40-LM, 2018 WL 2048385 at *1-2 (D.N.H. May 2, 2018)).  This is yet another Title IX case in which a male student was represented by the firm that now represents Doe and which resulted in no finding of gender bias.  Doe's allegations of "significant bias" in the other case are supported by nothing other than his attorneys' allegations in that case, which never were substantiated. Moreover, this other case has nothing to do with "selective enforcement."  Two Dartmouth students, one male and one female, brought cross-complaints of sexual assault and physical assault against each other and Dartmouth investigated both complaints.  *Id.* at *1.

Simply put, neither of the "examples" Doe cites involves a case remotely similar to this one.  Nor is there any value to his baseless assertion that "with the benefit of discovery" he will be able to "make specific allegations" of selective enforcement, from which gender bias may be inferred.  Pl. Mem. at 23 (citing *Amherst Coll.*, 238 F. Supp. 3d at 218).  Doe's burden in seeking a preliminary injunction is to offer evidence from which the Court can discern a substantial likelihood of success on the merits – not merely assert that "with the benefit of discovery" he hopes to go on a fishing expedition for evidence that will allow him to "make specific allegations" supporting his case.

### C.    The Title VI Claim

Doe acknowledges that for liability to attach under Title VI, he must prove Dartmouth discriminated against him on the basis of his race; the discrimination was intentional; and the discrimination caused the outcome of his case.  Pl. Mem. at 23-24 (citing *Goodman v. Bowdoin*

Case 1:24-cv-00046-JL   Document 14   Filed 02/23/24   Page 21 of 28

*Coll.*, 380 F.3d 33, 34 (1st Cir. 2004)).[7]  Under Title VI, like Title IX, liability does not attach

unless the discrimination at issue was part of an official school policy or a school official

authorized to take corrective measures had "actual knowledge" of the discrimination but

responded with "deliberate indifference."  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274,

290 (1998); *Bhombal v. Irving Indep. Sch. Dist.*, 809 F. App'x 233, 237 (5th Cir. 2020).  Doe

cites no evidence from which the Court could discern a substantial likelihood of success on this

claim.

      Doe alleges that in 2015 when he was an undergraduate student at Dartmouth – more

than eight years before the sexual assault finding at issue – an unnamed faculty member falsely

accused Doe of threatening behavior during a class; Ms. Clemens met with Doe after "arming

herself with the Director of Safety and Security" and called Doe "threatening"; some unnamed

person called Doe "threatening" and "tall, big, and Black"; and after the accusation of

threatening behavior was found to be unsubstantiated, the professor retaliated by falsely accusing

Doe of plagiarism.  Pl. Mem. at 24-25.

      In fact, the evidence is as follows:  In 2015, Ms. Clemens was Dartmouth's Assistant

Dean of the College and Director of Case Management.  Clemens Decl. ¶ 2.  Her job

responsibilities included, among other things, working with Dartmouth Safety and Security in

connection with "threat assessments" involving Dartmouth students.  *Id.* ¶ 3.  These assessments

routinely were conducted by Ms. Clemens and Harry Kinne, the Director of Public Safety.  *Id.*

Ms. Clemens and Mr. Kinne were asked to meet with Doe after a professor reported that Doe had

engaged in threatening behavior during a class.  *Id.* ¶ 4.  Ms. Clemens was informed that one of

---

[7] Recent case law has made it clear that Title VI requires but-for causation. *See Smith v. Wilson*,
705 F.3d 674, 681 (7th Cir. 2013); *see also Students for Fair Admissions, Inc. v. President &
Fellows of Harvard Coll.*, 600 U.S. 181, 289 (2023) (Gorsuch, J., concurring).

Dartmouth's deans had met with Doe and had told him, "You look threatening because you are big and tall." *Id.* She never was informed, and Doe at the time never alleged, that this Dean or anyone else referred to him as "tall, big and Black." *Id.* In fact, Doe's prior statement about this incident claims only that the faculty member called him "tall and big." Exhibit 3 at 6. After Ms. Clemens and Mr. Kinne met with Doe, Ms. Clemens concluded that Doe had not engaged in threatening behavior in the class, but instead merely felt disrespected by the professor and silenced. *Id.* ¶ 5. Ms. Clemens believed there were some cultural differences at work along with miscommunication between Doe and the professor. *Id.* She shared these conclusions with other Dartmouth administrators, including the dean assigned to this matter, advocating on Doe's behalf. *Id.*

Another professor made a similar report of threatening behavior by Doe in Spring 2016. *Id.* ¶ 6. Ms. Clemens also advocated for Doe in this matter – advocating for his right to attend class and pushing back on some of the assumptions faculty had made about him. *Id.* Doe was appreciative of Ms. Clemens's support and until his graduation he continued to correspond with her about his accomplishments. *Id.* ¶ 7.[8]

Simply put, Doe has no substantial likelihood of proving intentional discrimination on the part of Ms. Clemens, much less a causal connection between such discrimination and the outcome of his case.

Doe alleges that because he feared Ms. Clemens was biased against him,[9] he requested

---

[8] Doe also alleges he reported "concerns with professors" to Ms. Clemens in 2016 – more than seven years before the conduct finding at issue – but no action was taken on his behalf. Pl. Mem. at 25. Ms. Clemens has no memory of this, nor does she have any record of it, as ordinarily would be the case if this occurred. Clemens Decl. ¶ 8.

[9] Doe alleges that a Dartmouth Safety and Security officer once referred to Doe as a "Black man in a dark-colored hoodie," and that during an internship, a Dartmouth professor told him he

that she be removed from any involvement with his case.  Pl. Mem. at 25.  That happened,
according to Doe, only after he brought forward his concern that someone at Dartmouth – he
believed it was Ms. Clemens – had disclosed to Smith that Doe's "name had been circulating
around for a while" and there was a "behavioral pattern" that "somebody needed to look into."
*Id*.  Ms. Clemens made no such statement to Smith and has no knowledge of anyone at
Dartmouth doing so.  Clemens Decl. ¶ 11.

Doe acknowledges that Dartmouth decided to address his concerns by outsourcing every
aspect of his case to a third party, Grand River Solutions, including the role of Title IX
Coordinator; but he claims "the damage was done" because Ms. Clemens "already had addressed
the jurisdictional decision, and Investigator 1 already had completed a majority of the interviews
that would become the Final Record."  Pl. Mem. at 25.  There is no evidence that Ms. Clemens's
decision that Dartmouth should address Smith's rape allegation had anything to do with Doe's
race and no evidence nor any basis to infer that any other Title IX Coordinator would have made
a different decision in that regard.  Nor is there any evidence – or even any allegation – that race
discrimination was the cause of the independent Hearing Panel's finding against Doe.  Once Doe
raised his concerns of racial bias in his case, even though they were unsubstantiated, Dartmouth
responded out of an abundance of caution by removing Ms. Clemens from the proceedings and
referring Doe's claim of discrimination and unfair treatment to a third-party for review.
Dartmouth's care in avoiding even the appearance of bias should not be interpreted to establish
bias.  Dartmouth's response was not deliberately indifferent, as it was not "clearly unreasonable"
under the circumstances – indeed, it was just the opposite.  *See Doe v. Brown Univ.*, 896 F.3d

---

needed to "speak, act, and behave like a white man" to have the opportunity to "match" in
neurosurgery.  Pl. Mem. at 25. These alleged incidents occurred in 2020 and 2022 respectively
and did not involve anyone who played any role in the sexual misconduct case at issue.

127, 130 (1st Cir. 2018).

### III.   DOE HAS NOT DEMONSTRATED A LIKELIHOOD OF IRREPARABLE HARM IF A PRELIMINARY INJUNCTION DOES NOT ISSUE.

Even if Doe had demonstrated a likelihood of success on the merits, which he has not done, he has failed to establish that he will suffer irreparable harm in the absence of preliminary injunctive relief.  Irreparable harm is "a substantial injury that is not accurately measurable or adequately compensable by money damages."  *Ross-Simons of Warwick v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996).  "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store."  *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).  Moreover, "an attempt to show irreparable harm cannot be evaluated in a vacuum; the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem."  *Ross-Simmons*, 102 F.3d at 19.

Doe has failed to meet his burden to show that, without injunctive relief, he likely will suffer an immediate, substantial injury that is not adequately compensable by money damages.  He claims that his expulsion or even a "gap" in his education will cause him to suffer lost educational and career opportunities, Pl. Mem. at 3, but as this Court previously has held, such harms are entirely compensable with money damages.  *Doe v. Trs. of Dartmouth Coll.*, 1:19-cv-00013-JL (D.N.H. Jan. 2019), Dkt. Nos. 17 & 29.  Other courts in the First Circuit have reached the same conclusion.  *See Doe v. Williams College*, 3:16-cv-30184-MGM, Dkt. No. 65 & 74 at pp. 51-55 (D. Mass. March 29, 2017); *Doe v. Amherst Coll.,* No. 14-CV-30114-MGM, 2014 WL 12597613, at *3 (D. Mass. July 28, 2014) (citing *Powell v. City of Pittsfield*, 221 F. Supp. 2d 119 (D. Mass 2002)); *Bray v. Worcester Polytechnic Inst.*, 540 F. Supp. 3d 94, 103 (D. Mass. 2021).  Courts in other jurisdictions also have reached the same conclusion.  *See, e.g., Phillips v. Marsh*,

687 F.2d 620, 622 (2d Cir. 1982); *Doe v. Texas A&M Univ.*, No. CV H-20-4332, 2021 WL

257059, at *8 (S.D. Tex. Jan. 26, 2021); *Montague v. Yale Univ.*, No. 3:16-CV-00885(AVC),

2017 WL 4942772, at *4 (D. Conn. Mar. 8, 2017).

This case is easily distinguished from *Doe v. Middlebury Coll.*, No. 1:15-cv-192-JMG,

2015 WL 5488109 (D. Vt. Sept. 16, 2015), on which Doe relies.  Pl. Mem. at 26.  That case

involved "a unique situation" in which the college sought to re-investigate a case in which the

plaintiff had been exonerated, notwithstanding that its policy did not allow for a second

investigation.  2015 WL 5488109 at *3.  There is no such policy violation in this case.  In

addition, the plaintiff in *Middlebury* had obtained a specific job offer, which he stood to lose

without injunctive relief.  *Id.*  No such circumstance exists in this case.

Doe's reliance on *King v. DePauw Univ.*, No. 2:14-cv-70 (S.D. Ind. Aug. 22, 2014), Pl.

Mem. at 26-27, also is unavailing.  The Court's ruling that even a "gap" in a student's transcript

necessarily will result in irreparable harm is conclusory, cites no supporting authority, and is

contrary to the weight of authority in this Circuit.  The last case on which Doe relies, *Ritter v.*

*Oklahoma*, No. CIV-16-04838, 2016 WL 2659620 (W.D. Okla. May 6, 2016), also gives only

cursory attention to the issue of irreparable harm and is contrary to the authority in this Circuit.

Nor is there any merit in Doe's arguments that if he is forced to pursue his education at a

medical school outside the U.S. or at an osteopathic school in the U.S., he likely will face

difficulties getting into a residency program or will require additional education and training

beyond what would have been required if he graduated from Geisel.  Pl. Mem. at 28.  Judge

McCafferty rejected these arguments in denying another expelled Geisel student's motion for a

preliminary injunction.  *Doe v. Trs. of Dartmouth Coll.*, 597 F. Supp. 3d 511, 515 (D.N.H. 2022)

("Of course, if Doe's case is ultimately unsuccessful on the merits and his expulsion stands, he

25

would be harmed.  But he has not explained why delaying his ability to return to Dartmouth

while this case is litigated would force him to enroll in a different school.  The court finds this

argument unpersuasive.").

Doe's argument that irreparable injury arises from a denial of "equal protection," Pl.

Mem. at 28, also is unavailing.  Doe's constitutional rights are not implicated in this case, as

Dartmouth is a private university, not a state actor.  *See Doe v. Trs. of Bos. Coll.*, 942 F.3d 527,

533 (1st Cir. 2019); *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1012 (9th Cir. 2020).  Doe's

claim that his rights under Title IX implicate rights protected by the Fourteenth Amendment is

incorrect.  Title IX applies to Dartmouth not under the Fourteenth Amendment, but by virtue of

the Spending Clause in Article I of the Constitution – i.e., compliance with Title IX is a

condition for Dartmouth to receive federal funding.  *See Gebser*, 524 U.S. at 286-87.  Doe's

reliance on *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016), on this

point is misplaced because that case involved a public university, not – as Doe states in his

memorandum – a private one.  *Id.* at 977.  Doe's "equal protection" argument also fails because

his Title IX claims are without merit in any event, for the reasons discussed above.

Finally, Doe's claims of irreparable harm if Dartmouth declares him in eligible for the

Match also are without merit because he can avert that harm simply by withdrawing from the

Match this year.  If Doe were to withdraw voluntarily from the Match and subsequently obtain a

judgment in this case requiring Dartmouth to vacate his expulsion, he would be eligible to

reapply for the Match at a future time without prejudice.  Chimienti Decl. ¶ 14. On the other

hand, should Dartmouth be forced to violate the Match Agreement and certify Doe for the

Match, thereby misrepresenting Doe's readiness to graduate, other students would unfairly lose

out on their Match opportunities; this also would cause damage to Dartmouth's standing with the

NRMP and other institutions participating in the Match.  *Id.* ¶¶ 8-11.

**IV.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH AGAINST INJUNCTIVE RELIEF.**

Dartmouth has compelling interests in maintaining its good standing with the NRMP, not violating the Match Participation Agreement, and not being required to make untrue statements to the NRMP that would disadvantage other applicants and residency programs.  Failing to report Doe's expulsion would negatively impact Dartmouth's relationships with not only the NRMP but also residency programs, thus impacting future Dartmouth graduates.  If residency programs rank Doe, only to learn later that he cannot graduate and start residency in July, the programs will be unwilling to take Geisel students in the future due to lack of trust in Geisel's information. Residency programs communicate with each other and there inevitably would be spillover effect with other programs as well.  Chimienti Decl. ¶ 10.  Dartmouth, and the public, also have a strong interest in maintaining the fairness of the Match process.  *Id*. ¶ 11.

Dartmouth also has a strong interest in enforcing its student conduct policies, including its prohibition against sexual misconduct.  Courts should not discount the harm resulting from an injunction that undermines a college's authority to address such misconduct.  *See Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 827 (7th Cir. 1998) (vacating preliminary injunction where allowing a student to remain enrolled undermined the school's authority to take disciplinary action).  It is well-settled that Courts should not lightly interfere with such judgments. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) ("courts should refrain from second-guessing the disciplinary decisions made by school administrators"); *Boston College II*, 942 F.3d at 535 (quoting *Schaer*, "Courts are chary about interfering with academic and disciplinary decisions made by private colleges and universities")*; Havlik*, 509 F.3d at 35 (courts must accord a school some measure of deference in matters of discipline); *Morale*, 422 F.

Supp. at 1004–05 ("federal courts do not sit in judgment of the wisdom of school administrators").

Dartmouth's interest in addressing allegations of sexual misconduct on the part of its students is especially strong when the student seeks to graduate from medical school and enter a profession requiring the utmost public trust.  Dartmouth's judgment in this case was that Doe's conduct warranted his separation and public policy favors the upholding of such judgments.

The balance of equities and the public interest thus favor preserving the status quo, rather than granting the extraordinary remedy of mandatory injunctive relief.

### CONCLUSION

The Court should deny Doe's motion for a preliminary injunction.

TRUSTEES OF DARTMOUTH COLLEGE,

/s/ Elizabeth H. Kelly
Daryl J. Lapp (pro hac vice)
Elizabeth H. Kelly (N.H. Bar No. 276459)
LOCKE LORD LLP
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100 telephone
(617) 227-4420 facsimile
daryl.lapp@lockelord.com
February 23, 2024                liz.kelly@lockelord.com

**Certificate of Service**

I certify that on February 23, 2024, I caused the foregoing document to be served on counsel of record for all parties that have appeared to date through the Court's CM/ECF system.

/s/ Elizabeth H. Kelly
Elizabeth H. Kelly