UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| JOHN DOE,<br><br>                    Plaintiff,<br><br>        v.<br><br>TRUSTEES OF DARTMOUTH COLLEGE,<br><br>                    Defendant. | Civil Action No. 1:24-cv-00046-JL |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND RULINGS OF LAW**

In accordance with the Court's procedural order dated February 20, 2024 (doc. no. 12), Plaintiff John Doe ("Doe") files the following Proposed Findings of Fact and Rulings of Law relevant to his request for preliminary injunctive relief.

**PROPOSED FINDINGS OF FACT**

**The Parties**

1.      John Doe is a Black male originally from the Democratic Republic of the Congo who presently resides in Vermont.  At all times relevant to this complaint, he was a Student at Dartmouth College, progressing from undergraduate, to Tuck Bridge program, to Geisel School of Medicine ("Geisel").

2.      Defendant Trustees of Dartmouth College is the board of trustees for Dartmouth College, a partially federally funded private liberal arts college in Hanover, New Hampshire.

**John Doe's Background and Goals**

3.      Doe is a Black male.

4.      Doe grew up in the Democratic Republic of the Congo.

5.      Doe left the Democratic Republic of the Congo in 2011 because of political instability and threats to his family.

6.      Doe and his sisters sought refuge in the United States in 2011 to join their mother, who had immigrated in 2003.

7.      Upon arriving in the United States, Doe's mother grappled with severe financial hardships exacerbated by a workplace accident which had left her disabled.  Doe took on the responsibility of supporting his family, engaging in odd jobs and extended hours of manual labor to make ends meet and cover bills.

8.      After a year, Doe decided to resume his education, studying in English, his fifth language, and juggling the roles of student and provider.

9.      Doe earned an associate degree in chemistry.

10.      Doe earned a bachelor's degree in psychology from Dartmouth.

11.      Doe secured acceptance into Geisel, Dartmouth College's Medical School, and relied on financial aid to provide housing, facilitating the relocation of his mother and sisters to join him.

12.      Doe has been a student at Geisel for the past seven years, with a focus on neurology and neurosurgery.

13.      Outside of his education at Geisel, Doe runs a nonprofit organization, Bonsomi, which is dedicated to providing free healthcare access to vulnerable populations, especially women and children in his home country.

14.      Doe's medical school years at Geisel have been marred by discrimination, racism, and retaliation, in addition to the hardships posed by language and cultural barriers.

15.     Despite these hardships, Doe secured fifteen residency interviews, placing him in a strong position to secure a residency match in March 2024 and graduate in May 2024.

16.     Doe is weeks away from being matched with a residency and beginning his career as a doctor.

**Plaintiff's Interactions with Smith**

17.     Doe met Smith on Bumble, a dating app, in early November 2022.  Bumble allows people to "swipe" on each other in three different modes: "Date"; "BFF"; and "Bizz." Bumble only allows users to "match" with users who are using the same mode.  Doe had decided to re-enter the dating scene in October of 2022, and "matched" with Smith in date mode.  On the Bumble app in heterosexual dating mode, only women are able to initiate conversations with matches, and matches expire within 24 hours if conversation is not initiated.

18.     Smith is not and has never been a Dartmouth student.

19.     Smith was in Vermont as part of her nursing curriculum at Bethel University to complete a labor and delivery clinical rotation at a midwifery – not associated with Dartmouth or the hospital.

20.     Smith initiated conversation with Doe in date mode, and they exchanged messages for a few hours on the day that they matched.  Doe and Smith agreed to exchange phone numbers to transition away from communicating through the Bumble app.

21.     Doe suggested they meet, and Smith agreed.  Doe suggested several public meeting places for the date, including the Collis Center at Dartmouth, a community socializing venue.

22.     Doe and Smith met at the Collis Center around 6:00 p.m. on Tuesday, November 1, 2022, and talked for hours.  They sat in chairs facing each other, and spoke about their

backgrounds, work, goals, families, and friends.  Doe expressed his interest in finding a serious, meaningful relationship.

23.     During this conversation, Doe learned that Smith was using a fake name on her Bumble profile but learned her real name at that time.

24.     Smith also expressed her interest in finding a serious relationship, but she expressed mistrust towards Black Africans.  She explained that she believes that Black Africans tend to use "sweet talking" to persuade women into having sex with them, and then abruptly end the relationship.  She shared an example of one of her friends who dated a Black African man who "ghosted" her after they were intimate.  Doe disagreed with her generalization but was encouraged to hear that she was also looking for a longer-term relationship.

25.     Doe and Smith left the Collis Center around 1:00 a.m., walking out to their cars with their arms around each other's waist.  Upon reaching their cars, they turned their engines on to warm them up and continued talking.

26.     Doe and Smith parted ways just before 2:00 a.m. on November 2, 2022, after talking in Doe's car for some time and expressing interest in seeing each other again at Doe's apartment the following day.

27.     Doe and Smith exchanged messages throughout the day on November 2, 2022.  On Thursday, November 3, 2022, Doe messaged Smith asking if she still wanted to meet.  Smith responded that she did and that she would be leaving work early.  Smith asked Doe to pick her up from her apartment.

28.     On Thursday, November 3, 2022, Doe picked Smith up in his car at her address in Norwich, Vermont, and drove her to his house in Fairlee, Vermont, arriving there around 7:00 or 8:00 p.m.

29.     Doe and Smith initially sat on opposite sofas to watch a movie.  Eventually, Doe asked if Smith wanted to cuddle.  Smith stood up and came to Doe's sofa, where she laid against Doe with her body pressed against his body and rested her head and back against his chest, with Doe's arm across her chest.

30.     Doe and Smith watched the movie in that position and Smith mentioned that she was hungry.  Doe said he had food that his mother had brought him, so they went together into the kitchen, heated it in the microwave, and shared it.  They ate together on the couch and watched the movie and then resumed cuddling.

31.     While they were on the couch, Doe told Smith that he was anxious about a board exam he was preparing for.  Smith offered Doe encouragement, massaging the back of his head, and telling him all was going to be fine.

32.     Smith told Doe that she had to see a patient near Hanover, New Hampshire around 7:00 a.m. the next morning, and asked that she leave around 5:00 or 6:00 a.m.  Up until that time, Doe had assumed he was going to drive Smith home that night.

33.     Doe and Smith began flirting, by physical contact and staring at each other.

34.     Smith turned her body toward Doe and then grabbed the back of Doe's head and kissed him passionately on the lips.

35.     Smith and Doe continued kissing, and Doe kissed Smith on the neck.  Smith removed her shirt and pants as they continued to kiss and touch each other, remaining with only a bra on.

36.     Doe suggested they move into his bedroom.  Smith assisted Doe in lifting her up, wrapping her legs around his waist, and they kissed as they made their way into the bedroom.

37.     Doe was not able to lift Smith off the couch without her hopping onto him and wrapping her legs around him due to both the simple physics of the lift, as well as Doe's documented back injuries that previously required multiple cortisone shots.  Smith provided support in this position, allowing Doe to carry her.

38.     Doe placed Smith on his bed and then removed his shirt.

39.     Doe suffers from sexual dysfunction, a medical condition which significantly impacts his sexual performance.  Because of this condition, Doe is unable to have sex for more than a few minutes without ejaculating. He received treatment for this condition in 2021 but discontinued medication because of adverse side-effects.  He had discontinued the medication before meeting Smith.

40.     Given his worries about sexual contact ending prematurely and his fear of embarrassment, Doe decided to perform oral sex on Smith.  Smith opened her legs, indicating her willingness to engage, and then grabbed his head, moaned, and said "it feels good," while he was performing oral sex.

41.     After engaging in oral sex, Smith asked Doe to lie down on the bed and relax. She took his shorts off and put his penis against her vagina without inserting it in her vagina while she was moving on top of him.

42.     After a while, Doe asked Smith to stand so he could retrieve a condom from the nightstand drawer next to his bed.

43.     Smith stood, and as Doe got out of bed to retrieve the condom, Smith bent at the waist and placed her hands on the bed next to Doe, allowing Doe to initiate penile-vaginal intercourse from behind her.

44.     Intercourse lasted less than two minutes before Doe ejaculated.

45.     After Doe flushed the condom down the toilet in his bathroom, Smith asked him if it had broken.  Doe responded that it had not and asked why.  Smith replied that she was ovulating.

46.     Doe was worried and in panic and asked why she had not told him ahead of time. He asked if she had access to birth control pills.  Smith told him not to worry and that she had handled worse situations in the past.

47.     Doe and Smith cuddled and went to sleep until between 5:00 and 6:00 a.m.  Smith woke Doe up when she returned from the bathroom.  When she returned, he got up to go to the bathroom, and when he returned, they began cuddling and kissing.

48.     As they kissed, Smith said his first name twice, to which Doe responded "yes," twice.  Smith then asked Doe to "stop."  Doe stopped kissing her and looked at Smith.

49.     Doe asked Smith if she wanted him to drop her off to see her patient in Hanover or if she wanted him to drop her off at her home in Norwich.  Smith said she wanted to be dropped off in Norwich, so he asked her to get ready.  Smith went to the living room to retrieve her pants and shirt, and they both got dressed before Doe drove her home.

50.     As he was driving, Smith asked Doe why he had gone from being apparently happy to being silent. Doe responded that everything was fine, but was confused by Smith's mood change.  Smith put her hand under his while he drove.

51.     Doe asked if they would be meeting again and Smith said yes, and that she would text him on Wednesday of the following week.

52.     Doe texted Smith over the weekend, asking how she was doing and whether she was able to get the birth control pill.  She did not reply, so he called her several times, but she did not answer.

53.     Smith picked up one of Doe's calls, on Sunday evening, November 6, 2022.  She said she was with family in Connecticut and was able to see the doctor and address everything. She assured him that everything was under control and that she would be back on Tuesday, November 8, 2022, or Wednesday, November 9, 2022.

54.     Doe texted Smith on November 9, 2022, expressing concern that Smith considered him a "one-night stand":

> I hope all is well.  This is my last attempt to reach out to you.  I could be wrong, but I have a strong impression that there is no reciprocal attraction.  The first time we met, you said Africans are bizarre because an African guy slept with your friend and then ghosted her.  I tried to be different with you, but I realized that maybe guys need to be more like that African guy.  How would you blame him? Anyways, I hope all is well and enjoy.

55.     Doe's message was prompted by emotional pain and concern that he was being used for sex and not a relationship.

56.     Smith responded on November 10, 2022:

> [John], I thought we were only friends.  When you decided you wanted to have sex, I asked you to stop.  I begged you to stop and you didn't.  This has nothing to do with African people, just your selfishness.

57.     What Smith was describing in her text was not what had happened between them. Doe previously thought that he had found somebody interested in a meaningful relationship, and now was being confronted with something horrible and false.  Doe was shocked, confused, upset, and responded emotionally:

> [Sally], I'm deeply concerned and speechless by this insult.  I decided to have sex?  And you begged me to stop, but I continued, so that means I raped you? Isn't it?

> So, you know what?  I'm not going to say what's on my mind.  I said this to you before and I'm going to stick with it: "I have deep respect for all women I had a sexual relationship with."  You including, and I will leave it as that.  For the rest, keep on living in your imaginary world.

8

58.     Doe felt hurt and decided to block Smith and delete her number from his contacts.

**Criminal Investigation**

59.     On December 9, 2022, Doe received a visit at his apartment from Detective Chris Pilner.  Detective Pilner explained that he came from Sharon, Vermont, and asked Doe if he knew a woman named Sally.

60.     Detective Pilner told Doe that Smith had reported to the police that Doe engaged in non-consensual sex with Smith in the morning and had blocked her from leaving his apartment by standing against her and the door.

61.     Doe denied the allegations.

62.     Detective Pilner asked Doe if he knew that Smith was married with a child, which Doe did not—Smith told Doe that she was single and childless.

63.     Doe invited Detective Pilner to search his apartment because he had nothing to hide and again denied the allegation of non-consensual sex.

64.     Detective Pilner told Doe that Smith had made the accusation a month ago and had not responded to attempts by officers to follow-up.

65.     Detective Pilner told Doe that Smith's husband was angry and was thinking about coming to hurt Doe.  This warning prompted Doe to tell Detective Pilner about threatening messages and calls he had received from a man purporting to be "James from Ghana."

66.     Doe reported Detective Pilner's visit to Dr. John Dick, Associate Dean of Clinical Education, Dr. Alison Holmes, the Associate Dean for Student Affairs, and Ms. Alison Ricker, the Director of Clinical Curriculum, because he believed he was in danger.  Dr. Holmes told Doe that there was nothing the school could do to assist him.

67.     The Orange County State's Attorney's Office declined to prosecute Doe. Exhibit 6 (Police Reports).

## Smith's Complaint to Dartmouth

68.     On December 19, 2022, Smith filed a report to Dartmouth's Title IX Office, alleging that Doe had raped her three times on or about November 3, 2022.

69.     On December 20, Dartmouth issued a Notice of Allegations to Doe notifying him that a white female attorney at a New England law firm ("Investigator 1") had been assigned as investigator.

## Dartmouth's Relevant Policies and Procedures

70.     At the time of the events relevant to this case, Dartmouth investigated and administered discipline for allegations of sexual assault by students in accordance with both its "Sexual and Gender Based Misconduct Policy" ("SMP") and its "Process for Resolving Reports Against Students" ("PRP").  The SMP and the PRP that were in effect at all times relevant are attached to the underlying Complaint. (doc. no. 1-1 and 1-2).

71.     The PRP applies to:

[A]cts of Prohibited Conduct committed by Students that occur within Dartmouth's Education Program or Activity.  The term Education Program or Activity includes all of Dartmouth's operations, including locations, events, or circumstances over which Dartmouth exercised substantial control over both the Respondent and the context in which the Prohibited Conduct occurred; and any building owned or controlled by a student organization that is officially recognized by Dartmouth.  The Title IX regulations, which direct Dartmouth's response to sexual harassment as defined by the Title IX regulations, do not draw a line between on campus, off campus, or online, provided the conduct occurred in an Education Program or Activity in the United States.  Examples include Dartmouth-sponsored, Dartmouth-funded or otherwise Dartmouth-supported study off campus, research, internship, mentorship, summer session, conferences, meetings, social events, or other affiliated programs or premises.

In keeping with Dartmouth's educational mission and commitment to foster a learning, living, and working environment free from discrimination and

10

harassment, this process also pertains to acts of Prohibited Conduct that may fall outside of the jurisdiction set forth in the May 2020 Title IX regulations, including additional forms of sexual and gender-based harassment, as well as conduct that occurs outside the United States, but still within an Education Program or Activity.   Conduct outside of the United States, may include, for example, Dartmouth-sponsored, Dartmouth-funded or otherwise Dartmouth-supported study abroad.  Under limited circumstances, this process may apply to instances in which the conduct occurred outside of the Education Program or Activity.

(doc. no. 1-2 at I).

72.    Pursuant to the PRP,

The Title IX Coordinator or Deputy Title IX Coordinator will be responsible for determining whether the reported conduct falls within the scope of the Policy and this process, and more specifically, whether the reported conduct falls within Title IX jurisdiction as defined by the Title IX regulations.  If so, Dartmouth may move forward with a Formal Complaint process as described below.  If not, Dartmouth may be required to dismiss any Formal Complaint.

The Title IX Coordinator or Deputy Title IX Coordinator will evaluate reasonably available information to make the following determinations:

1.    Did the reported conduct occur within Dartmouth's Education Program or Activity; this question considers:

a.    Does Dartmouth have substantial control over the Respondent; and

b.    Does Dartmouth have substantial control over the context in which the conduct is reported to have occurred; or

c.    Did the conduct occur in a building owned or controlled by a student organization that is officially recognized by Dartmouth;

2.    Did the reported conduct occur in the United States; and,

3.    Would the facts set forth by the report, if substantiated, constitute a violation of sexual harassment as defined by the Title IX regulations.

Based on the answers to these questions, the Title IX Coordinator will make a determination about scope and process."

(doc. no. 1-2 at III).

73.    At the conclusion of the above inquiry, described as "a threshold determination regarding scope and jurisdiction," the appropriate next steps are determined as follows:

Where the answer to these three questions is yes, and a Formal Complaint is filed, Dartmouth will follow the formal resolution process required by the Title IX regulations (Title IX Hearing Process).  The Title IX Hearing Process includes cross-examination by the party's advisor. The hearing will allow the participants

to simultaneously see and hear each other but may be conducted remotely through videoconferencing technology.

Where the answer to any of these three questions is no, Dartmouth will dismiss the allegations in the Formal Complaint related to sexual harassment as defined in the Title IX regulations.

(doc. no. 1-2 at III).

74.    "In all stages of the process, Dartmouth will apply the preponderance of the evidence standard (i.e., more likely than not) when determining whether Dartmouth policy has been violated." (doc. no. 1-2 at IV).

75.    Once formal resolution is initiated, "[t]he Title IX Office will appoint one or more trained investigators to conduct a <u>prompt</u>, <u>thorough</u>, <u>fair and impartial investigation</u>."  Exhibit B at VI.A.2 (emphasis added).  "Any investigator used by Dartmouth will receive annual training on the issues related to . . . sexual assault . . . and on how to conduct an investigation that is fair and impartial, provides parties with notice and a meaningful opportunity to be heard, and protects the safety of complainants while promoting accountability."  (doc. no. 1-2 at VI.A.2).  "The investigator will be impartial and free from conflict of interest or bias."  (doc. no. 1-2 at VI.A.2).

76.    At the outset of the investigation, the Title IX Coordinator provides notice to the Complainant and Respondent that is required to include, *inter alia*, the nature of the reported conduct, the reported policy violations, and how to challenge participation by the investigator on the basis of a conflict of interest or bias.  (doc. no. 1-2 at VI.A.4).

77.    During the investigation, the investigator will seek to meet separately with the Complainant, Respondent, and relevant witnesses for interviews. "<u>The investigator will also gather other relevant information or evidence, including documents, photographs, communications</u> between the parties, and <u>medical records</u> (subject to the consent of the

applicable person), and other electronic records as appropriate.  The investigator will not require,

allow, rely upon, or otherwise use questions or evidence that constitute, or seek disclosure of,

information protected under a legally recognized privilege, unless the person holding such

privilege has waived the privilege."  (doc. no. 1-2 at VI.A.5).

78.     "Both the Complainant and the Respondent are permitted to provide other

relevant evidence to the investigator.  Evidence may be inculpatory or exculpatory.  Evidence

includes any facts or information presented in support of an assertion and may include text

messages, email exchanges, timelines, receipts, photographs, etc. . . . During the course of the

investigation, the parties should bring any new or evolving evidence, such as harassing or

retaliatory conduct, to the attention of the investigator.  The investigator may consider such

information in the investigation and will also share any information about retaliation . . . with the

Title IX Coordinator for further action."  (doc. no. 1-2 at VI.A.7).

79.     Once the fact-gathering portion of the investigation is concluded, the investigator

will produce a written investigation report, which is intended to be "a fair and thorough summary

of all relevant information gathered that is inculpatory or exculpatory the accounts of the

Complainant, the Respondent or other witnesses."  (doc. no. 1-2 at VI.A.11).

80.     The Title IX Coordinator will review the investigator's determination as to

whether the conduct alleged in the Formal Complaint falls within the scope of the Policy and the

definitions of Prohibited Conduct.  Based on the determination by the investigator in the

investigative report, the Title IX Coordinator must dismiss some or all of the allegations in the

Formal Complaint if . . . the conduct did not occur within Dartmouth's education program or

activity."  (doc. no. 1-2 at VI.A.12).

81.     "The Hearing Panel will determine: whether there is sufficient evidence, <u>by a preponderance of the evidence</u>, to support a finding of responsibility as to each element of each Policy violation at issue. If the Hearing Panel determines that the evidence is sufficient to support one or more policy violations, the Hearing Panel will issue a determination as to the appropriate sanction."  (doc. no. 1-2 at VI.B).

82.     "A Hearing Panel consists of fair and impartial decision-makers who will conduct an objective evaluation of <u>all relevant evidence</u>, including both inculpatory or exculpatory evidence.  The role of the Hearing Panel is to provide all parties with an equitable opportunity to be heard; to serve as a safeguard on the reliability and accuracy of the investigative process; to give appropriate consideration to victim impact and mitigating factors; and to reach a full and fair determination of any sanction, should there be a finding of responsibility."  (doc. no. 1-2 at VI.B).

83.      "The Complainant and Respondent will be informed of the composition of the Hearing Panel and may raise a challenge for actual bias or conflict of interest to the Title IX Coordinator" who "shall render a determination in writing on any such challenge, which determination shall be final." (doc. no. 1-2 at VI.B).

84.     For hearings involving allegations of conduct outside of Title IX jurisdiction, "the parties will have the opportunity to submit questions through the Hearing Coordinator and Chair of the Hearing Panel, and the Hearing Panel may consider any information provided in the final investigation report that the Hearing Panel finds reliable and credible."  (doc. no. 1-2 at VI.B.2.a).  "Only relevant questions may be asked of a party or witness.  Before a Complainant, Respondent, or witness responds to a question, the Chair, in consultation with the Hearing Coordinator, will first determine whether the question is relevant and explain any decision to

exclude a question as not relevant.  The Chair and Hearing Coordinator will be guided by the same relevance considerations set forth in Section VI.A.8 of this process."  (doc. no. 1-2 at VI.B.2.a.i).

85.    After the Hearing Panel reaches a determination, "[t]he Chair will issue the written notice of outcome to the Complainant, the Respondent, and the Title IX Coordinator within ten (10) business days following the conclusion of the deliberations."  (doc. no. 1-2 at VI.B.5).

86.    Either party may appeal the final determination of responsibility and/or the resulting sanction based on: "1.  Procedural irregularity that affected the outcome of the matter and/or sanction; 2. New evidence, not reasonably available at the time of the hearing regarding responsibility or dismissal of the Formal Complaint, that could affect the outcome of the matter; [or] 3. The Title IX Coordinator, investigator(s), or any member of the Hearing Panel had a conflict of interest or bias for or against Complainants or Respondents generally or the individual Complainant or Respondent that affected the outcome of the matter."  (doc. no. 1-2 at VI.C).

87.    An appeal "must be submitted to the Title IX Coordinator within three (3) business days following delivery of the notice of the outcome.  Each party may respond in writing to any appeal submitted by the other party.  Written responses must be submitted within three (3) business days following delivery of the notice of the written appeal."  (doc. no. 1-2 at VI.C).

88.    "Dartmouth will not draw any adverse inference solely from a Complainant's or Respondent's decision not to participate in the investigation or any form of resolution under this policy; however, the Complainant or Respondent should be aware that declining to participate in

the investigation may impact the admissibility of certain information or the timing and outcome

of the case."  (doc. no. 1-2 at VI.D).

89.     The PRP states:

Dartmouth will seek to complete its investigation and disciplinary process, if any,
in a prompt, fair, and impartial manner following the issuance of the notice of the
investigation.  This process contemplates reasonably prompt timeframes for the
major stages of the investigation and resolution process, but Dartmouth may
extend any timeframe in this policy for good cause . . .  While requests for delays
by the parties may be considered, Dartmouth cannot unduly or unreasonably delay
the prompt resolution of a report under this policy.

Reasonable requests for delays by the parties will serve to extend the anticipated
time period for resolution of the report. The Title IX Coordinator, in consultation
with the investigator, has the authority to determine whether an extension is
required or warranted by the circumstances, and will notify the parties in writing
of any extension of the timeframes for good cause <u>and the reason for the
extension</u>.

(doc. no. 1-2 at VII).

90.     "Dartmouth's overarching goal is that all Complaints be investigated in a prompt,

fair, and impartial manner." (doc. no. 1-2 at VII).

**<u>Dartmouth's Procedurally Deficient Process</u>**

91.     On December 20, 2020, Ms. Clemens, emailed a notice to Doe that he was

accused of sexual misconduct violating the Dartmouth Sexual Misconduct Policy, and notifying

him that Investigator 1 had been assigned as the investigator to conduct the investigation of

Smith's complaint ("Investigation").

92.     At all times relevant to the Investigation, Investigator 1 was an agent of

Dartmouth.

93.     Upon receiving the notice, Doe reached out to Ms. Clemens to seek clarification

on how his case fell under Dartmouth's jurisdiction.  Ms. Clemens acknowledged his concerns,

responding: "I can see you've been doing your homework," and asserting that it was not Doe's role to define the boundaries of Dartmouth's jurisdiction.

94.     On January 3, 2023, Ms. Clemens sent Doe a passage from the SMP, highlighting sections she believed gave Dartmouth the authority to investigate the matter:

> In the "Scope of Policy" section, it states that the policy applies to all Dartmouth students.  Further in that section, it states:
>
>> In keeping with Dartmouth's educational mission and commitment to foster a learning, living, and working environment free from discrimination and harassment, this policy also pertains to acts of Prohibited Conduct that may fall outside of the jurisdiction set forth in the May 2020 Title IX regulations, including additional forms of sexual and gender-based harassment, as well as conduct that occurs outside the United States, but still in an Education Program or Activity.  Conduct outside of the United States, may include, for example, Dartmouth-sponsored, Dartmouth-funded or otherwise Dartmouth-supported study abroad.  Under limited circumstances, this policy may also pertain to instances in which the conduct occurred outside of the Education Program or Activity.
>
> The highlighted sections are those that give me the authority to investigate this report under the SMP.

95.     Over the course of several communications in January and February 2023, Doe asked Dartmouth to address his concerns regarding its exercise of jurisdiction and Ms. Clemens's history of racial bias against him, discussed *infra*.  Doe was hesitant to participate in the investigation because of these concerns.  Doe's concerns were minimized and ignored.

96.     During these communications, Doe repeatedly noted past incidents, dating back to 2015, where Ms. Clemens engaged in racially biased behavior towards him and repeatedly asked for Ms. Clemens to be removed.

97.     Ms. Clemens was not removed initially.

98.     Investigator 1 interviewed Smith on January 12, 2023.

99.     Investigator 1 interviewed witnesses, including "Witness 1", Smith's brother, who would later become her Advisor; "Witness 2", the girlfriend of Witness 1; "Witness 3", Smith's husband; "Witness 4", named by Smith as her friend; "and "Witness 5", named by Smith as her best friend, between January 23, 2023, and February 3, 2023.

100.    Doe was not interviewed.

101.    Investigator 1 gathered other evidence from Smith, the witnesses, and Dartmouth.

102.    Doe was initially denied access to the evidence, despite repeatedly asking, but was eventually provided secure access to the evidence from March 3, 2023, to March 17, 2023.

103.    During the evidence review period, Doe learned from Smith's husband's interview transcript that when Smith called Dartmouth, "somebody" told her that Doe's "name has been circulating around for a while" and there was a "behavioral pattern" that "somebody needs to look into." Joint Exhibit 6 (Witness 3's interview).

104.    On March 8, 2023, Ms. Clemens was removed from the investigation.  She had overseen the investigation until that date and had made the initial determination of jurisdiction.

105.    On March 8, 2023, Ann James ("Ms. James"), a "Senior Solutions Specialist" at Grand River Solutions, was named Acting Coordinator.

106.    Because Doe feared that Ms. Clemens's bias had influenced her determination of jurisdiction, Smith's decision to move forward with a formal allegation, Investigator 1, and the investigation itself, he sought to have Investigator 1 removed for bias as well.

107.    On May 26, 2023, Ms. James notified Doe that she decided to pause the hearing timeline to assign a new investigator.  Ms. James told Doe that the initial investigation was not properly conducted as it had been "rushed."

108.    On June 2, 2023, a white female employee of Grand River Solutions was identified as the new investigator ("Investigator 2").

109.    On June 19, 2023, Investigator 2 met with Smith and her advisor, Witness 1.

110.    On August 6, 2023, Investigator 2 interviewed Doe.

111.    The complete investigation was not done in full, as promised by Ms. James.

112.    Doe was provided secure access to the "second evidence review" from September 5, 2023, to September 18, 2023.

113.    On September 19, 2023, Investigator 2 submitted her Final Report ("Final Report").  Joint Exhibit 5.  Investigator 2's Final Report summarizes her interviews and some relevant evidence.  It concludes with a recitation of undisputed and disputed facts.

114.    Doe continued to question the fairness of the process.  On November 17, 2023, he wrote to Ms. James, Investigator 2, Jennifer Larimore, another Grand River Solutions employee ("Ms. Larimore"), and Alejandro Diaz, Dartmouth's Chief Compliance Officer ("Mr. Diaz") to point out instances of bias and misrepresentation within the Final Report.

115.    Doe's hearing was initially scheduled to take place on December 7, 2023.

116.    Doe informed Ms. James a number of times that he would not be able to attend the hearing that day due to an all-day residency interview.  Ms. James refused to change the date of the hearing.

117.    Doe retained an Advisor approximately five days before the hearing, who also requested Ms. James change the date of the hearing to allow for preparation and to avoid her own scheduling conflicts.

118.    Doe's Advisor was provided with the evidentiary record and the Final Report on December 6, 2023.

119.    On December 6, 2023, Ms. James notified Doe that the hearing had been rescheduled for December 8, 2023, due to a medical concern with one of the panelists.

120.    On December 7, 2023, Ms. James notified Doe that one of the panelists had been replaced, and if Doe wanted to challenge his participation, he needed to inform her by 4:00 p.m. that same day.

121.    At 4:52 p.m. on December 7, 2023, Ms. James notified Doe that the replacement panelist "also had an urgent conflict arise" and was replaced by a third panelist.  Ms. James informed Doe that if he wanted to challenge the third panelist's participation, he would have to inform her of his objection by 8:00 a.m. the next day.

122.    Ms. James provided Doe exactly eight minutes during business hours to object to the new panelist.  This did not provide enough notice to meaningfully respond.

123.    Doe's hearing was convened on December 8, 2023.

124.    The three panelists were white employees of Grand River Solutions: Hearing Chair, Dr. Adam Wolkoff; Hearing Panelist, Megan Altman-Cosgrove; and Hearing Panelist Ashley Hull.

125.    During the hearing, it became apparent that despite Doe's Advisor timely submitting questions to be asked on cross-examination, they were not submitted to the Hearing Panel in advance and had to be submitted in the middle of the hearing for review.  Exhibit 9.  Because of this deficiency, the panel was not able to cross-reference the questions with the report and appendix before them in a meaningful and timely way, harming their ability to make connections between the questions and the evidence for the purpose of relevance.

126.    Notwithstanding its contractual obligations, Dartmouth did not issue the written notice of income within ten (10) business days following the conclusion of deliberations.

127.    At 4:47 p.m. on December 22, 2023, Doe's Advisor contacted Ms. James to inquire about the written notice of outcome because ten (10) business days had passed since the hearing date.

128.    On December 24, 2023, Ms. James reported that an extension had been requested and granted through January 10, 2024.  No good cause was provided.  Notwithstanding its contractual obligations, Dartmouth failed to notify Doe in writing of any extension for good cause and the reason for the extension.

129.    On January 8, 2024, Ms. James emailed Doe to inform him that the hearing determination would be communicated on January 17, 2024.  Again, no good cause was provided.  Notwithstanding its contractual obligations, Dartmouth failed to notify Doe in writing of any extension for good cause and the reason for the extension.

130.    On January 16, 2024, Doe submitted a "Mitigation Statement" to the panel.

131.    On January 16, 2024, Doe was told to come to campus the following day to receive the determination in person.

132.    The panel found Doe responsible for violating the SMP and imposed the sanction of expulsion. Joint Exhibit 8.

133.    On January 22, 2024, Doe filed a request for appeal through his Advisor, detailing the procedural irregularities which affected the outcome of his matter, producing new evidence, and describing the instances of bias which affected the outcome of his matter. Joint Exhibit 10.

134.    On January 25, 2024, Ms. James granted Smith's request for an extension to respond to Doe's appeal.  Based on this extension, the deadline for Smith to respond was January 29, 2024.

135.   After being asked to provide good cause for this extension, Ms. James told Doe,

"I have determined that the requested one-business day extension was reasonable given the

length of the written record – including the length of [John's] appeal submission – and the

minimal impact of the request on the overall timeline.

136.   Smith did not submit a response to Doe's appeal.

137.   On February 1, 2024, Ms. James wrote to Doe offering him an "opportunity to

clarify his appeal submission."  Ms. James wrote:

> Exhibit 1 to that submission contains records not previously submitted to either
> the investigator or the Hearing Panel.  In addition, those records are not explicitly
> referenced within the text of your appeal submission.  Upon review, these records
> do not, on their face, appear to be "new evidence" as defined in the Dartmouth
> College Sexual and Gender-Misconduct Policy (SMP) procedures and it is unclear
> how they relate to any of the grounds for appeal you have asserted.  Refraining
> from any assessment of the substance of the records, I therefore would like to give
> you the opportunity to explain how the records fit within the bounds of the three
> grounds for appeal outlined in the SMP procedures and how, if considered, they
> could have affected the outcome of the matter.
>
> Please submit any clarification to me by 5:00 pm on Monday, February 5, 2024.
> Please note that should you elect to provide a clarification, I will provide the
> supplement to Complainant, who will have 3 business days to respond.  If you are
> not interested in providing a further submission, please let me know and
> consideration of your existing appeal of January 22 will then proceed.

138.   The timing of this communication was deeply concerning.  Ms. James' email

indicated that she had not yet turned the appeal and record over to Geisel Medical School Dean

Duane A. Compton, PhD ("Dean Compton"), who should have been in possession of the appeal

documents on January 22, 2024.  This delay is highly irregular and violative of the PRP, and

further prejudiced Doe by needlessly extending the timeline of his appeal.

139.   Additionally, Ms. James's apparently unilateral determination that Doe's medical

records did not relate to the grounds of his appeal was clearly erroneous, as the records were

explicitly referenced within the text of the appeal.  They were referenced in the section

addressing the two bases for appeal: procedural irregularity and bias.  Both bases were

substantially addressed throughout the appeal submission and are both independent and

legitimate grounds for appeal pursuant to the PRP.

140.    Ms. James' erroneous determination caused Doe to, in the imperative interest of

receiving a determination on appeal before the date of his residency match, sever his medical

records from his appeal, depriving Dean Compton of a crucial piece of objective evidence

corroborating Doe's sexual dysfunction and directly contradicting Smith's claims that he raped

her three times, with the final rape lasting for an hour.

141.    On February 12, 2024, Doe's appeal was denied, determining that the exercise of

jurisdiction under the policy was permissible, and that there were no procedural irregularities or

evidence of bias. <u>Joint Exhibit 11</u>.

### **Motivated by Bias Against Doe, Dartmouth Exceeded the Scope of Its Jurisdiction in Investigating Smith's Complaint Against Him**

142.    Doe's alleged conduct occurred off-campus at his apartment in Fairlee, Vermont

with a person who did not attend Dartmouth and was not in any way affiliated with any

Dartmouth Program or Activity.  Doe's alleged conduct was not related to any Dartmouth

Program or Activity and did not have any remote relationship to Dartmouth.

143.    When Doe raised these concerns with Ms. Clemens, she responded that the

alleged conduct fell "within the scope since [Doe] [was] participating in Dartmouth's Education

Program or Activity at the time of the incident- meaning, [Doe] [was] a current Dartmouth

student."

144.    Ms. Clemens's application of her office's policies was plainly wrong.  Both the

SMP and PRP state:

The term Education Program or Activity includes all of Dartmouth's operations, including locations, events, or circumstances over which Dartmouth exercised substantial control over <u>both the Respondent and the context in which the Prohibited Conduct occurred</u>; and any building owned or controlled by a student organization that is officially recognized by Dartmouth.

Exhibit A at II; Exhibit B at I.

145.    The SMP does not apply universally in any instance to any Dartmouth student simply because they are enrolled at Dartmouth.

146.    The alleged conduct did not take place on Dartmouth's campus, in a building owned or controlled by a Dartmouth organization, or in any place Dartmouth had substantial control over Doe or the conduct.  Doe and Smith were not interacting as a result of any Dartmouth sponsored or affiliated activity or event.  The only connection to Dartmouth is Doe's enrollment in the medical school.

147.    Ms. Clemens went on to cite that the policy pertains to additional forms of sexual harassment not included under the Title IX policy, or conduct occurring in an Education Program or Activity occurring outside the United States.  This portion is inapplicable to the instant matter.

148.    Finally, she cited a policy reading: "[u]nder limited circumstances, this policy may also pertain to instances in which the conduct occurred outside of the Education Program or Activity."

149.    Doe asked Ms. Clemens repeatedly how his alleged conduct fell under the "limited circumstances" portion.  Upon Ms. Clemens's removal, Doe asked Ms. James to clarify how his alleged conduct fell within the "limited circumstances" portion.  In later conversations with Mr. Diaz, Doe asked for clarification as to how his alleged conduct fell within the "limited circumstances" portion.

150.    The only response Doe has received from anyone is that the "exercise of jurisdiction over the claims against [Doe] under the Sexual Misconduct Policy is appropriate and consistent with both the provisions of the Sexual Misconduct Policy and previous exercises of jurisdiction by Dartmouth in similar circumstances."

151.    In December of 2023, Doe's Advisor asked Ms. James to provide the specific criteria for "limited circumstances" granting extended jurisdiction under Dartmouth's external or internal policy, attaching with this request a PowerPoint presentation slide prepared specifically for Dartmouth's Title IX training, which permits the exercise of jurisdiction under the SMP for conduct occurring off campus or otherwise unassociated with Dartmouth "**as long as the conduct has a nexus to Dartmouth**" (emphasis added). Joint Exhibit 13.

152.    Doe's Advisor requested that if Ms. James or any other member of Dartmouth possessed any policy defining "limited circumstances" beyond requiring that the conduct has a nexus to Dartmouth to please provide it. Id.

153.    Doe's Advisor requested that Ms. James, as acting Title IX coordinator, independently reassess the decision to confer jurisdiction over the conduct, given the fact that Ms. Clemens, the original determiner of jurisdiction, was removed from the matter following allegations of bias. Id.

154.    Doe's Advisor requested that Ms. James provide the similar criteria shared in the "similar circumstances" in which jurisdiction was exercised. Id.

155.    Ms. James never responded to this correspondence.

156.    The SMP clearly provides that the policy only applies in "limited circumstances" if the conduct occurs off-campus/outside of an education program or activity.  It does not assert jurisdiction over conduct occurring off-campus/outside of an education program or activity as

long as the Respondent is a student/employee/staff member of Dartmouth. The caveat regarding the limitation on the applicability of the policy to *certain circumstances* necessarily narrows the scope of the reaches of the policy itself.

157. Moreover, the determination should have been reassessed by the acting Title IX coordinator in light of Ms. Clemens's removal from the proceeding. If her bias made her inappropriate to act as the Title IX coordinator in this matter, surely it would also render her jurisdictional decisions tainted by bias as well.

158. The decision to confer jurisdiction was improper, lacked substantiation, and was made as a result of bias. This matter should have never reached the formal investigation procedural posture.

### Dartmouth's Delayed Removal of Ms. Clemens Prejudiced the Investigation

159. Doe has previous experience with Ms. Clemens dating back to 2015, where she engaged in racially biased behavior toward him. Doe repeatedly raised this issue and asked for Ms. Clemens to be removed from this matter. She was not removed initially.

160. Ms. Clemens was not removed until March 8, 2023, after Doe learned that when Smith called Dartmouth, "somebody" told her that Doe's "name has been circulating around for a while" and there was a "behavioral pattern" that "somebody needs to look into."

161. Considering that Smith's point of contact at Dartmouth would have been Ms. Clemens as a result of her Complaint, upon information and belief, Ms. Clemens was the person who made this statement.

162. The statements regarding Doe's name being circulated were not investigated despite Doe's requests, and likely had already impacted Smith's decision to move forward with a formal allegation. Furthermore, a person who had demonstrated bias was the sole arbitrator for

determining jurisdiction, as outlined above.  Finally, it likely impacted the investigator and the investigation itself, as Clemens oversaw the initial investigation and Investigator 1.

163.    Much of the record had already been created by the time Ms. Clemens was removed and Ms. James was appointed.

164.    Most of that work was not revisited by Investigator 2.

165.    To be clear, Doe had never previously been accused of or investigated for sexual misconduct.

## Dartmouth Failed to Apply the Preponderance of the Evidence Standard Properly, Fairly, and Impartially in Finding Doe Responsible for Violating the SMP

166.    The Hearing Panel's Final Decision provides an outrageous "analysis" of the two parties' statements, apparently evaluating "the reliability of each party's statements, considering the sufficiency of detail and specificity in each account; whether other reliable evidence corroborated each account; the internal consistency and inherent plausibility of each account; and whether either party omitted material information or had a motive to falsify."

167.    The Panel "generally found each party's statements to be detailed, specific, plausible, and internally consistent regarding the critical facts at issue," and found that neither party had motives to falsify.  This finding is illogical given the evidence before the panel.

### A.    *The Hearing Panel Failed to Evaluate the Rape Kit, a Crucial Piece of Objective Evidence Directly Contradicting Smith's Claims.*

168.    The most profound omission from the Hearing Panel's Final Decision is the absence of the rape kit provided by Smith to Investigator 1. *See* Joint Exhibit 8.

169.    This rape kit was taken less than one hour following the third and final alleged rape, and provides objective, scientific data regarding the plausibility of Smith's allegations.

27

170.    Smith alleged that Doe engaged in nonconsensual oral sex with digital penetration and three occasions of nonconsensual vaginal intercourse, including the final iteration, which is alleged to have occurred for an hour, during which Doe allegedly pried Smith's legs open, as well as allegedly "vigorously" and "viciously" fingered her.  Smith also reported to Investigator 1 that she felt swollen everywhere and her whole body hurt.

171.    Smith produced six pages of a 39 plus-page rape kit, which was attached to the Final Investigation Report submitted by Investigator 2. <u>Joint Exhibit 6</u> (rape kit).

172.    Those pages state that there was "no obvious trauma noted" on any of Smith's genitalia or surrounding structures. <u>Id</u>.

173.    There were no signs of redness, swelling, tearing, or bruising of Smith's genitals or surrounding areas.  There were two bruises, one black and one light blue (indicating different ages and stages of healing), that she did not attribute to her legs being pried apart. <u>Id</u>.

174.    This evidence, though incomplete and seemingly unquestioned regarding the missing pages of the report, is highly relevant and probative to the plausibility and consistency of Smith's statements.

175.    Not only does the Hearing Panel's decision fail to consider the implausibility of Smith's claims when contrasted with this objective, reliable evidence—**it does not mention the results of the rape kit at all**.

176.    Excluding a relevant, reliable piece of non-testamentary evidence from the entire analysis demonstrates that the Hearing Panel did not correctly apply the preponderance of the evidence standard when assessing these claims.

B. <u>*The Hearing Panel Gave Undue Weight to Smith's Snapchat Video.*</u>

177.    The Hearing Panel also erred in determining that a Snapchat video provided by Smith to Investigator 1 was reliable, credible evidence of rape. *See* Joint Exhibit 8.

178.    The video in question is an eight-second video file submitted by Smith. Joint Exhibit 12.

179.    Smith's video is date-stamped December 19, 2022.

180.    Smith alleged that the assaults occurred on November 3, 2022, and November 4, 2022.

181.    The Hearing Panel made no mention of this date discrepancy in its final report.

182.    The video is black, neither party is visible in the video, and there are no other voices or discernable noises.

183.    In the video, Smith states in a dispassionate, steady voice: "[John], I'm telling you to stop.  What are you doing?  Get off."

184.    The video is totally dark, except for a small triangular section in the upper right, that is only visible at the last second.

185.    The Hearing Panel "found plausible that the recording was dark, with only a single source of light showing, because the only strong light source came from the hallway through a slightly open door, and that Complainant was the only audible voice because Respondent had become quiet by that part of the encounter."

186.    This conclusion suggests that the proper evidentiary standard was not applied.

187.    If a light source was coming through a cracked door, it would appear in a straight line, not a triangular one.

188.    In her interview with Investigator 1, Smith stated there were lights on in the kitchen, the other bedroom, and in the hallway, and that the door was open.

189.    Further, the idea that it was pitch black in the room is inconsistent and implausible with her previous statements regarding looking around the room for her clothes, ultimately finding them under Doe, where Doe was looking "very pitiful, looking all sad," suggesting Doe's facial expression and emotions were clearly visible.

190.    Additionally, she stated that the bed would "sway ridiculously" with "literally any little movement."

191.    Smith alleges she captured the Snapchat video in the midst of the last alleged rape.  However, there is no significant visible movement that would suggest either the motion of intercourse or the ridiculous swaying as she suggests.

192.    Investigator 2 reported: "[Sally] stated that she was crying throughout the incident…"  In the video, her voice is clear, with no indication she was crying.

193.    <u>No other sounds can be heard in the video</u>.  There is no other voice, breathing, moaning, rustling of sheets, swaying of the mattress, or movement of bodies.

194.    This piece of evidence is neither relevant nor probative, especially considering that the date stamp on the produced video itself is over a month and a half after the alleged rape.

195.    The Hearing Panel viewing this video as a credible piece of objective evidence demonstrates that they did not correctly apply a preponderance of the evidence standard.

C.  *Smith's Inconsistent Statements*

196.    The Hearing Panel noted that the Complainant's statements to authorities, the Sexual Assault Nurse Examiner ("SANE nurse"), the narrative given to Investigator 1, the police report, and the Hearing Panelists "included much of the same description of the incident." *See* <u>Joint Exhibit 8</u>.

197.     However, Smith reported notably different accounts to Investigator 1, the SANE

nurse, the police, Witness 1, Witness 2, and the Hearing Panel. *See generally* Joint Exhibit 6.

198.     In her statement to the Investigator 1, Smith alleged that Doe pulled her into him

so that she was laying against his chest, and he then "picked [her] up so that [the two] were

facing each other and [Doe] was just supporting [Smith] with [his] arms."  Smith alleged that

Doe brought her to his room, held her down with his bodyweight while also engaging in oral sex,

stopped eventually, went back to the couch, went to bed, groped and raped her, vigorously

fingered her and then raped her, pushed her down to the bed and then raped her for an hour.

199.     In her SANE report, Smith stated that Doe sucked her breasts, bit her nipples, and

sexually assaulted her 3 times.

200.     In her statement to the police, Smith alleged that Doe carried her to his room, got

her undressed, but stopped after she told him to get off, went back to the couch, went back to

bed, dry humped her, raped her, viciously fingered her but stopped after she told him to, later

tried to rub her genitals, pushed her hand away, grabbed her when she tried to get up, spread her

legs, and raped her—losing his erection, fingering her again, and then penetrating her again.

201.     Smith told Witness 1 that Doe forced her to give him oral sex.

202.     Smith told Witness 2 that Doe threw her to the ground and raped her.

203.     Smith told the Hearing Panel that she and Doe never cuddled—that she never had

her back to his chest in that position—and also that Doe would pull out to masturbate during the

final rape.

204.     Each of these statements omits and/or adds significantly varied details—

especially regarding the police report, which does not allege that Doe engaged in any oral sex,

and specifically states that he did not penetrate her after the alleged "vicious" fingering.

205.    The Hearing Panel's decision to equate these as the "same description of the incident" is shocking—these inconsistencies are significant and should have been evaluated with respect to the credibility of Smith's narrative in the first place.  To weigh these inconsistent statements as evidence of credibility is demonstrative of the failure to implement the preponderance standard.

D. *Smith's Motive to Falsify*

206.    The Hearing Panel also took no notice of the inconsistencies regarding how Smith claimed she met Doe. *See* Joint Exhibit 8.

207.    Although Smith disclosed to the investigator that she met Doe on Bumble, she led the investigator and the Hearing Panel to believe that she was on Bumble for "friendship." *See generally* Joint Exhibit 6.

208.    Smith did not tell any of her witnesses, including her husband, her brother, her brother's girlfriend, or her two friends, that she met Doe on Bumble.

209.    Smith told Witness 1, her brother, that Doe was within her program.

210.    Smith told Witness 2, her brother's girlfriend, that she had seen Doe on campus walking around and the two became friends after that.

211.    Smith told Witness 3, her husband, that she and Doe would hang out to talk about a collaboration for their organizations.

212.    Smith told Witness 4, her friend, that she met Doe because the two were "both medical."

213.    Finally, Smith told Witness 5, her friend, that she met Doe on an "online friend app or something" at Dartmouth.

214.     Smith did not tell anyone that she met Doe on Bumble because she is married, and Bumble is known as a dating app.

215.     Doe explained the function of Bumble Date versus Bumble BFF in his interview and in several statements thereafter, although it is not apparent whether Investigator 2 confirmed his representation that one cannot match with another gender in Bumble BFF mode.  This could have been easily confirmed by the investigator or Hearing Panel. *See* Joint Exhibit 10.

216.     Smith and Doe matched in date mode, and her failure to disclose that to any of her witnesses, including her husband, suggests knowledge of her indiscretion.  There is no mention of these significant inconsistencies in the Hearing Panel's Decision.

217.     Additionally, Doe's Advisor had requested that the panel chair ask Smith a question about the importance of virginity to her husband.

218.     The chair refused, citing lack of relevance and an absence of anything related to the question in the record. *See* Joint Exhibit 9.

219.     Smith's husband articulated in his brief interview that he "found his wife a virgin at 23 years old and [he] married her as fast as [he] could."  This was also reflected in the Final Investigation Report. *See* Joint Exhibit 6 (Witness 3's statement).

220.     The panel chair nevertheless refused to ask the question.

221.     Smith's husband's bewildering statement in his interview, when coupled with Smith's false, contradictory, and evasive statements regarding how she met Doe, is directly related to her motive to falsify.  Smith has motive to falsify insofar as she was having consensual sex with a man outside of her marriage.  Her husband's statement about her virginity further emphasizes a concern about her sexual purity and a motive to falsify consensual sex with Doe.

222.    Throughout her statement to police and to the Investigators, Smith never
mentioned telling Doe she was married or partnered.  Smith only claimed that she told Doe that
she was married to her witnesses.

223.    For the first time, at the hearing, Smith stated she told Doe she was partnered and
that her phone wallpaper had a picture of her husband and son.

224.    Again, the Hearing Panel did not assess these inconsistencies for credibility or for
motive to falsify.  Rather, it did the opposite, stating that it did not "draw a negative
determination about the reliability of Complainant's statements, as the Respondent urged, based
on her decision not to discuss her marriage at the hearing or directly tell Respondent she had a
husband and child prior to the incident."

225.    This is an abuse of the evidentiary standard, underweighting her probative,
inconsistent statements that give clarity on Smith's motive to falsify these allegations.

    E.   *Procedural Irregularities at the Hearing*

226.    It is apparent from the Hearing Panel's decision that much of their decision rested
on the fact that Doe failed to produce his sensitive medical records and deleted his text messages
with Smith.  Notably, Doe was not represented by an advisor during the evidentiary stage.

227.    Despite Doe's consistent responses, the Hearing Panel found his answers
inconsistent, finding that he should have known he was accused of something based on the text
exchange with Smith.

228.    Doe maintained and made clear that he did not realize Smith was actually
accusing him of sexual assault given how discordant it was from the consensual experience the
two had just shared—Doe was shocked and appalled, but not legitimately concerned because

Doe knew he had engaged in consensual sex with Smith.  It was not until the police arrived at

Doe's door that he understood he was actually being accused of sexual assault.

229.    Further, the Hearing Panel's implication that Doe "intentionally destroyed

material documents in anticipation of an investigation" fails to account for the numerous requests

Doe made to Dartmouth to subpoena the phone records or request that Smith produce the entire

text exchange.  Both investigators failed to ever request any additional texts from the

Complainant.

230.    The Hearing Panel decision also suggests that the deleted texts are potentially

exculpatory, yet the Panel failed to consider the already existing exculpatory evidence in the text

messages that were produced.  The text exchange seen in the Final Investigation Report, which

contains a text from Doe about the first time he and Smith met and their discussion about the

"African guy" who slept with Smith's friend.  This substantiates and gives credibility to Doe's

statements regarding their conversation from the first night he and Smith met and their

discussion about what they were looking for in a relationship.

231.    The Hearing Panel ignores this exculpatory evidence entirely, yet pretends, in

their Decision, that if Doe had provided the text messages, it could have changed their decision.

232.    The Panel stated: "The Panel's confidence in the reliability of Respondent's

account, then, was diminished by his inconsistent explanation for why he could not provide

potentially exculpatory documents and raised significant questions about whether he had

intentionally destroyed material documents in anticipation of an investigation."

233.    The Hearing Panel also questioned Doe's honesty by suggesting that he

mentioned that he deleted all the messages but was still able to provide Smith's correct address.

If the panel asked Doe this question, rather than drawing speculative conclusions, he would have

told them that the day he went to pick her up, she texted him her address, which was one of the text messages she did not share with the investigator. Doe used his GPS to go pick her up. That is where Doe was able to retrieve her address.

234.    While it is not clear from the record whether either Investigator 1 or Investigator 2 requested the complete record of text and Bumble messages between Doe and Smith from Smith, who had produced a partial record of their text exchange, the Hearing Panel only made a negative inference about Doe's failure to provide the text messages, while not making any inference about Smith's failure to provide all of the messages.

235.    The Hearing Panel also lamented that Doe did not provide his sensitive healthcare documents, stating, "without this information, the Panel could afford his statements about his medical history only limited weight, and ultimately did not find them persuasive in light of Complainant's statements about his use of physical force and the duration and nature of sexual intercourse."

236.    Again, it is not clear whether either Investigator requested the entirety of the 39+ page rape kit from Smith, who had produced six (6) of the pages, but the Hearing Panel only made a negative inference about Doe's failure to provide his medical records, while not making any inference about Smith's failure to provide a complete copy of her relevant medical records.

237.    Doe explained in his statement to the Investigator 2 that he was concerned about the production of his healthcare documents, given the fact that he did not trust Smith, who had already made false allegations against him and would have had access to the documents through the investigation report, to not distribute his highly personal and embarrassing healthcare records.

238.     Despite significant risk to his privacy, Doe specifically discussed his medical history and relevant treatment for his knee and back injuries and sexual dysfunction with Investigator 2 and the Hearing Panel.

239.     In his appeal, Doe produced his medical records detailing treatment for knee and back injuries, as well as his sexual dysfunction.

240.     The records show that on August 6, 2021, Doe was prescribed 25 mg Sildenafil by his primary care provider to combat "early ejaculation", and on November 3, 2021, Doe reported during a follow-up visit that even with the Sildenafil, he could still only last "about 5 min[utes]" before ejaculating, and his dosage was increased.

241.     Concerningly, the Hearing Panel Decision contains the following statement: "Respondent did not provide supporting medical information, and he was not obliged to produce those records, <u>as the burden of proof rests with Dartmouth</u> and medical information is privileged from disclosure." (emphasis added).

242.     This is incidentally revealing, as it makes apparent that Dartmouth views its role not as a neutral decision-maker, but as the prosecution.  If Dartmouth bears the burden of proof, Dartmouth makes clear that its goal is to prove that Doe engaged in this behavior, rather than determine <u>whether</u> he did.  This is clear bias and procedural misconduct.

**<u>Dartmouth Showed Clear Evidence of Motive and Bias Throughout the Proceeding</u>**

243.     Without restating the above, there was clear evidence of motive and bias throughout the proceeding.

244.     The Hearing Panel showed obvious bias in favor of Smith, as her inconsistent statements are weighted as more credible than Doe's consistent statements, her inconsistent

statements are weighted as more credible than external, reliable evidence, and her inconsistent statements are weighted as more credible despite clear evidence of her motive to falsify.

245.   The failure to implement the proper evidentiary standard makes the bias against Doe obvious and prejudicial.

246.   Moreover, Doe had a number of experiences of racism at Dartmouth.

247.   Dartmouth chose to selectively enforce the SMP policy under the "limited circumstances" caveat without providing policy or factually specific substantiation to render the exercise of the jurisdiction appropriate.

248.   Further, Doe had racist experiences with Ms. Clemens personally, yet she was the person charged with determining jurisdiction and pursuing this matter.

249.   It is obvious that there is a conflict of interest insofar as Dartmouth viewing itself as the prosecutor—not the judge.

## Doe Has Experienced Racism and Bias at the Hands of Dartmouth Employees and Community Members Dating Back to 2015

250.   Doe has been a student at Dartmouth for ten years.

251.   In 2015, an undergraduate professor falsely accused Doe of threatening her in class in front of numerous classmates.  Ms. Clemens, then the Assistant Dean of the College and Director of Case Management, emailed Doe requesting a meeting.  Despite having no proof beyond a verbal accusation, Ms. Clemens summoned Dean Higgins and the Director of Safety and Security, Harry Kinne, to the meeting, indicating her implicit belief in Doe's capacity to carry out the alleged threat.

252.   When Doe asked about Mr. Kinne's presence, Ms. Clemens responded, "I heard you were threatening, so I did not know what to expect; that's why I called Mr. Kinne."  Doe

was told that he posed a threat because he was "tall, big, and Black."  Dr. Higgins chuckled, affirming this statement.

253.     This marked the commencement of Ms. Clemens's years-long demonstration of racial and personal bias against Doe.

254.     The false allegation against Doe was investigated and found unsubstantiated.  The same professor then falsely reported to Ms. Clemens that Doe had plagiarized a paper.  This allegation was also investigated and found unsubstantiated.

255.     Subsequently, Doe encountered a series of discriminatory and racist incidents from faculty and colleagues.

256.     In 2015, Doe was awoken by a group of white male students banging on his door, who had written the words "f*ck n*gga" on the door itself.

257.     In 2016, Doe reported concerns relating to a professor and related threats he had received to Ms. Clemens.  Despite reporting each instance, Ms. Clemens and others failed to act to protect Doe.

258.     In 2018, Dartmouth refused to publish Doe's Fellowships at Auschwitz for the Study of Professional Ethics ("FASPE") award, after publishing the FASPE award earned by another student, who was not Black, in 2017.

259.     In 2020, Doe was referred to as a "Black male in a dark-colored hoodie" by a Dartmouth Safety and Security officer following Doe's request for assistance after noticing his car keys had been taken.  When Doe asked Dr. Julie Kim and the Committee on Student Performance and Conduct to investigate, he was ignored.

260.     In 2022, during his four-week sub-internship in Dartmouth's neurosurgery department, Dr. Jennifer Hong subjected Doe to detrimental assessments without a clear

delineation of academic or clinical obligations, failed to provide grading criteria or transparency in the grading process, and graded Doe with different standards compared to his peers, including inaccurate and retaliatory final evaluations.

261.    Dr. Hong told Doe that he needed to "speak, act, and behave like a white man" in order to have the opportunity to match in neurosurgery.

262.    Doe reported his complaints against Dr. Hong to Dr. John Dick, the Associate Dean of Assessment, Quality & Accreditation.  His complaints were then referred to Dr. Lysa McBride, the Dean of Diversity.  Dr. Weissburg and Dr. McBride concluded that Doe's appeal of his grade had merit, and his grade was changed from High Pass to Honors.  No disciplinary action or apology was issued.

263.    As referred to in this Complaint, Doe experienced discrimination and harassment at the hands of Ms. Clemens or another individual in the Title IX office when Smith was told that Doe's "name has been circulating around" and that there was a "behavior pattern" that "somebody needs to look into."  This false and damaging statement also speaks to Clemens's racial bias and selective enforcement of the SMP.

### Consequences of Dartmouth's Decision

264.    If Dartmouth's expulsion of Doe is allowed to remain, Doe will be irreparably harmed.

265.    The expulsion from Geisel prevents Doe from finishing medical school.  Doe was nearly finished earning his degree and was set to match for a residency in March 2024, and graduate from Geisel in May of 2024.  The expulsion leaves Doe with substantial student loan debt without the earning capacity to be able to pay it off in a timely manner.  It also prevents him

from achieving his lifelong goal, which he has nearly achieved, of becoming a doctor and contributing to his Congolese community in the Democratic Republic of the Congo in the future.

266.    Further, the expulsion will significantly harm Doe's work through his non-profit organization Bonsomi, which he established in 2012.  Bonsomi is dedicated to combatting sexual assault against women and facilitating easy access to healthcare for women and children.

267.    Without appropriate redress, the unfair outcome of Dartmouth's flawed and biased disciplinary process will cause irreparable harm to Doe by not permitting him to complete his education at Geisel, impairing his ability to continue his education elsewhere, and impacting his ability to work in his chosen field should he eventually be able to complete his medical degree.

## PROPOSED CONCLUSIONS OF LAW

1.    When ruling on a motion for preliminary injunction, the Court must assess: (1) the movant's likelihood of success on the merits of their substantive claim(s); (2) the potential that the movant will face irreparable harm in the absence of an injunction; (3) the balance of the equities between the parties; and (4) the public interest.  *See Cohen v. Brown Univ.*, 991 F.2d 888, 902 (1st Cir. 1993) (upholding the grant of a preliminary injunction under Title IX against a private university seeking to discontinue its varsity women's volleyball and gymnastics teams).

### Likelihood of Success on the Merits

2.    John Doe has shown a likelihood of success on the merits of his breach of contract and Title IX claims.

### Breach of Contract

3.    The relationship between Dartmouth and Doe is contractual in nature.  *Marlowe v. Keene State Coll.*, 189 F. Supp. 3d 326, 332 (D. Mass. 2016) (applying New Hampshire law).

4.      The terms of the contractual relationship between Dartmouth and Doe consist of the terms contained in the Student Handbook and other college materials, including the SMP and the PRP. *Bleiler v. Coll. of Holy Cross*, No. 11-11541-DJC, 2013 WL 4714340, at *14 (D. Mass. Aug. 26, 2013).

5.      When reviewing the contractual relationship and the relevant documents, courts "employ a reasonable expectations standard," which requires that they "ask what meaning the party making the manifestation, the university, should reasonably expect the other party[, the student,] to give it." *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 80 (1st Cir. 2018) (internal citation and quotation marks omitted).

6.      "In the context of disciplinary hearings, [courts] 'review the procedures followed to ensure that they fall within the range of reasonable expectations of one reading the relevant rules.'" *Id.* (quoting *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 724-25 (1st Cir. 1983)).

7.      "'[I]f the facts show that the university has failed to meet [the student's] reasonable expectations' the university has committed a breach." *Id.* (quoting *Walker v. President & Fellows of Harv. Coll.*, 840 F.3d 57, 61-62 (1st Cir. 2016)).

8.      "[Dartmouth's] obligation to provide basic fairness in its proceedings is separate from and in addition to its contractual obligation to follow the rules it set forth in the [SMP and PRP]." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 601 (D. Mass. 2016) (citing *Cloud*, 720 F.2d at 725). "Basic fairness" in university disciplinary proceedings includes both "procedural fairness"—"whether the process used to adjudicate the matter was sufficient to provide the accused student a fair and reasonable opportunity to defend himself"—and "substantive fairness"—"whether the decision was unduly arbitrary or irrational, or tainted by bias or other unfairness." *Id.* at 602.

9. "It is well-established, . . . that a private university is not required to adhere to the standards of due process guaranteed to criminal defendants or to abide by rules of evidence adopted by courts. . . . However, courts may refer to those rules in evaluating the fairness of a particular disciplinary hearing." *Brandeis Univ.*, 177 F. Sup. 3d at 602 (internal citations and quotations omitted).

10. Doe has shown a likelihood of success on his claim that, based on the "reasonable expectations" and "basic fairness" standards, Dartmouth breached its contract with him by electing to take jurisdiction over Doe's matter falling beyond the scope of the SMP and the PRP and by failing to apply the preponderance of the evidence standard properly, fairly, and impartially in its findings regarding the available evidence in Doe's proceeding.

11. Doe has shown a likelihood of success on his claim that Dartmouth breached its contract with him by failing to provide elements of basic fairness, including its failure to apply the preponderance of the evidence standard to the evidence in Doe's proceeding properly, fairly, and impartially.

12. Doe has also shown a likelihood of success on his claim that Dartmouth applied the preponderance of the evidence standard differently to him as a male student than it would have if he were a female student.

13. Dartmouth's finding that Doe was responsible notwithstanding the relevant exculpatory evidence and evidence calling into question Smith's credibility is not supported by a preponderance of the evidence. Doe has a likelihood of success on the merits of his breach of contract claim based on Dartmouth's failure to apply the preponderance of the evidence standard fairly, thoroughly, and impartially to the investigation and adjudicatory process in his case.

<u>Title IX Claims</u>

14.     "Title IX prohibits gender-based discrimination in a wide array of programs and activities undertaken by educational institutions."  *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 221 (D. Mass. 2017) (quoting *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002)).

15.     "One of the purposes of Title IX is 'to provide individual citizens with effective protection against [discriminatory] practices.'"  *Id.* (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979)).

16.     "Title IX provides that '[n]o person in the United States shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance.'"  *Trs. of Bos. Coll.*, 892 F.3d at 89-90 (quoting 20 U.S.C. § 1681(a)).

17.     The United States Department of Education interprets Title IX's provisions to extend to institutions of higher education that accept federal funds.  *See* 34 C.F.R. § 106.31(a).

18.     Title IX "is enforceable through an implied private right of action."  *Trs. of Bos. Coll.*, 892 F.3d at 90 (internal citations and quotation marks omitted).

19.     There are "two categories of claims arising in these types of cases, both of which fall under the differential treatment line of Title IX cases.  In one category are claims alleging bias in the disciplinary process led to an erroneous outcome.  The other category includes claims asserting selective enforcement."  *Amherst Coll.*, 238 F. Supp. 3d at 222 (internal citations and quotation marks omitted).

20.     "To succeed on an erroneous outcome claim, a plaintiff must demonstrate there was (1) a flawed proceeding that (2) led to an erroneous outcome that was adverse to the plaintiff

and (3) specific circumstances causally connecting gender bias to the erroneous outcome." *Id.* (internal citation omitted).

21.     In stating an erroneous outcome claim under Title IX, Doe "may rely on circumstantial evidence alone to prove that there was a discriminatory pattern of decision-making" to show that gender bias was a "motivating factor" behind the report finding him responsible. *Trs. of Bos. Coll.*, 892 F.3d at 92.

22.     "In order to prevail on a Title IX selective enforcement claim, Doe must establish his gender was a motivating factor behind either the College's decision to pursue disciplinary action against him or its decision as to the severity of punishment to impose upon him." *Amherst Coll.*, 238 F. Supp. 3d at 223.

23.     "Unlike an erroneous outcome claim, a plaintiff can prevail on a selective enforcement claim without disturbing the factual findings made in a disciplinary proceeding." *Id.* at 222 (internal citation omitted).

24.     Doe has shown a likelihood of success on his claim that Dartmouth's investigation violated Title IX, resulting in an erroneous outcome.  Specifically, Doe will show that Dartmouth did not consider the evidence in Doe's proceeding in a fair and impartial way, rather, gender bias infected the investigatory and adjudicatory process, in which the female complainant was credited every step of the way, and male respondent was discredited every step of the way.

25.     Doe has shown a likelihood of success on his claim that Dartmouth selectively enforced its policies against him and that such selective enforcement was motivated by his gender.  Specifically, Doe will show that Dartmouth aggressively pursued the complaint filed by

a non-student female complainant to whom it had no duty, and credited her statements as true

while discrediting Doe's statements as false.

<u>Title VI Claims</u>

26.    To succeed on a Title VI claim, a plaintiff must allege facts from which plausible

inferences can be made that (1) defendant discriminated against the plaintiff on the basis of race;

(2) the discrimination was intentional; and (3) the discrimination was a substantial motivating

factor for the defendant's actions. *Goodman v. Bowdoin Coll.*, 380 F.3d 33, 34 (1st Cir. 2004).

27.     "Intentional racial discrimination can be inferred from disparate or differential

treatment of races… Regardless of the type of circumstantial evidence used to support the claim,

the pleading must support a connection 'between the university's actions and racially

discriminatory motivations.'" *Doe v. Trs. of Dartmouth Coll.*, 2021 WL 2857518 at *8 (D.N.H.

July 8, 2021) (quoting *Doe v. Harvard Univ.*, 462 F. Supp. 3d 51, 62 (D. Mass. 2020)).

28.    A plaintiff may plausibly allege intentional racial discrimination and that the

reason behind his differential treatment was his race through circumstantial or cumulative

evidence. *Doe v. Brown University* 327 F. Supp. 3d 397, 413 (D.R.I. 2018) (noting that the

description of the plaintiff as a "predator" and the use of the racial epithet "boy" could be found

by a jury to be "imbued with racial hostility").

29.     Plaintiffs in discrimination suits must rely on the cumulative weight of

circumstantial evidence because it is "unrealistic to think that in the 21st century any

sophisticated" person would make a blatant statement tainted with impermissible discriminatory

animus. *Mayale-Eke v. Merrill Lynch*, 754 F.Supp.2d 372, 381 (D.R.I. 2010).

30.    Doe has shown a likelihood of success on his claim that Dartmouth discriminated

against him based on his race because there are clear acts of intentional racism in the form of

racial epithets, racially motivated comments, and racially based retaliation that provide the framework and the foundation for the intentional, racially motivated approach toward Doe with respect to disciplinary action. Ms. Clemens' statement that Doe's name has been circulating with a behavioral pattern is just the same as "predator" with more words.

31. The choice to pursue this formal complaint, despite the fact that it was beyond the scope of Dartmouth's authority, and the total failure to conduct the investigation in a fair and impartial manner was an intentional act of discrimination motivated by race, evidenced by Doe's cumulative history with open and unpunished racism at Dartmouth.

**Irreparable Harm**

32. Allegations that a suspension or expulsion from college would damage a student's academic and professional reputation are sufficient to establish irreparable harm at the preliminary injunction stage. *See Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 712 (S.D. Ohio 2016).

33. While a plaintiff "may recover money damages to compensate for lost wages, money damages cannot compensate for the loss of his senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career . . . . Further, [a] [p]laintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap." *Doe v. Middlebury Coll.*, No. 1:15-CV-192-JGM, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015).

34. In the absence of an injunction, Doe would be irreparably harmed in several ways, including: the delay in completion of his degree, the gap in his education that he will have to explain; the delay in starting a residency and subsequent career; difficulties in obtaining a residency; and difficulties in paying off student loans due to a diminished earning capacity.

35.     Further, without an injunction, even if Doe were to ultimately succeed on his claims and be reinstated at Dartmouth, he would have to identify himself as a "re-Match" candidate, and after eight (8) years of medical school, it would be near impossible that he would receive a "Match" for residency.   Without a "Match," Doe will never achieve his goal of becoming a doctor.

## Balance of the Equities

36.     The balance of the equities weighs in favor of a preliminary injunction because while Doe will suffer immediate and lasting irreparable harm without one, Dartmouth will suffer only limited harm if it ultimately prevails, and the injunction is lifted.   Smith will not suffer any harm because she is not a member of the Dartmouth community.

## Public Interest

37.     When a plaintiff has a likelihood of success on a Title IX claim, "the public interest weighs in [p]laintiff's favor because the public's interest in eradicating sex discrimination is compelling." *Portz v. St. Cloud Univ.*, 196 F. Supp. 3d 963, 978 (D. Minn. 2016) (citing *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983)).

38.     The broad public interest in enforcing fundamental constitutional principles and contractual fairness claims against universities in the Title IX context is sufficient to justify issuing a preliminary injunction against allegedly unfair disciplinary proceedings.   *See, e.g.*, *Univ. of Cincinnati*, 223 F. Supp. 3d at 712.

39.     The public interest in this case weighs in favor of granting an injunction.

Respectfully submitted,

Dated: February 26, 2024

/s/ *Leah Cole Durst*
Leah Cole Durst (NH Bar #273679)
Olivia F. Bensinger (NH Bar #274145)
SHAHEEN & GORDON, P.A.
107 Storrs Street, P.O. Box 2703
Concord, NH 03302
(603) 225-7262
ldurst@shaheengordon.com
obensinger@shaheengordon.com

## CERTIFICATE OF SERVICE

I, Leah Cole Durst, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be served conventionally on all parties or their counsel.

/s/ *Leah Cole Durst*
Leah Cole Durst